Nos. 13-16106, 13-16107

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## STEPHANIE LENZ,

*Plaintiff, Appellee, and Cross-Appellant,*

v.

## UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC., AND UNIVERSAL MUSIC PUBLISHING GROUP,

*Defendants, Appellant, and Cross-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
Honorable Jeremy Fogel, United States District Judge
Dist. Case No. 5:07-cv-03783-JF

## APPELLEE AND CROSS-APPELLANT'S
## ANSWERING AND OPENING BRIEF ON CROSS-APPEAL
## PUBLIC REDACTED VERSION

Ashok Ramani - #200020
Michael S. Kwun - #198945
Theresa H. Nguyen - #284581
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone:  (415) 391-5400
Facsimile:   (415) 397-7188

Cindy Cohn - #145997
Kurt Opsahl - #191303
Corynne McSherry - #221504
Daniel K. Nazer - #257380
Julie Samuels - #288039
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:  (415) 436-9333
Facsimile:   (415) 436-9993

*Attorneys for Plaintiff, Appellee, and Cross-Appellant*
*STEPHANIE LENZ*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................... 1

JURISDICTIONAL STATEMENT
(AS TO MS. LENZ'S CROSS-APPEAL) .................................................. 3

STATEMENT OF ISSUES. ........................................................................ 3

STATEMENT OF FACTS. ......................................................................... 5

I.      Ms. Lenz uploads a home video to YouTube. ................................. 5

II.     Without considering fair use, Universal demands that YouTube take down Ms. Lenz's video. .............................................................. 6

III.    In response to Universal's demand, YouTube disables access to Ms. Lenz's video. ....................................................................... 9

STANDARD OF REVIEW ........................................................................ 11

SUMMARY OF ARGUMENT ................................................................... 12

ARGUMENT ............................................................................................. 16

I.      The district court correctly found that section 512 requires consideration of fair use. ............................................................... 16

        A.     Section 512 embodies a balanced approach to addressing online copyright infringement while promoting the growth of the internet as a platform for innovation and expression. ....................................................... 16

        B.     Section 512 includes several safeguards to protect lawful speech. ............. 18

        C.     Section 512 requires the sender of a takedown notice to form a good faith belief that a targeted use is not a lawful fair use. ........................................ 21

               1.     Section 512 requires a content owner to consider whether a targeted use is authorized by law—including the fair use doctrine. .............. 21

793876

2.  There is no ambiguity about section 512's requirement that the sender of a takedown notice form a good faith belief that the use is not authorized by law, which requires considering fair use.............24

II.  Universal violated section 512(f). ............................................................29

A.  Universal knowingly misrepresented that it had formed a good faith belief that the Lenz video was not authorized by law. ..........................................29

B.  Universal's liability does not depend on what it would have concluded if it *had* considered fair use...............................................................30

C.  The district court set an impermissibly high bar to liability that Congress did not intend and this Court did not mandate. ...........................................30

III.  Universal also violated section 512(f) because it *should* have known, as a matter of law, that Ms. Lenz's use was a lawful fair use.......................................33

A.  The district court applied the wrong knowledge standard, based on a fundamental misreading of *Rossi*. ..................................................33

B.  *Rossi* did not mandate a subjective knowledge standard with respect to legal determinations. ...................................................................35

C.  The good faith of a legal determination in a DMCA takedown notice must be measured by an objective standard........................................................36

1.  Consistent with Congress's intent to discourage use of the DMCA to take down lawful speech, those who use copyright law to take down speech should be charged with basic knowledge of that law...........36

2.  *Online Policy Group v. Diebold* correctly applied an objective standard to determine whether Diebold's assertion of infringement in its DMCA takedown notice was held in good faith. .......................37

3.  The objective standard used in *Online Policy Group v. Diebold* is consistent with other cases that apply an objective standard to determine good faith.........................................................39

4.  Applying a subjective standard to legal determinations under section 512 would encourage censorship of online speech. ..........................42

D.  Based on the facts readily available to it, Universal should have known Ms.

      Lenz's video was lawful. ............................................................................ 48

IV.   There is a dispute of material fact regarding whether Universal willfully blinded itself to whether Ms. Lenz's use was lawful. ......................................................... 54

V.   Ms. Lenz was damaged. ......................................................................... 57

    A.   In keeping with its purpose, section 512(f) creates liability for "any damages," thereby embracing the broadest definition of damages. ............ 58

    B.   "Any damages" includes nominal damages for impairment of free speech rights. ........................................................................................................... 61

    C.   "Any damages" includes damages for lost time, even if no wages were lost. ........................................................................ 63

    D.   Section 512(f) permits recovery for attorney fees and costs. ...................... 63

        1.   Ms. Lenz is entitled to damages because counsel assisted her with the DMCA counter-notification process. ......................................... 64

        2.   Ms. Lenz is entitled to damages because counsel has assisted and is assisting her with this litigation. ....................................................... 65

CONCLUSION   ..................................................................................................... 68

STATEMENT OF RELATED CASES ................................................................... 69

CERTIFICATE OF COMPLIANCE ....................................................................... 70

793876

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*A&M Records, Inc. v. Napster, Inc.*
239 F.3d 1004 (9th Cir. 2001) ...................................................................... 49

*Am. Civil Liberties Union of Nevada v. City of Las Vegas*
333 F.3d 1092 (9th Cir. 2003) ...................................................................... 11

*American Ass'n of Retired Persons v. EEOC*
873 F.2d 402 (D.C. Cir. 1989)...................................................................... 65

*Association of American Medical Colleges v. Cuomo*
928 F.2d 519 (2d Cir. 1991) ........................................................................ 22

*Astoria Fed Sav & Loan Ass'n v. Solimino*
501 U.S. 104 (1991)...................................................................................... 59

*Batzel v. Smith*
333 F.3d 1018 (9th Cir. 2003) ............................................................... 18, 63

*Bond v. Blum*
317 F.3d 385 (4th Cir. 2003) ....................................................................... 27

*Burnett v. Twentieth Century Fox*
491 F. Supp. 2d 962 (C.D. Cal. 2007).......................................................... 26

*Carroll v. President & Comm'rs of Princess Anne*
393 U.S. 175 (1968)...................................................................................... 47

*Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*
150 F.3d 132 (2d Cir. 1998) ........................................................................ 49

*Celle v. Filipino Reporter Enter's Inc.*
209 F.3d 163 (2d Cir. 2000) ........................................................................ 62

*Central Green Co. v. United States*
531 U.S. 425 (2001) ..................................................................................... 58

*Citizens United v. Federal Election Commission*
558 U.S. 310, 130 S. Ct. 876 (2010) ........................................................... 24

*Cuellar v. Joyce*
603 F.3d 1142 (9th Cir. 2010) ..................................................................... 65

*Does 1-4 v. Arnett*
Case No. SACV 12-96-JST, 2012 WL 3150934 (C.D. Cal. Aug. 1, 2012) ................ 23

*Dolman v. Agee*
 157 F.3d 708 (9th Cir. 1998) ...................................................................... 55

*Eldred v. Ashcroft*
 537 U.S. 186 (2003) ......................................................................... 23, 46

*Elvis Presley Enters., Inc. v. Passport Video*
 349 F.3d 622 (9th Cir. 2003), *overruled on other grounds by Flexible Lifeline Sys. v.*
 *Precision Lift, Inc*., 654 F.3d 989 (9th Cir. 2011) ........................................ 51

*Fisher v. Dees*
 794 F.2d 432 (9th Cir. 1986) .............................................................. 48, 51

*Freedman v. Maryland*
 380 U.S. 51 (1965) ............................................................................ 25

*Global-Tech Appliances, Inc. v. SEB S.A.*
 131 S. Ct. 2060 (2011) .................................................................... 55, 56

*Golan v. Holder*
 132 S. Ct. 873 (2012) ...................................................................... 23, 46

*Harper & Row Publishers, Inc. v. Nation Enter's*
 471 U.S. 539 (1985) .................................................................. 23, 47, 50

*Howard Gault Co. v. Texas Rural Legal Aid, Inc.*
 848 F.2d 544 (5th Cir. 1988) ...................................................... 5, 15, 16, 48

*In re Aimster Copyright Litig.*
 334 F.3d 643 (7th Cir. 2003) ................................................................. 54

*In re Cinematronics, Inc.*
 916 F.2d 1444 (9th Cir. 1990) ...................................................... 12, 34, 66

*In re Nieves*
 648 F.3d 232 (4th Cir. 2011) ................................................................. 41

*Jarvis v. K2 Inc.*
 486 F.3d 526 (9th Cir. 2007) ................................................................. 60

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*
 559 U.S. 573 (2010) ....................................................................... 42, 43

*Kane v. Comedy Partners*
 No. 00 Civ. 158 (GBD), 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003) ...................... 53

*Keene Corp. v. United States*
 508 U.S. 200 (1993) ........................................................................... 60

*Kelly v. Arriba Soft Corp.*
 336 F.3d 811 (9th Cir. 2003) ................................................................. 50

*Kramer v. Thomas*
  No. CV 05-8381 AG, 2006 WL 4729242 (C.D. Cal. Sept. 28, 2006)................... 53, 54

*Kyle v. Campbell Soup Co.*
  28 F.3d 928 (9th Cir. 1994) ...................................................................... 42, 48, 49, 51

*Leadsinger v. BMG Music Pub.*
  512 F.3d 522 (9th. Cir. 2008) ................................................................................ 26

*Lyes v. City of Riviera Beach*
  166 F.3d 1332 (11th Cir. 1999) (en banc) ............................................................ 58

*Maryland Cas. Co. v. Regis Ins. Co.*
  No. CIV.A. 96-CV-1790, 1997 WL 164268 (E.D. Pa. April 9, 1997)........................ 67

*Miller v. French*
  530 U.S. 327 (2000).............................................................................................. 21

*Monge v. Maya Magazines, Inc.*
  688 F.2d 1164 (9th Cir. 2012) .............................................................................. 52

*Morrison v. C.I.R.*
  565 F.3d 658 (9th Cir. 2009) ................................................................................ 65

*New York Times Co. v. United States*
  403 U.S. 713 (1971)............................................................................................. 62

*Norfolk & Western Ry. Co. v. Am. Train Dispatchers Ass'n*
  499 U.S. 117 (1991)............................................................................................. 21

*Olsen v. Idaho State Bd. of Med.*
  363 F.3d 916 (9th Cir. 2004) ................................................................................ 11

*Online Policy Group v. Diebold*
  337 F. Supp. 2d 1195, 1200 (N.D. Cal. 2004)...................................... 22, 37, 38, 39, 40

*Org. for a Better Austin v. O'Keefe*
  402 U.S. 415 (1971)............................................................................................. 47

*Ouellette v. Viacom Int'l, Inc.*
  Case No. CV 10-133-M-DWM-JCL, 2012 WL 850921 (D. Mont. Mar. 13, 2012) ..... 23

*Padfield v. AIG Life Ins. Co.*
  290 F.3d 1121 (9th Cir. 2002) .............................................................................. 11

*Penelope v. Brown*
  792 F. Supp. 132 (D. Mass. 1992)......................................................................... 22

*Perfect 10 v. CCBill*
  488 F.3d 1102 (9th Cir. 2007) ......................................................................... 19, 36

793876

*Procter & Gamble Co. v. Bankers Trust Co.*
  78 F.3d 219 (6th Cir. 1996) ........................................................ 47

*Religious Tech. Ctr. v. Lerma*
  908 F. Supp. 1362 (E.D. Va. 1995) ........................................ 27, 40

*Risdal v. Halford*
  209 F.3d 1071 (8th Cir. 2000) .................................................... 62

*Rossi v. Motion Picture Ass'n of Am.*
  391 F. 3d 1000 (9th Cir. 2004) ............................................*passim*

*Rudiger Charolais Ranches v. Vam De Graaf Ranches*
  994 F.2d 670 (9th Cir. 1993) ...................................................... 41

*Russello v. United States*
  464 U.S. 16 (1983)...................................................................... 23

*Salinger v. Random House*
  811 F.2d 90 (2d Cir. 1987) .......................................................... 52

*Shropshire v. Canning*
  809 F. Supp. 2d (N.D. Cal. 2011) ................................................ 23

*Sony Corp. of America v. Universal City Studios, Inc*............................22

*Stanford Daily v. Zurcher*
  64 F.R.D. 680 (N.D. Cal. 1974)................................................... 65

*Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc*.
  335 F. Supp. 2d 466 (S.D.N.Y. 2004) ........................................ 60

*Suarez v. Barrett (In re Suarez)*
  400 B.R. 732 (B.A.P. 9th Cir. 2009) (Jury, J., concurring)........................ 67

*Suntrust v. Houghton-Mifflin*
  268 F.3d 1257 (11th Cir. 2001) .................................................. 47

*United States v. Gonzales*
  520 U.S. 1 (1997)................................................................. 58, 60

*United States v. James*
  478 U.S. 597 (1986)..................................................................... 58

*United States v Ron Pair Enter's, Inc*
  489 U.S. 235 (1989).................................................................... 58

*Video-Cinema Films, Inc. v. Cable News Network, Inc.*
  2003 WL 1701904 (S.D.N.Y. 2003)........................................... 27

*Virginia v. Hicks*
  539 U.S. 113 (2003).................................................................... 25

793876

*Williams v. United States*
  503 U.S. 193 (1992) ........................................................................ 67

*Worldwide Church of God v. Philadelphia Church of God*, Inc.
  227 F.3d 1110 (9th Cir. 2000) ....................................................52, 53

*Wright v. Warner Books, Inc.*
  953 F.2d 731 (2d Cir. 1991) .............................................................. 53

*Yamaha Motor Corp., U.S.A. v. Calhoun*
  516 U.S. 199 (1996) ........................................................................ 11

*Yniguez v. Arizonans for Official English*
  69 F.3d 920 (9th Cir.1995) (en banc),
  *vacated on other grounds,* 520 U.S. 43 (1997) .............................. 62

*Zaldivar v. City of Los Angeles*
  780 F. 2d 823 (9th Cir. 1986) ...................................................... 40, 41

## Federal Statutes

15 USC § 1692 ................................................................................ 42

17 U.S.C. § 106 .............................................................................. 25

17 U.S.C. § 107 ................................................................. 4, 14, 22, 33

17 U.S.C. § 504 ........................................................................ 27, 28, 67

17 U.S.C. § 505 .......................................................................... 27, 28

17 U.S.C. § 512 ....................................................................... *passim*

17 U.S.C. § 1203 ............................................................................ 60

18 U.S.C. § 3742 ............................................................................ 67

28 U.S.C. § 1292 .......................................................................... 3, 11

28 U.S.C. § 1338 .............................................................................. 3

793876

## Other Authorities

U.C.C. § 1-201 ..................................................................... 41

U.C.C. § 1-304 ..................................................................... 41

## Federal Rules

Fed. R. App. P. 5 ................................................................... 3

Fed. R. App. P. 28.1 ............................................................... 1

Fed. R. App. P. 32 ................................................................. 1

## Treatises

Dan B. Dobbs, Law of Remedies (2d Ed. 1993) ........................... 60, 62

Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT (2005) ....... 53

Restatement of the Law, Second, Torts .................................... 59

## Constitutional Provisions

First Amendment ......................................................... *passim*

## Legislative History

144 Cong. Rec. H10618 (daily ed. Oct. 12, 1998) ....................... 18, 36

House Rep. 105-551, Part 1 ............................................ 28, 36, 59

S. Rep. 105-190 ......................................................... *passim*

793876

# INTRODUCTION

This case concerns Stephanie Lenz's right to hold Universal accountable for wrongfully accusing her of copyright infringement and causing YouTube to take down her 29-second home video of her toddler dancing in the kitchen. However, the stakes of this case are much higher than those facts might suggest. This appeal asks the Court to decide whether internet users, from homemakers like Ms. Lenz to political activists, artists, and scholars, will have any meaningful remedy for—and thereby protection against—wrongful claims of copyright infringement under the Digital Millennium Copyright Act ("DMCA").

Ms. Lenz urges this Court to watch the video[1] at issue prior to reviewing the briefs, to put both parties' characterizations of it into context. The video depicts a loud and chaotic kitchen scene, with a toddler bouncing while holding on to a push toy and a slightly older child running around him. In the background of the kitchen noise, for about 20 seconds of the video, a snippet of a song by pop icon Prince can be heard. Ms. Lenz published her video online via YouTube, as have millions of other Americans who use this service to share their daily lives with loved ones far away and even total strangers. Whether banal or profound, such user-generated

---

[1] 4ER 526 (video file "Lets Go Crazy 1.wmv"). Universal has filed a motion seeking leave to submit a copy of the CD that was submitted to the district court, which includes this file. App. Dkt. 22. The video can also be viewed on the YouTube site. *See* http://www.youtube.com/watch?v=N1KfJHFWlhQ.

793876

content is important to the people who make and view it. Indeed, this kind of expression has become central to our social, political, and cultural life.

There is no dispute that Ms. Lenz's video is protected expression under the First Amendment. There is no serious question that it is fair use and that Universal failed to recognize it as such because Universal's review process ignored the fair use question. There is no dispute that Universal's infringement claim forced Ms. Lenz's video offline. Most importantly for the broader implications of this case, there is no dispute that this takedown was not a one-time mistake, but a foreseeable result of Universal's fair-use-blind policy.

At bottom, then, the only operative questions before this Court are whether, given these undisputed facts, the remedy for a "knowing material misrepresentation of infringement," 17 U.S.C. § 512(f), applies and whether the censorship of her video and efforts of *pro bono* counsel to assist her in having it restored and obtaining redress count as damages.

The answer to both must be yes. When it passed the DMCA, Congress did not intend to give copyright holders the broad authority to inhibit lawful speech yet provide only near-illusory protection against abuse of that power.

The district court's decision on Ms. Lenz's motion for summary judgment creates that end result, which runs directly contrary to the overall statutory scheme. Based on a misreading of this Court's rulings, the district court set an

impermissibly high bar for section 512(f) liability. This case offers the Court an opportunity to ensure that the DMCA balance remains what Congress intended and what the statute plainly provides.

## JURISDICTIONAL STATEMENT
## (AS TO MS. LENZ'S CROSS-APPEAL)

This action arises under the Copyright Act, and the district court therefore has subject matter jurisdiction. 28 U.S.C. § 1338. This Court has jurisdiction over Ms. Lenz's cross-appeal pursuant to 28 U.S.C. § 1292(b). The order being appealed was originally entered on January 24, 2013, and amended on March 1, 2013. 1ER 3, 10. Ms. Lenz petitioned for permission to appeal on March 11, 2013. 1SER 1. This Court granted Ms. Lenz's petition for permission to appeal on May 30, 2013, 1ER 1, and that order serves as her notice of appeal. Fed. R. App. P. 5(d). Ms. Lenz's cross-appeal is timely because her petition for permission to appeal was filed within ten days of the amended district court order. 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a).

## STATEMENT OF ISSUES

*In Universal's Appeal*

1.      Whether the district court correctly denied Universal's motion for summary judgment that it did not make a knowing, material misrepresentation of infringement under section 512, given that its section 512 notification to YouTube of alleged infringement stated that Universal had a good faith belief that Ms.

793876

Lenz's video was not authorized by law, even though Universal knew that it had not considered whether Ms. Lenz's use was authorized by 17 U.S.C. § 107 (fair use).

2.      Whether the district court correctly denied Universal's motion for summary judgment that Ms. Lenz was not damaged by Universal's knowing, material misrepresentation, given that YouTube disabled her video as a result of Universal's claim of infringement, her free speech rights were curtailed by the disabling of her video, she spent time and effort to get her video restored, and *pro bono* counsel represented her both in that effort and in her subsequent lawsuit against Universal.

*In Ms. Lenz's Cross-Appeal*

1.      Whether as a matter of law Universal's notification of claimed infringement was a knowing, material misrepresentation of infringement under section 512 where the undisputed facts show that (a) Universal did not consider fair use, (b) Universal knew it did not consider fair use, and (c) Universal nonetheless represented to YouTube, as part of its notification of claimed infringement under section 512, that it had a good faith belief that Ms. Lenz's video was not authorized by law.

793876

2.    Whether, under *Rossi v. Motion Picture Ass'n of Am.,* 391 F. 3d 1000

(9th Cir. 2004), the sender of a DMCA takedown notice can escape section 512(f)

liability based on subjectively held but unreasonable *legal* determinations.

## STATEMENT OF THE CASE

On July 24, 2007, Ms. Lenz filed her Complaint against Universal. 6ER

1067. The operative complaint, filed on April 18, 2008, seeks damages under

section 512(f) based on Universal's knowing, material misrepresentation, which

resulted in YouTube disabling her video. 6ER 1034.

On the parties' cross-motions for summary judgment, the district court found

that Universal's takedown notice was a "notification of claimed infringement"

under the DMCA, that Universal did not consider fair use, and that a trier of fact

could conclude that Universal took deliberate actions to avoid finding out if fair

use applied to any particular video. 1ER 15, 17, 20. The district court did not grant

summary judgment to either party, though, because it found the evidence

insufficient to establish whether or not Universal subjectively believed there was a

high probability that "any given video" in the takedown notice was a fair use. 1ER

20.

## STATEMENT OF FACTS

## I.    Ms. Lenz uploads a home video to YouTube.

In early February, 2007, Stephanie Lenz uploaded a 29-second video to

YouTube, in which her two young children play in the family kitchen while the song *Let's Go Crazy* by the artist known as Prince plays in the background.[2] In the video, Ms. Lenz's 13-month-old son walks with his push-toy, Ms. Lenz asks him what he thinks of the music, and he occasionally "dances" by bouncing up and down.[3] The video bears all the hallmarks of a family home movie—it is somewhat blurry, the sound quality is poor, and it focuses on recording the child's "dance moves" in a kitchen, against a background of normal household activity, commotion, and laughter.[4] Due to the noise and commotion made by the children, only a roughly 20-second snippet of the song *Let's Go Crazy* can be heard, indistinctly, in the background of the 29-second video.[5]

## II.    Without considering fair use, Universal demands that YouTube take down Ms. Lenz's video.

Universal sent a formal notice to YouTube, demanding that it take down Ms. Lenz's video.[6] At the time, Universal managed Prince's copyrights, ████████

████████████████████████████████████████████

---

[2] 1SER 100 ¶¶ 3–4.

[3] 4ER 526.

[4] *Id.*

[5] *See id*.

[6] 1SER 87.

6



---

[7] 2SER 185:15–24, 193:25–194:20.

[8] 2SER 179:15–180:6; *see also* 2SER 306, 309, 311.

[9] 2SER 180:1–6.

[10] *Id.* at 180:22–181:1, 182:2–17.

[11] 2SER 221:7–22.

793876

 [12] [13] [14] Less than two hours

later, a Universal attorney sent an electronic notice to YouTube demanding that the

videos on the Mr. Johnson's list be removed.[15]

[16] [17]

Universal's electronic notice to YouTube tracked the DMCA's statutory

provisions for a notice of claimed infringement,[18] including the requirement that

the notice contain a "statement that the complaining party has a good faith belief

that use of the material in the manner complained of is not authorized by the

---

[12] *Id*. at 2SER 222:4–7, 223:3–17.

[13] 2SER 189:7–190:4; *see also* 1SER 74:2–3, 75:13–17, 76:2, 77:13–24.

[14] 2SER 219:17–220:1, 229.

[15] *See* 1SER 31:16–32:25, 41:25–42:6, 87.

[16] 2SER 178:15–20.

[17] 2SER 176:15–20; *see also*1SER 34:23–25, 2SER 175:15–19.

[18] 17 U.S.C. § 512(c)(3)(A).

copyright owner, its agent, or the law."[19]

The district court found, and Universal does not challenge on appeal, that the evidence established that Universal sent its takedown notice without considering fair use.[20]

### III.    In response to Universal's demand, YouTube disables access to Ms. Lenz's video.

On June 4, 2007, YouTube disabled access to the video due to Universal's accusation of infringement.[21] YouTube also sent Ms. Lenz an email notifying her that it had done so in response to the accusation of copyright infringement, and warning her that repeated incidents of copyright infringement could lead to the deletion of her account and all her videos.[22]

Surprised and dismayed, on June 7, 2007, Ms. Lenz tried to send a counter-notification to YouTube explaining that her video was a non-infringing fair use:

> I do not believe that the video in question violated copyright or infringed on copyright in any way. It was a 30 second video of my children running around our kitchen, with my one year old son pausing to dance to the music that was playing, "Let's Go Crazy" by Prince. This music was not superimposed on the video but was merely, as I said, playing in the background during the action of the

─────────────────

[19] *Id.* § 512(c)(3)(A)(v); 1ER 13–14.

[20] 1ER 17.

[21] 2SER 255 ¶ 11.

[22] 1ER 100 ¶ 5, 53.

9

video.[23]

████████████████████████████████████████████

██████████████[24]██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████[25] Ms. Lenz then retained *pro bono* counsel who spent time

assisting her in sending a second DMCA counter-notification to YouTube, in

which she asserted that her video was a fair use and did not infringe Universal's

copyrights.[26] Although her video was subsequently restored approximately six

weeks after it had been disabled, these counter-notification efforts cost Ms. Lenz

about five to ten hours of her time and resources.[27] Her video was also unavailable

until the process was completed.[28] Ms. Lenz has also spent time and money

working on this lawsuit, as have her attorneys.[29]

---

[23] 1SER 100 ¶ 6; 2SER 302.

[24] 2SER 304.

[25] 2SER 302.

[26] 1SER 100 ¶ 7.

[27] 1SER 100 ¶ 8, 149:13–25.

[28] 1SER 100 ¶ 8.

[29] 1SER 150:1–7, 153:21–155:13; *see also* 1SER 106:22–25, 100 ¶¶ 6–7, 9.

## STANDARD OF REVIEW

This Court reviews an order granting or denying summary judgment *de novo,* using the same standard as the district court. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124 (9th Cir. 2002). Viewing the evidence in the light most favorable to the non-movant, the Court must determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Am. Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). In reviewing the district court's ruling on cross-motions for summary judgment, the Court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *Id.* On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, 922 (9th Cir. 2004).

In an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the court of appeals may address any issue "fairly included within the certified order" because it is the order, not the controlling question identified by the district court, that is appealable. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 204-05 (1996) (citation omitted). The scope of review is "not so broad as to allow reexamination

11

793876

of all matters previously ruled upon in the case." *In re Cinematronics, Inc.*, 916 F.2d 1444, 1449 (9th Cir. 1990). But the court of appeals "may address those issues *material* to the order from which appeal has been taken." *Id.* (citation omitted). Thus, "where reconsideration of a ruling material to an order provides grounds for reversal of the entire order, review of issues other than those certified by the district court as 'controlling' is appropriate." *Id.* (citation omitted) (reviewing issue decided in order prior to certified order).

## SUMMARY OF ARGUMENT

Ms. Lenz asks this Court to affirm the right of internet users—Ms. Lenz and the hundreds of millions of others who have been empowered to make and publish their own works online—to hold copyright holders accountable when they misuse the Digital Millennium Copyright Act.

The DMCA embodies a grand bargain that offered copyright owners a new, streamlined process for taking down allegedly infringing material, in exchange for strong protections for service providers from the risk of secondary liability for their users' activities. *See* 17 U.S.C. § 512. That bargain included the powerful incentive to service providers to take down any speech identified in a compliant takedown notice. Mindful of the risks of effectively giving content owners the power to shut down speech Congress recognized that it needed to balance "the need for rapid response to potential infringement with the *end-users [sic] legitimate interests in*

12

*not having material removed without recourse.*" S. Rep. 105-190, May 11, 1998, at

21 (emphasis added).

Accordingly, Congress included a requirement that an allegation of

infringement take the form of a statement that the sender has formed a good faith

belief that the targeted content was not authorized law. 17 U.S.C.

§ 512(c)(3)(A)(v). That requirement was designed to ensure that content owners

would take care not to use the new process to take down non-infringing speech.

Congress also gave that process teeth by creating a specific cause of action where,

as here, that statement is false. Thus, section 512(f) provides that:

> [a]ny person who knowingly materially misrepresents under this
> section . . . that material or activity is infringing . . . shall be liable for
> any damages, including costs and attorneys' fees, incurred by the
> alleged infringer . . . as the result of the service provider relying upon
> such misrepresentation in removing or disabling access to the material
> or activity claimed to be infringing . . . .

*Id.* § 512(f). Section 512(f) "is intended to deter knowingly false allegations to

service providers in recognition that such misrepresentations are detrimental to . . .

Internet users." S. Rep. 105-190 at 49.

Universal's takedown notice to YouTube was just such a misrepresentation.

Universal told YouTube that it had a good faith belief that the use of Prince's

sound recording in Ms. Lenz's video was not "authorized by the copyright owner,

its agent, *or the law.*" 17 U.S.C. § 512(c)(3)(A)(v) (emphasis added); 1SER 87.

That wasn't true. Universal never considered whether Ms. Lenz's use was

793876

authorized by section 107 of the Copyright Act—whether the use was a fair use

and thus "not an infringement of copyright." *Id.* § 107. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████ 2SER 180:1-6.

Thus, Universal *knowingly misrepresented* that it had a good faith belief that

Ms. Lenz's use was not authorized by the law, because it *knew* that it did not

consider whether the use was authorized by section 107 of the Copyright Act.

Relying on Universal's misrepresentation, YouTube disabled Ms. Lenz's video.

Universal is therefore liable to Ms. Lenz for "any damages, including costs and

attorneys' fees," that she incurred as a result of its misrepresentation. 17 U.S.C.

§ 512(f).

And Ms. Lenz has been damaged. First, her free speech rights were curtailed

by Universal's actions, which caused her video to be disabled for about six weeks.

1SER 100 ¶ 8. Second, Ms. Lenz had to devote time and energy in order to get

access to her video restored. 1SER 100 ¶ 8, 149:13-25. Third, Ms. Lenz's counsel

spent time assisting her in that process. 1SER 94–95, 100 ¶ 7. Fourth, Ms. Lenz

and her counsel have spent time and money pursuing this lawsuit. 1SER 150:1–7,

153:21–155:13; *see also* 1SER 106:22–25, 100 ¶¶ 6–7, 9.

Ms. Lenz is therefore entitled to summary judgment in her favor.

Unfortunately, rather than apply the statute as it is written, the district court

misread this Court's ruling in *Rossi v. Motion Picture Ass'n of Am.*, 391 F.3d 1000, 1004 (9th Cir. 2001), to require an additional showing of willful blindness. 1ER 19–20. According to this approach, a content owner can knowingly set up a system that ignores the fair-use doctrine but nonetheless escape section 512(f) liability unless a fair user can show that the content owner also subjectively believed there was a high probability that the process would result in improper takedowns. That interpretation of *Rossi* set up a virtual smoking gun standard that could render section 512(f) all but meaningless—an outcome that Congress surely did not intend.

The district court's error was based on and compounded a prior error. The district court interpreted *Rossi* to require a showing of subjective bad faith as to every aspect of a DMCA takedown notice prior to any finding of section 512(f) liability. 6ER 1045–46. But the *Rossi* ruling was not so broad as that. *Rossi* required this Court to opine on the standard for knowledge with respect to *facts*, and the decision concluded that section 512(f) does not require a detailed factual investigation prior to forming a good faith belief as to whether material is infringing. 391 F.3d at 1004–06.

However, the Court was not asked to, and did not, offer any conclusions regarding the standard applicable to *legal* conclusions, because all that was disputed in *Rossi* was whether the MPAA should have investigated the *facts*

15

further. In contrast, this case presents the question of whether the *legal* determination that Universal claimed to have made was objectively reasonable—and, based on the undisputed facts available to Universal, it was not.

The district court therefore should have found Universal liable on the merits for two independent reasons. First, Universal did not bother to make any legal determination about fair use in the first place. Because this failure was a matter of *policy,* not merely a mistake, Universal's claim to have formed a good faith belief that Ms. Lenz's use was not authorized by law was a knowing misstatement. Second, any claim that Universal believed that the video was not authorized by law was not a *good faith* belief, because any such belief would have been unreasonable.

## ARGUMENT

### I.    The district court correctly found that section 512 requires consideration of fair use.

#### A.    Section 512 embodies a balanced approach to addressing online copyright infringement while promoting the growth of the internet as a platform for innovation and expression.

When Congress took up the issue of online copyright infringement in the mid-1990s, it sought to resolve a difficult challenge: how to allow copyright owners to quickly and efficiently police online infringement without impairing lawful uses of copyrighted works or unfairly penalizing service providers for the actions of their users. Its answer was section 512 of the DMCA.

Congress realized that establishing clear rules regarding intermediary

liability was essential to the development of the internet as a vehicle for free expression, innovation and commerce. Accordingly, Congress designed the DMCA "to clarify the liability for copyright infringement of online and internet service providers . . . [by setting] forth 'safe harbors' from liability for ISP's and OSP's under clearly defined circumstances, which both encourage responsible behavior and protect important intellectual property rights." S. Rep. No. 105-190, at 67 (additional views of Sen. Patrick Leahy, Member, S. Comm. on the Judiciary).

These statutory safe harbors replaced conflicting judicial decisions applying secondary liability doctrines to new platforms and services with detailed provisions that gave rightsholders, service providers and users relatively precise "rules of the road." In exchange for substantial protection from liability for the actions of their users, service providers must implement and maintain a DMCA policy that includes a notice-and-takedown process, a system to track and deactivate repeat infringers, a counter-notification process, and other prescribed steps. *See* 17 U.S.C. § 512. Copyright owners, for their part, are given an expedited, extra-judicial procedure for obtaining redress against alleged infringement, paired with explicit statutory guidance regarding the process for doing so and provisions designed to deter and ameliorate abuse of that process. *See id.* § 512(c)(3)(A), (f) & (g). Taken as a whole, the safe harbors embody a quid pro quo that (1) balances the interests of online intermediaries against the interests of content owners, allocating

17

responsibility to both groups; and (2) limits the collateral damage the system might cause to users.

### B.    Section 512 includes several safeguards to protect lawful speech.

Congress knew that online intellectual property enforcement should not come at the expense of stifling lawful speech. 144 Cong. Rec. H10618 (daily ed. Oct. 12, 1998) (Rep. Barney Frank stating, "As Members have mentioned, we have a tough situation here in which we want to protect intellectual property rights but not interfere with freedom of expression."). Section 512 can result in expressive material being taken down from the internet, without prior judicial scrutiny, notice to the person who posted the material, or an opportunity to contest the removal before it happens.

To help make up for that lack of scrutiny, Congress laid out an alternative system of checks and balances to protect lawful speech and accomplish the goal of "carefully balanc[ing] the First Amendment rights of users with the rights of a potentially injured copyright holder." *Batzel v. Smith,* 333 F.3d 1018, 1031 n.19 (9th Cir. 2003).

First, it required the sender of a notice to allege infringement clearly and precisely. 17 U.S.C. § 512(c)(3)(A). A bald allegation that material infringes copyright does not suffice. Rather, a representation under section 512 that material infringes must, among other things, contain a "statement that the complaining party

18

has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." *Id.* § 512(c)(3)(A)(v). In addition, the copyright owner must state, under the penalty of perjury, that the information in the notification is accurate. *Id.* § 512(c)(3)(A)(vi).

This Court has recognized the First Amendment harms that could be caused by indiscriminate takedowns under section 512, and the importance of mitigating that harm by requiring copyright owners to take the notice requirements seriously. Admonishing one copyright owner for its failure to send a compliant notice, this Court noted:

> The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing. This requirement is not superfluous. Accusations of alleged infringement have drastic consequences: A user could have content removed, or may have his access terminated entirely. If the content infringes, justice has been done. *But if it does not, speech protected under the First Amendment could be removed.*

*Perfect 10 v. CCBill*, 488 F.3d 1102, 1112 (9th Cir. 2007) (emphasis added).

Second, Congress also included a process for the relatively speedy restoration of non-infringing content targeted for takedown, which allows a user to send a counter-notification challenging the infringement allegations. 17 U.S.C. § 512(g). According to this procedure, as with a takedown notice, a counter-notification must include certain representations to be a valid under section 512. *Id.* § 512(g)(3).

19

Third, Congress gave users a remedy where, as here, their lawful speech is improperly targeted. It recognized that section 512(g) by itself is not enough to ensure that the DMCA does not trample First Amendment rights by impeding online fair use. Even if a takedown notice seems improper, the DMCA strongly discourages service providers from restoring targeted speech for a minimum of ten business days, lest they lose the protection of the safe harbors. *Id.* § 512(g)(2)(B). Therefore, Congress also crafted a provision to deter such claims. *Id.* § 512(f). Section 512(f) holds copyright owners accountable if they send a takedown notice without properly considering whether the use was in fact authorized by the copyright owner or the law. As the Senate Report on section 512(f) explained:

> The Committee was acutely concerned that it provide all end-users . . . with appropriate procedural protections to ensure that material *is not disabled without proper justification*. The provisions in the bill balance the need for rapid response to potential infringement with the end-users legitimate interests in not having material removed without recourse.

S. Rep. No. 105-190 at 21 (1998) (emphasis added).

Specifically, section 512(f) imposes liability on "[a]ny person who knowingly materially misrepresents under this section [(i.e., under Section 512)] . . . that material or activity is infringing." 17 U.S.C. § 512(f). To represent "under this section . . . that material or activity is infringing," the copyright owner must invoke section 512(c)(3)'s notice-and-takedown process. *See id.* § 512(c)(3)(A). As noted, that provision requires a statement that "the complaining

party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, *or the law*." *Id.* § 512(c)(3)(A)(v) (emphasis added). These two sections are linked; "both [the statute and the applicable case law] frame the [section 512(f)] inquiry in terms of whether the party that issued the takedown notice had a 'good faith belief' that use of the copyrighted work was unauthorized." 1ER 19 (citing 17 U.S.C. § 512(c)(3)(A)(v) and *Rossi*, 391 F.3d at 1004).

Taken together, the requirements of 512(c)(3)(A), (f) and (g) are crucial safeguards against DMCA abuse.

C.    **Section 512 requires the sender of a takedown notice to form a good faith belief that a targeted use is not a lawful fair use.**

1.    **Section 512 requires a content owner to consider whether a targeted use is authorized by law—including the fair use doctrine.**

Where a statute is unambiguous, a court must take Congress at its word. *Norfolk & Western Ry. Co. v. Am. Train Dispatchers Ass'n,* 499 U.S. 117, 128 (1991); *Miller v. French,* 530 U.S. 327, 336 (2000). Section 512 is unambiguous. It explicitly requires copyright owners to allege infringement by attesting to a good faith belief that the material in question is not authorized *by law*—not just that it is not authorized by the copyright owner or its agent. 17 U.S.C. § 512(c)(3)(A)(v). That attestation is what puts the DMCA's powerful takedown machinery into play. *Id.* And the DMCA explicitly allows a user harmed by a knowingly false

21

attestation to hold the sender accountable. *Id.* § 512(f).

There is no need to second-guess Congress's meaning when it adopted the phrase "authorized by law"—one may simply look to the Copyright Act and the Supreme Court's repeated statements to discover that the phrase means, at the very least, "authorized by section 107 of the Copyright Act." That section provides that "the fair use of a copyrighted work . . . is *not* an infringement of copyright," i.e., it is a use "authorized by law." 17 U.S.C. § 107 (emphasis added). And as the Supreme Court stated in *Sony Corp. of America v. Universal City Studios, Inc.*,

> the definition of exclusive rights in § 106 of the present Act is prefaced by the words "subject to sections 107 through 118." Those sections describe a variety of uses of copyrighted material that "are not infringements of copyright notwithstanding the provisions of § 106." The most pertinent in this case is § 107, the legislative endorsement of the doctrine of "fair use."

464 U.S. 417, 447 (1984); *see also Online Policy Group v. Diebold*, Inc., 337 F. Supp. 2d 1195, 1200 (N.D. Cal. 2004) ("a fair use is not infringement of a copyright.") (citations omitted).[30] Indeed, the language of section 512(c)(3)(A)(v) parallels the Supreme Court's definition of noninfringing uses: "Anyone who is authorized by the copyright owner to use the copyrighted work in a way specified

---

[30] *See also Association of American Medical Colleges v. Cuomo*, 928 F.2d 519, 523 (2d Cir. 1991) ("It has long been recognized that certain unauthorized but 'fair' uses of copyrighted material do not constitute copyright infringement."); *Penelope v. Brown*, 792 F. Supp. 132, 136 (D. Mass. 1992) ("The fair use of a copyrighted work is not an infringement of copyright.").

in the statute *or* who makes a fair use of the work is not an infringer of the copyright with respect to such use." *Sony*, 464 U.S. at 433 (emphasis added)

Thus, fair uses are indeed authorized by law—both by statute and well-established jurisprudence. It follows that copyright owner who sends a takedown notice must form a good faith belief that a given use is not a fair use (or otherwise authorized by law) or risk liability under section 512(f). 6ER 1005; *see also Does 1-4 v. Arnett*, Case No. SACV 12-96-JST, 2012 WL 3150934 at *3 (C.D. Cal. Aug. 1, 2012) (following *Lenz*); *Ouellette v. Viacom Int'l, Inc.*, Case No. CV 10-133-M-DWM-JCL, 2012 WL 850921 at *3–*4 (D. Mont. Mar. 13, 2012) (same); *Shropshire v. Canning*, 809 F. Supp. 2d at 1148 n.3 (N.D. Cal. 2011) (same).

Any other reading effectively erases the clear and unambiguous statutory language. It also creates a tension with the First Amendment. As the Supreme Court has repeatedly held, fair use is one of the essential "built-in First Amendment accommodations" that help ensure that copyright's necessary restrictions on speech do not run afoul of the Constitution. *Golan v. Holder*, 132 S. Ct. 873, 890 (2012); *see also Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Harper & Row Publishers, Inc. v. Nation Enter's*, 471 U.S. 539, 560 (1985). The DMCA effectively gave private actors the power of a court temporarily to restrain the communication of online content. Absent correspondingly strong protections for lawful speech, such as fair uses, the DMCA could be interpreted to alter the

793876

traditional contours of copyright by creating a system for easy private censorship of lawful fair uses. The requirement that the party claiming infringement form a good faith belief whether a given use is authorized by law, including whether it is a fair use, forestalls that interpretation and helps reconcile the DMCA with the First Amendment.

> **2.    There is no ambiguity about section 512's requirement that the sender of a takedown notice form a good faith belief that the use is not authorized by law, which requires considering fair use.**

Because it did not consider fair use before sending its takedown notice, Universal makes several attempts to explain why it did not have to. None succeeds.

*First,* Universal suggests that Congress did not intend for section 512(f) to be a meaningful check on takedown abuse but rather an exceedingly narrow cause of action applicable only in the rarest of circumstances. Universal's Opening Brief ("Br.") 22. In other words, Universal claims, Congress intended section 512(g)'s counter-notification procedure to be the principal safeguard against DMCA abuse. Universal offers no evidence to support this theory, because there is none. Moreover, requiring counter-notifications to hold up the weight of protecting free speech undermines the carefully-wrought balance between copyrights and free expression. As the Supreme Court noted in *Citizens United v. Federal Election Commission,* "First Amendment standards . . . 'must give the benefit of any doubt to protecting rather than stifling speech.'" 558 U.S. 310, 130 S. Ct. 876 at

24

891(2010) (quoting *FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 469

(2007)). Otherwise, "[m]any persons, rather than undertake the considerable

burden (and sometimes risk) of vindicating their rights through case-by-case

litigation, will choose simply to abstain from protected speech—harming not only

themselves but society as a whole, which is deprived of an uninhibited marketplace

of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). If so, "the censor's

determination may in practice be final." *Freedman v. Maryland*, 380 U.S. 51, 58

(1965).

In the DMCA context, many users, rather than undertake the burden and

risks of counter-notification, will abstain from lawful speech. In effect, the

copyright holder's decision to issue a takedown for non-infringing material could

be as final as that of any government censor. The DMCA should not be construed

to allow that social cost.

*Second,* Universal insists that because fair use is raised in litigation as an

affirmative defense, Congress could not have imagined that copyright owners

would have to consider fair use before sending a takedown notice. But because a

copyright owner's exclusive rights are "subject to" the fair use right, 17 U.S.C.

§ 106, a fair use does not infringe any of those exclusive rights, even without

sending a counter-notification, or a lawsuit and the raising of fair use as a defense.

That fair use is an affirmative defense merely is the procedural means by which the

25

question is raised in litigation. Indeed, were it the rule that "authorized by . . . law" does not take into account affirmative defenses, there would be no need for copyright owners to consider whether a use is allowed due to a compulsory license, which Universal concedes is not correct. Br. 35–36.

*Third,* Universal complains that fair use is hard. Unlike licensing arrangements, including compulsory licensing arrangements, Universal argues, a copyright owner could never know in advance whether a given use was fair. Therefore, Universal claims, Congress couldn't have intended "authorized by law" to mean anything more than "licensed." Again, Universal offers not a shred of legislative history in support of this proposition. Instead, Universal points to a variety of challenging fair use cases. But the fact that *some* fair uses are difficult to identify does not relieve Universal, or any other sender of a DMCA notice, of its obligation to *form a good faith belief* whether *the use it is targeting* is fair. That belief may be mistaken—but it must at least be formed, and formed in good faith.

Further, fair use is not always hard. In *Burnett v. Twentieth Century Fox*, for example, a federal district court dismissed a copyright claim—without leave to amend—at the pleading stage based on a finding of fair use. 491 F. Supp. 2d 962, 967, 975 (C.D. Cal. 2007); *see also Leadsinger v. BMG Music Pub.*, 512 F.3d 522, 532–33 (9th. Cir. 2008) (affirming motion to dismiss, without leave to amend, fair use allegations where three factors "unequivocally militated" against fair use).

26

Courts have also awarded attorneys' fees in copyright cases where the plaintiffs have brought frivolous claims of infringement against fair uses of their material—i.e., where determining fair use was not hard. *See, e.g., Bond v. Blum*, 317 F.3d 385, 397–98 (4th Cir. 2003) (affirming copyright defendants' fee award because fair use question was "not a close one" and copyright holder's position was frivolous and unreasonable); *Video-Cinema Films, Inc. v. Cable News Network, Inc.,* 2003 WL 1701904, *3 (S.D.N.Y. 2003) (awarding defendants' fees because copyright holder's position on fair use was "objectively unreasonable"); *Religious Tech. Ctr. v. Lerma,* 908 F. Supp. 1362, 1368 (E.D. Va. 1995) (awarding defendants' fees because "no reasonable copyright holder could have in good faith brought a copyright infringement action.").

Moreover, much of the Copyright Act is premised on the notion that individuals can and should make *ex ante* determinations—and holds them accountable if those determinations are wrong. If a fair user such as Ms. Lenz miscalculates in determining that a use is fair, she can be held liable for damages and, potentially, attorneys' fees. 17 U.S.C. §§ 504, 505. If an internet service provider misjudges whether it has been put on notice of actual infringement by a user—i.e., whether it has actual knowledge of infringement—it will be at risk of secondary liability for infringement. *Id.* §§ 512(c)(1)(A) & (C), 512(d)(1)(A) & (C). If a researcher misjudges whether his research circumvents a technological

27

protection measure, he can be held liable under section 1201 of the DMCA. *Id.* § 1201. All of these individuals must make *ex ante* judgments about the law to avoid liability under the Copyright Act. There is nothing in the statute or the case law to suggest that senders of section 512(c)(3) notices cannot do the same.

*Finally,* Universal suggests that Congress couldn't have intended to require copyright holders to consider fair use, because the allegedly massive scope of online infringement[31] does not allow for such considerations. What Universal is suggesting must be made explicit: Universal is arguing that the extrajudicial takedown of lawful fair uses is legitimate collateral damage in its war against copyright infringement. But nothing—nothing at all—in the DMCA suggests that Congress intended to sacrifice lawful speech of innocent bystanders like Ms. Lenz so that Universal could shoot first and ask questions later. To the contrary, the legislative history shows that Congress intended just the opposite. S. Rep. 105-190, at 49 (1998); *see also* H. Rep. 105-551, Part 1, at 27 (1998).

---

[31] Universal cites no admissible evidence in support of this assertion. Br. 10. It cites an expert's assertion, but that expert has no expertise regarding online infringement, and certainly no expertise regarding measuring the volume of online infringement. 5ER 827–28. His opinion is itself based on the inadmissible work of others.

## II.  Universal violated section 512(f).

### A.  Universal knowingly misrepresented that it had formed a good faith belief that the Lenz video was not authorized by law.

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████[32] ████████████

███████████████████████████████████████████████

███████████[33] █████████████████████████████████

███████████████[34] Thus, the undisputed evidence showed that Universal did not consider whether the fair use doctrine might apply to the video. 1ER 17. This was not an "unknowing mistake"—it was a policy.

Based on those admissions, the district court correctly found that Universal failed to consider fair use prior to sending its notice to YouTube. 1ER 17–18. Because Universal failed to form *any* belief about fair use, it did not form a good faith belief that the video was not authorized by law, and it knew it did not do so. Thus its representation to the contrary was knowingly false.

---

[32] 2SER 180:1–6; 1SER 073.

[33] 2SER 183:14–19, 184:12.

[34] *Id.* at 184:13–25.

**B.    Universal's liability does not depend on what it would have concluded if it *had* considered fair use.**

Universal argues that Ms. Lenz failed to adduce evidence that if Universal *had* considered fair use, it would have concluded that her video was a fair use. Br. 36–41. This is a non-sequitur. In order to make a notification of claimed infringement under section 512, Universal had to represent that it *in fact had* formed a good faith belief that Ms. Lenz's use was not authorized by law. 17 U.S.C. § 512(c)(3)(A)(v). And Universal did precisely that.[35] Even assuming that Universal, had it considered fair use, would have concluded that Ms. Lenz's use was unlawful, *representing that it had formed a good faith belief when it had not done so was still a misrepresentation.*[36]

**C.    The district court set an impermissibly high bar to liability that Congress did not intend and this Court did not mandate.**

Having found that Universal did not consider whether Ms. Lenz's use was fair, the district court should have found Universal liable under section 512(f). Based on a misreading of both Ms. Lenz's arguments and the implications of "*Rossi's* subjective standard," 1ER 19, the district court failed to do so. Instead, it concluded that Ms. Lenz had to show that Universal not only failed to consider fair

---

[35] 1SER 87.

[36] Moreover, as is explained below, *see* Part III.D., *infra,* if Universal *had* considered the issue, it could not in good faith have concluded Ms. Lenz's use was not fair.

use, but also that Universal had rendered itself willfully blind to fair use, i.e., that Universal subjectively believed there was a high probability that its takedown practices would fail to identify fair uses. 1ER 20. That was error, because the misrepresentation was complete as soon as Universal falsely represented that it had a good faith belief that the video was not authorized by law.

*Rossi* does not mandate otherwise. In *Rossi,* there was no dispute that the MPAA subjectively believed, in good faith, that Rossi infringed. Rossi's website exhorted visitors to join "to download full length movies online," represented that the site had "Full Length Downloadable Movies" that were "NOW DOWNLOADABLE," and followed these statements with graphics for MPAA motion pictures. *Rossi,* 391 F.3d at 1002. The MPAA employee investigating the site saw these indicia and assumed that Rossi was telling the truth, and therefore that copyright infringement of MPAA movies was occurring on the site. *Id.* at 1005. On appeal, Rossi argued that had the MPAA only investigated further, it would have determined that, in fact, the website was a sham—that "no movies could actually be downloaded from his website or related links." *Id.* at 1003.

Thus, in *Rossi* the question was whether the copyright owner is required to conduct a reasonable factual investigation into the allegedly offending website in order to form "a good faith belief" of infringement. On this question, this Court held that section 512(c)(3)(A)(v)'s required "good faith belief" implied a

31

subjective standard applied to the facts, and that, having reviewed the website and formed a subjective belief regarding the facts, the MPAA reviewer was not required to perform a further factual investigation. *Id.* at 1004.

Specifically, the Court concluded that "[t]he unequivocal language used by Rossi not only suggests that [motion pictures owned by MPAA members were available for immediate downloading from the website], but virtually compels it." *Id.* at 1005. The Court therefore held there was no material dispute of fact that the MPAA subjectively and in good faith believed that Rossi's website was infringing. *Id.* at 1006.

In short, the MPAA said it had a good faith belief that Rossi's website was not authorized by the copyright owners, their agents, or the law. And that statement was true. Here, Universal said it had a good faith belief that Ms. Lenz's use was not authorized by law. But, in fact, it had not considered fair use, *knew* it had not considered fair use, and therefore knew it lacked the good faith belief it claimed to have.

Indeed, not only did the *Rossi* court not reach the issue of whether a false statement that one even has a good faith belief is actionable, its discussion of whether "good faith" implies a subjective standard was *dictum*. As the Court noted, the contents of Rossi's website "virtually compel[led]" the conclusion that Rossi was infringing MPAA copyrights. *Id.* at 1005. That is, the MPAA's conclusion of

32

infringement *was objectively reasonable.* The key issue resolved in *Rossi* was that the MPAA was under no obligation affirmatively to investigate whether Rossi might have been lying.

Here, watching the 29-second video—the very act in which Universal engaged in order to determine that the video used anything copyrighted by Prince—gave Universal all the facts it needed to know about the video and the extent to which it used any of Universal's copyrighted works. It was required, based on those facts, to form a good faith belief whether the use in question was authorized by the law, *including 17 U.S.C. § 107.* It did not, because its own guidelines did not call for such a consideration. Universal knew what its guidelines were and, therefore, knew any claim that it considered fair use would be false.

**III.    Universal also violated section 512(f) because it *should* have known, as a matter of law, that Ms. Lenz's use was a lawful fair use.**

**A.    The district court applied the wrong knowledge standard, based on a fundamental misreading of *Rossi*.**

The district court also erred when it assumed the *Rossi* court's endorsement of "subjective" knowledge standard for factual investigations decided as well a question that was never presented: the standard for legal determinations based on those facts. On Universal's first motion to dismiss, Ms. Lenz explained that *Rossi* addressed only the extent to which the copyright owner must engage in an affirmative investigation of the facts before sending a takedown notice, and did not

33

reach the standard for legal determinations. 1SER 162–63.

The court disagreed, based on a highly cursory analysis, 6ER 1045–46, and that decision shaped the district court's subsequent analysis of Universal's liability on summary judgment.[37] In particular, it led the court to conclude that Universal could only be held liable if it were willfully blind to whether a given use was fair. *See, e.g.,* 1ER 19 n.3 ("Since the record is devoid of evidence that Universal subjectively believed that fair use might apply to Lenz's video, the Court concludes that the only other avenue available to Lenz is to show that Universal willfully blinded itself to the potential application of the fair use doctrine."). The district court also found that it could not impute knowledge to Universal that Ms. Lenz's use was fair, because "[a] legal conclusion that fair use was 'self-evident' necessarily would rest upon an objective measure rather than the subjective standard required by *Rossi*." 1ER 20. Both conclusions were incorrect.

---

[37] As noted, this error was in a prior order, not the order certified for interlocutory appeal. But the Court may address "those issues *material* to the order from which appeal has been taken." *In re Cinematronics, Inc.*, 916 F.2d at 1449. The proper reading of section 512 that Ms. Lenz previously argued and the district court previously rejected provides an additional ground for rejecting Universal's motion for summary judgment. Thus, just as review of a prior order where reconsideration of the prior ruling provides grounds for reversal of the certified order, *id.,* so too is review of the prior order proper here, where reconsideration of the prior order provides grounds for affirming the denial of Universal's motion for summary judgment on the issue of liability.

### B.    *Rossi* did not mandate a subjective knowledge standard with respect to legal determinations.

As explained above,[38] *Rossi* addressed whether a copyright owner or its agent, after being misled about the facts, can be held liable for attesting to a good faith but mistaken belief based on those facts. Given the stark assertions on Rossi's website that "virtually compel[led]" the conclusion of infringement, this Court concluded that "the district court properly found that no issue of material fact existed as to MPAA's 'good faith belief' that Rossi's website was infringing upon its copyrighted materials." *Rossi*, 391 F.3d at 1005–06.

Again, *Rossi's* statement that "[a] copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake" was *dictum*, because the MPAA did not act unreasonably when it reached the conclusion that Rossi's own website "virtually compel[led]." *Rossi*, 391 F.3d at 1005.

But regardless of whether this statement is *dictum* or binding precedent, nothing in *Rossi* suggests that the Court intended to, or did, reach any question other than whether *factual* beliefs that are erroneous but held in subjective good faith are shielded from section 512(f) liability.

---

[38] *See* Part II.C., *supra.*

793876

C.  **The good faith of a legal determination in a DMCA takedown notice must be measured by an objective standard.**

1.  **Consistent with Congress's intent to discourage use of the DMCA to take down lawful speech, those who use copyright law to take down speech should be charged with basic knowledge of that law.**

When it passed the DMCA, Congress was well aware of the need to ensure that the new tools it was giving copyright holders were not abused to take down lawful speech. 144 Cong. Rec. H10618 (daily ed. Oct. 12, 1998) (Rep. Barney Frank stating, "As Members have mentioned, we have a tough situation here in which we want to protect intellectual property rights but not interfere with freedom of expression."). That is because, as this Court has observed,

> Accusations of alleged infringement [in a DMCA notice] have drastic consequences: A user could have content removed, or may have his access terminated entirely. If the content infringes, justice has been done. But if it does not, speech protected under the First Amendment could be removed.

*CCBill*, 488 F.3d at 1112.

Section 512(f) is the primary remedy that Congress gave users to prevent that kind of damage. The provision was specifically "intended to *deter* knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and internet users." S. Rep. No. 105–190, at 49 (1998) (emphasis added); *see also* H. Rep. No. 105-551, Part (1), at 27 (1998). As the Senate Report on section 512(f) explained,

36

> The Committee was acutely concerned that it provide all end-users . . . with appropriate procedural protections to ensure that material *is not disabled without proper justification*.

S. Rep. No. 105-190 at 21 (1998) (emphasis added).

Consistent with that intent, Congress required a copyright owner or its agent to affirm that the content it targets for takedown is "not authorized by the law." 17 U.S.C. § 512(c)(3)(A)(v). An assertion that it is "not authorized by what I think might be the law" is not enough, nor is an allegation of infringement that does not attest to a good faith belief either way. Charging copyright holders and their agents, including sophisticated entities like Universal, with basic knowledge of what the law authorizes and a risk of section 512(f) liability when they fail to use that knowledge deters wide-scale abuse of the notice and takedown system. By contrast, allowing a party to escape liability based on a genuine but legally unsupportable belief of infringement thwarts that intent, encouraging copyright holders to take few, if any, precautions to ensure their takedown notices have a "proper justification."

> **2.** ***Online Policy Group v. Diebold* correctly applied an objective standard to determine whether Diebold's assertion of infringement in its DMCA takedown notice was held in good faith.**

Against this background, it is clear that the correct standard for weighing the "proper [legal] justification" was not articulated by *Rossi*. Rather, it was laid out in *Online Policy Group v. Diebold*, a decision issued while the *Rossi* case was still

37

pending, by the same court that issued the order on appeal here. 337 F. Supp. 2d 1195 (N.D. Cal. 2004).

In *Diebold*, unlike *Rossi*, there was no dispute about the factual basis for the defendant's DMCA notices. The parties agreed that the copyrighted works at issue were the email archives from Diebold's corporate email system and that the plaintiffs had posted those archives in their entirety on their web servers. *Diebold*, 337 F. Supp. 2d at 1198–99. The emails indicated that some of Diebold's employees believed there were problems with its voting machines. *Id.* at 1197.

Thus, the court was asked to decide whether the posting of those works was a fair use under the Copyright Act and whether Diebold had knowingly misrepresented that the archive was not authorized by law. *Id*. at 1204. Looking at the statute in context, the court concluded:

> the statutory language is sufficiently clear on its face and does not require importation of standards from other legal contexts. A party is liable if it "knowingly" and "materially" misrepresents that copyright infringement has occurred. "Knowingly" means that a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations.

*Id*. (citing BLACK'S LAW DICTIONARY (8th ed. 2004)).

The court granted summary judgment that Diebold had violated section 512(f) because it knew *or should have known* that the postings were fair. *Id*. ("no reasonable copyright holder could have believed that the portions of the email

archive discussing technical problems with [its] voting machines were protected by copyright."). That is, the court held that because a reasonable observer in Diebold's position would have known *as a legal matter* that the postings were fair use, Diebold violated section 512(f).[39]

### 3. The objective standard used in *Online Policy Group v. Diebold* is consistent with other cases that apply an objective standard to determine good faith.

Presented with a similar question in this litigation, the district court erroneously concluded that *Rossi* had modified the legal landscape to require a subjective standard for both legal and factual determinations. 6ER 1044–46. Instead, the district court should have recognized that any subjective standard mandated by *Rossi* applies only to factual beliefs, and that the court's own analysis in *Diebold* presented the appropriate standard for legal determinations like the one at issue in this case.

Such an approach is consistent not only with Congress's intent but also the use of the phrase "good faith" in section 512(c)(3)(A)(v). The phrase good faith does not mandate a subjective standard; quite the contrary. For example, courts have relied on an objective standard when deciding whether a copyright lawsuit

---

[39] At a hearing in the case, Diebold appeared to acknowledge that at least some of the emails were fair uses. *Id.* at 1203. The decision does not, however, reflect any concession by Diebold that it subjectively knew about the fair uses at the time it sent the DMCA notice.

was brought in good faith. *See Religious Tech. Ctr.,* 908 F. Supp. at 1368
(awarding fees because "no reasonable copyright holder could have in good faith
brought a copyright infringement action").

Similar examples abound outside of the copyright context. For example, a
prior version of Rule 11[40] allowed attorneys to avoid sanctions when relying on "a
good faith argument for an extension, modification, or reversal of existing
law . . . ." *Zaldivar v. City of Los Angeles,* 780 F. 2d 823, 828 (9th Cir. 1986)
(quoting Rule 11, as amended in 1983). Examining this clause, this Court
explained that "[i]t is obvious from the text of the Rule that the pleader need not be
correct in his view of the law." *Id.* at 830. But the pleader cannot avoid sanctions
by relying on an objectively unreasonable legal position:

> A good faith belief in the merit of a legal argument is an *objective
> condition* which a competent attorney attains only after "reasonable
> inquiry." Such inquiry is that amount of examination into the facts and
> legal research which is reasonable under the circumstances of the
> case. Of course, the conclusion drawn from the research undertaken
> must itself be defensible.

*Id.* at 831 (emphasis added).

*Rossi* addressed what inquiry was reasonable under the circumstances
presented, and held that the MPAA was entitled to believe Rossi's own statements

---

[40] The *Diebold* court declined to rely on a later version of Rule 11 when
interpreting section 512(f). 337 F. Supp. 2d at 1204. That later version of Rule 11
did not, however, use the phrase "good faith."

about the content of his site, even though those claims turned out to be false. *Zaldivar,* like *Diebold,* addresses what must be done with the results of that inquiry, in order to qualify as a belief held in good faith. It holds (in the context of the 1983 version of Rule 11) that one's good faith in reaching a legal conclusion must be judged using an objective standard.

Similarly, in bankruptcy law, courts also apply an objective good faith standard to determine whether a trustee can recover property transferred while insolvency loomed. *See, e.g., In re Nieves*, 648 F.3d 232 (4th Cir. 2011). If the transferee knew or should have known the transfer was suspicious, it has not acted in good faith and may be forced to return the property. *Id*. at 239–40 (adopting an "objective good faith standard [that] probes what the transferee knew or should have known, taking into consideration the customary practices of the industry in which the transferee operates."). As the Fourth Circuit Court of Appeals has noted, that standard comports in turn with sections of the Uniform Commercial Code, such as the implied duty of good faith in contract, U.C.C. § 1-304 (2001), which treat good faith as having both a subjective and objective component. *See* U.C.C. § 1-201(b)(20) (defining "good faith"). Under the subjective prong, a court looks to the honesty in fact of the party; under the objective prong, it looks to whether the party has abided by routine business practices and relevant statutory requirements. *Id.; see also Rudiger Charolais Ranches v. Vam De Graaf Ranches*, 994 F.2d 670,

41

672–73 (9th Cir. 1993).

An objective standard also comports with the most basic assumptions about the rule of law. It requires those who wish to use the law as a sword have a basic understanding of the weapon. The Supreme Court's decision in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573 (2010) is instructive. In that case, the Court considered a provision of the Fair Debt Collection Practices Act ("FDCPA") that allowed a debt collector to avoid liability where it can show its actions "resulted from a bona fide [i.e. good faith] error." 15 USC § 1692k(c). The Court was asked to decide whether this "bona fide error" defense extended to a mistake of law. *See* 559 U.S. at 576. The Court concluded that while the FDCPA's good faith defense applied to factual errors, it did not apply to mistakes of law. *Id.* The *Jerman* Court began its analysis with a fundamental principle: "ignorance of the law will not excuse any person, either civilly or criminally." *Id.* at 581 (quoting *Barlow v. United States*, 7 Pet. 404, 411 (1833) (opinion for the Court by Story, J.)); *see also Kyle v. Campbell Soup Co.*, 28 F.3d 928, 932 (9th Cir. 1994) ("the general rule [is] that a mistake of law does not constitute excusable neglect").

> ### 4.    Applying a subjective standard to legal determinations under section 512 would encourage censorship of online speech.

A subjective standard for legal determinations under section 512 would mean that ignorance of the law would not only be an excused, it would be

793876

encouraged. *See Jerman*, 559 U.S. at 588 (noting that excusing subjective legal errors creates an "affirmative incentive" not to learn about the law). A copyright owner's subjective belief that a use was infringing, even if unreasonable, could allow it to send frivolous or even malicious DMCA takedowns without fear of redress under section 512(f).

The situation grows worse if the Court accepts Universal's position that one cannot subjectively know a given use is fair absent a specific legal ruling. For example, Disney could incorrectly cause the takedown of a video that uses a series of very short, transformative clips from Disney movies to tell an entirely new story,[41] or Universal could even cause the takedown of a negative review of a Prince CD. Under Universal's theory, DMCA takedowns for these examples would be excused because, absent an *ex ante* legal determination on the issue, there would be no way for these copyright holders to "actually know" the legal status of the material's use.

These are not exaggerated risks. Consider just a few real-world examples of takedown abuse over the past several years:

(1) In June 2013, an Australian music publisher used YouTube's automated takedown process, Content ID, and the DMCA to force the takedown of an entire

---

[41] *See A Fair(y) Use Tale,* http://www.youtube.com/watch?v=CJn_jC4FNDo.

lecture delivered and posted by Professor Lawrence Lessig because it included

illustrative clips of a number of videos set to a piece of music in which the

company held copyright. When Professor Lessig counter-noticed pursuant to

section 512(g), the publisher, Liberation Music, threatened to take legal action

within 72 hours if Professor Lessig did not withdraw his counter-notification. This

was not the first time Professor Lessig had seen his lectures taken down due to an

improper copyright claim.[42]

    (2) In August 2013, the Alberta tourism bureau, Travel Alberta, sent a

takedown notice targeting a satirical video that happened to use four seconds of a

Travel Alberta advertisement. The video was tied to a fundraising campaign by

Andy Cobb and Mike Damanskis, Los Angeles-based satirists who have authored

over 100 political comedy videos. Cobb and Damanskis were inspired by an ad

from the Canadian oil industry that encouraged viewers to "come see for yourself"

the environment around Alberta's oil projects. Cobb and Damanskis decided to do

just that and film a documentary there. Their short video, created as part of their

---

[42] Michael B. Farrell, *Online Lecture Prompts Legal Fight on Copyright*, BOSTON GLOBE (Aug. 27, 2013), *available at* http://www.bostonglobe.com/business/2013/08/26/harvard-law-professor-sues-record-company-over-phoenix-lisztomania/jqYkgFaXSgGpd2hL2zsXsK/story.html.; Lawrence Lessig, *Update on Warner Music (UPDATED) (AGAIN),* LESSIG (Apr. 30, 2009), *available at* http://www.lessig.org/2009/04/update-on-warner-music/.

793876

fundraising efforts, was targeted because it includes glimpses of the Travel Alberta commercial, as part of its commentary.[43]

(3) News organizations have repeatedly used the DMCA takedown process to target political ads that contain clips of news broadcasts as part of their commentary.[44]

(4) In January 2013, Jonathan McIntosh found his remix video *Buffy vs. Edward: Twilight Remixed*—which was mentioned by name in official recommendations from the U.S. Copyright Office regarding DMCA exemptions for transformative noncommercial video works—was taken down due to a DMCA takedown notice. After three months of legal wrangling, Lionsgate finally relinquished its claim.[45]

DMCA abuse is well-documented,[46] and it is precisely what Congress

_____

[43] Mitch Stoltz, Using Copyright to Silence Oil Sands Satire? How Crude. (Aug. 20, 2013) https://www.eff.org/deeplinks/2013/08/using-copyright-silence-oil-company-satire-how-crude.

[44] CENTER FOR DEMOCRACY & TECHNOLOGY, CAMPAIGN TAKEDOWN TROUBLES: HOW MERITLESS COPYRIGHT CLAIMS THREATEN ONLINE POLITICAL SPEECH, *available at* http://www.cdt.org/files/pdfs/copyright_takedowns.pdf (describing how broadcasters sent DMCA takedown notices to remove political ads from a number of campaigns without considering fair use and finding that such removal chilled political speech).

[45] Jonathan McIntosh, *Buffy vs. Edward Remix Unfairly Removed by Lionsgate*, *available at* http://www.rebelliouspixels.com/2013/buffy-vs-edward-remix-unfairly-removed-by-lionsgate.

[46] *See generally* Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe*

intended section 512(f) to deter. Requiring a copyright holder to both (a) conduct a factual investigation sufficient to justify a subjective belief about the facts of a given use and then (b) form an objectively reasonable belief about the legal import of those facts is consistent with that intent.

To be clear, in the vast majority of instances this task will not be difficult. In many cases, as in *Rossi,* a reviewer will be confronted with facts that make the legal conclusion of infringement simple. In other instances, as here or in the Lessig example described above, a reviewer will be confronted with facts that make the legal conclusion of *non*-infringement equally simple. In edge cases, where it is not immediately clear whether the use is lawful, the reviewer need only form a reasonable belief, and need not be certain that every court would agree with that belief—only that there is an objectively reasonable basis for it.

Finally, an objective standard, like the requirement to consider fair use at all, helps reconcile the DMCA with the First Amendment. The Supreme Court has repeatedly affirmed that while Congress has broad latitude to exercise its power under Article I, section 8, it goes too far when it alters the traditional contours of copyright. *Golan v. Holder,* 132 S. Ct. 873, 890 (2012); *see also Eldred v.*

---

*Harbor: Chilling Effects of the DMCA on the First Amendment,* 24 HARVARD J.L. & TECH. 171 (2010), *available at* http://jolt.law.harvard.edu/articles/pdf/v24/24HarvJLTech171.pdf.

*Ashcroft,* 537 U.S. 186, 219 (2003); *Harper & Row Publishers, Inc. v. Nation Enter's,* 471 U.S. 539, 560 (1985). Mindful of this balance, courts hesitate to restrain speech where a party has raised a colorable fair use defense. In *Suntrust v. Houghton-Mifflin,* for example, the court explicitly recognized fair use's "constitutional significance as a guarantor to access and use for First Amendment purposes." 268 F.3d 1257, 1260 n.3 (11th Cir. 2001). Because a viable fair use defense was available, the court concluded "the issuance of the injunction was at odds with the shared principles of the First Amendment and the copyright law, acting as a prior restraint on speech . . . ." *Id.* at 1276–77.

In *Suntrust*, of course, the defendant had an opportunity to plead her fair use case. The DMCA contemplates a scheme whereby the secondary user has no opportunity even to raise a fair use defense before her speech is restrained. Universal reads that to mean it need not consider fair use at all, much less be charged with an obligation to make a reasonable determination as to whether or not the doctrine might apply.

Precisely the opposite is true. "Any prior restraint on expression comes to [court] with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. O'Keefe*, 402 U.S. 415, 419 (1971). Courts have consistent rejected prior restraint based only on ex parte review. *See Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 184-85 (1968); *Procter & Gamble Co. v. Bankers*

*Trust Co.*, 78 F.3d 219, 225–26 (6th Cir. 1996); *Howard Gault Co. v. Texas Rural Legal Aid, Inc.,* 848 F.2d 544, 561 (5th Cir. 1988). A law that grants a private actor the power to do what even a court cannot—cause the prior restraint of speech based on a purely *ex parte* review—alters not only the traditional contours of copyright protection but of our fundamental free speech doctrines. Such a law can only be tolerated, if at all, if the exercise of that power is tied to an obligation to understand what the law *is*, and to make reasonable assertions based on that understanding.

### D. Based on the facts readily available to it, Universal should have known Ms. Lenz's video was lawful.

Where the material facts are not disputed, fair use is an issue of law. *Fisher v. Dees,* 794 F.2d 432, 436 (9th Cir. 1986). With respect to what Universal *would* have concluded had it actually considered fair use, there are no material facts in dispute.

First, nothing in the video suggests that the *purpose and character* of the use was anything other than noncommercial and transformative. There was no reason—none—to imagine that her blurry 29-second home video was created for any commercial purpose. *See Campbell*, 510 U.S. at 578–579. Universal nonetheless claims that Ms. Lenz's use was "indisputably commercial in nature," simply because it was posted to YouTube, which is itself a commercial enterprise. Br. 9, 38. But the notice at issue asserted that *Ms. Lenz's use* was not authorized by

48

law. "The crux of the profit/non-profit distinction is . . . whether *the user* stands to profit from exploitation of the copyrighted material without paying the customary price." *L.A. News Serv.*, 149 F.3d at 994 (quoting *Harper & Row*, 471 U.S. at 562) (emphasis added). The question is whether *Ms. Lenz's* use is commercial, not whether YouTube's is.

Ms. Lenz's use was in any event transformative in that it made a use of the work—a use in the genre of family home videos—that was distinct and separate from its original context and added additional creative elements, such as a voice talking over the music and children dancing and running around. *See generally A&M Records, Inc. v. Napster, Inc.,* 239 F.3d. 1004, 1015 (9th Cir. 2001) (transformative works are those which do not "merely supplant" the original work but rather add "a further purpose or different character"); *Campbell,* 510 U.S. at 579 (transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright"). A transformative work "is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.,* 150 F.3d 132, 142 (2d Cir. 1998) (citation omitted). Universal points to absolutely nothing about the video (aside from the legally irrelevant point that *YouTube* is commercial) that suggests that the first factor militates against fair use.

Second, while the *nature of the original work* is indisputably creative, this

49

factor tends to carry the least weight in the fair use analysis. Indeed where, as here, the use is transformative, the nature of the work is "not . . . terribly significant in the overall fair use balancing." *Mattel,* 353 F.3d at 803 (citation omitted). Moreover, there is no question that the original work was published many years ago, which means the composer has already been amply compensated and this factor carries even less weight. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–821 (9th Cir. 2003).

Third, the *amount and substantiality* of the use is minor. The entire video is less than thirty seconds long. *See* 4ER 526. And due to the noise and commotion made by the children, the song *Let's Go Crazy* can only be heard in the background for approximately 20 seconds—less than ten percent of the original work—and even then not all that clearly. *See id.;* 2SER 327:1–9; *see generally Harper & Row,* 471 U.S. at 564 ("[T]he Act directs us to examine the amount and substantiality of the portion used in relation to the copyrighted work as a whole."). Moreover, Ms. Lenz used no more than necessary to fulfill her purpose, as is evident from the video itself: a video of her son "dancing" to music in her kitchen. "If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly*, 336 F.3d at 820–21.

Fourth, *there is no remotely plausible market harm*. The snippet of the composition that plays in the background of the video (not dubbed as a soundtrack)

could not substitute for the original Prince song in any conceivable market, *Fisher,* 794 F.2d at 438, given the brief use of the work, the low audio quality of the ordinary digital video camera Ms. Lenz used, the household noises, laughter and talking that partially obscure the music, and the sounds made by the toys that Ms. Lenz's children are pushing around the kitchen during the video—all of which is apparent simply by watching the video. Moreover, because Ms. Lenz's use was noncommercial and transformative, market harm cannot be presumed and is in fact unlikely. *Campbell,* 510 U.S. at 591 ("No 'presumption' or inference of market harm . . . is applicable to a case involving something beyond mere duplication for commercial purposes."); *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003) ("The more transformative the new work, the less likely the new work's use of copyrighted materials will affect the market for the materials."), *overruled on other grounds by Flexible Lifeline Sys. v. Precision Lift, Inc*., 654 F.3d 989, 994–95 (9th Cir. 2011).

Indeed, Universal has never tried seriously to contend that the video itself could have a demonstrable effect on an actual market for *Let's Go Crazy*. Universal simply declares that the only relevant market is the "synchronization license" market for this specific song, and that Prince has a right to choose to opt out of that market with respect to user-generated content. But that does not mean Ms. Lenz's use is not fair—if it did, the fair use right would be almost

meaningless. Moreover, this Court has held that a copyright holder's refusal to license a work for the use in question weighed *in favor* of a fair use finding where the work was necessary to the transformative purpose. *See Mattel*, 353 F.3d at 806 (no market harm where copyright owner would not enter the relevant market).

None of the cases Universal cites are to the contrary. In *Salinger v. Random House*, for example, the court simply recognized that an author's refusal to publish his letters did not end the market harm analysis, and went on to consider whether the use in question could harm a potential market. 811 F.2d 90, 99 (2d Cir. 1987). Here, as explained above, it self-evidently could not. *Monge v. Maya Magazines, Inc.,* concerned photos the copyright owners had not yet chosen to publish (even though they were "undisputedly in the business of selling images of themselves") and took into account evidence that the potential market for the photos had dropped as a result of the disputed publication. 688 F.2d 1164, 1181-82 (9th Cir. 2012). And in *Worldwide Church of God v. Philadelphia Church of God*, *Inc.*, the copyright owner testified that it intended to publish an annotated version of the work in question. 227 F.3d 1110, 1119 (9th Cir. 2000).

Even if Prince or Universal were amenable to licensing rights for this song for home videos, it is preposterous to imagine that any parent would—or should— seek such a license in order to share a video of her children playing in the kitchen. Indeed, court after court has rejected similar attempts to manufacture market harm

52

where there was no likely market for the challenged use of the copyrighted works. *Id.*; *see also Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991) (affirming district court's finding of no reasonable likelihood of injury to alleged market where, inter alia, alleged potential market was "highly improbable"); *Kane v. Comedy Partners*, No. 00 Civ. 158 (GBD), 2003 WL 22383387, at *7 (S.D.N.Y. Oct. 16, 2003) (to avoid danger of circularity, copyright owner not entitled to license fees for uses that otherwise qualify as fair uses); 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13.05[A][4] (2005) ("it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar.").

Universal implies that it might have considered the possible effects of "unrestricted and widespread" uses like the video. Br. 40. Courts have rejected similar efforts to ignore the key issue of substitution, particularly where the copyrighted work is embedded in another, transformative work. In *Kramer v. Thomas*, No. CV 05-8381 AG (CTx), 2006 WL 4729242 (C.D. Cal. Sept. 28, 2006), for example, the court found that there was no market harm where a composition was embedded in a DVD collection, and specifically rejected the plaintiff's "unrestricted and widespread" use theory:

> Nobody who wanted to listen to the compositions would choose to do so by paying $65 for a 12-hour 3-DVD set in which sonically limited portions of the compositions are anonymously nested in less than 1% of the work. . . . Unrestricted and widespread collection of these

53

DVD's would not result in a substantially adverse impact on the potential market for the original composition.

*Id.* at *11. Similarly, unrestricted and widespread use of *Let's Go Crazy* as incidental background music in 30-second home videos could not possibly harm any market for Prince's works.

Universal had all the facts it needed to determine that that Ms. Lenz's use was lawful, if only it had bothered to consider the issue. On these facts, it should have known that Ms. Lenz's use was lawful and therefore made a knowing misrepresentation when it stated otherwise.

## IV. There is a dispute of material fact regarding whether Universal willfully blinded itself to whether Ms. Lenz's use was lawful.

The Court should reverse the district court's denial of Ms. Lenz's motion for summary judgment, either because Universal knowing misrepresented that it held a good faith belief that Ms. Lenz's video was not authorized by law, or because no reasonable person in Universal's position could have concluded, based on the facts available, that Ms. Lenz's use was infringing. But if the Court concludes otherwise, it should affirm the district court's conclusion that Universal was not entitled to summary judgment that it was not willfully blind to Ms. Lenz's fair use.

Under copyright law, proof of willful blindness will suffice to establish knowledge and, therefore, bad faith. "Willful blindness is knowledge, in copyright law . . . as it is in the law generally." *In re Aimster Copyright Litig*., 334 F.3d 643,

650 (7th Cir. 2003). In *Dolman v. Agee,* 157 F.3d 708 (9th Cir. 1998), for example, a record producer was found to have willfully infringed where it continued to produce and market a song collection "despite knowing that someone owned the copyrights in the music, and being presented with evidence regarding [plaintiff]'s claim of ownership." *Id.* at 715 (emphasis in original). In other words, the producer was charged with knowledge when it was shown that he knew certain facts but actively disregarded their implications. Willful blindness requires that the defendant "must subjectively believe that there is a high probability that a fact exists," and the defendant must "take deliberate actions to avoid learning this fact." *Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2070 (2011).

As to the first prong, the district court correctly held that Ms. Lenz "is free to argue that a reasonable actor in Universal's position would have understood that fair use was 'self-evident,' and that this evidence of Universal's alleged willful blindness." 1ER 20.

That is, a reasonable actor would have understood that a review process that failed to consider fair use was bound to erroneously identify fair uses as infringement, especially given what Universal claims is a tremendous quantity of allegedly infringing material on YouTube. Br. 10. That, in turn, is circumstantial evidence of what Universal *did in fact* understand. *See* 1ER 20. Because a jury would be entitled to credit this circumstantial evidence, Universal could not rely on

an absence of evidence in order to obtain summary judgment. Instead, Universal was only entitled to summary judgment if it proffered undisputed evidence *negating* this element, which it failed to do.

As to the second prong, the district court correctly held that a trier of fact could conclude that Universal took deliberate actions to avoid learning whether any particular use of Prince's works was a fair use.  1ER 21.  Ms. Lenz submitted ample evidence showing the following: ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

  ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████  It then deliberately sent takedown notices

claiming to have formed a good faith belief that those videos were not authorized by law, though it knew it could not have formed such a belief.

In short, Ms. Lenz submitted evidence that Universal deliberately and systematically closed its eyes to its own wrongdoing. Universal was confronted with actual facts establishing fair use (and thus noninfringement). According to Universal's own admissions, it willfully ignored those facts—indeed, it set up a takedown system that would inevitably *require* ignoring those facts–and, therefore, rendered itself incapable of forming a good faith belief that Ms. Lenz's video, or any other video, was not authorized by law. The district court correctly held that this evidence sufficed to create a jury question on the issue of willfulness.

## V.    Ms. Lenz was damaged.

Universal incorrectly argues that Ms. Lenz was not damaged by its misrepresentations. As explained below, section 512(f) expansively creates liability for "any" damages caused by a defendant's misrepresentations, not just pecuniary losses. And as is also explained below, Ms. Lenz presented unrebutted evidence of three classes of damages: (1) nominal damages for harm to her speech rights; (2) damages for time Ms. Lenz expended getting her video restored to YouTube; and (3) attorneys' fees and costs. The district court therefore correctly declined to grant Universal summary judgment on the issue of damages.

793876

### A. In keeping with its purpose, section 512(f) creates liability for "any damages," thereby embracing the broadest definition of damages.

Universal's claim that Ms. Lenz was not damaged unless she suffered direct monetary loss, Br. at 44, cannot be reconciled with the DMCA itself. "The plain meaning of legislation . . . [is] conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v Ron Pair Enter's, Inc*, 489 U.S. 235, 242 (1989) (quotation marks and citation omitted).

In keeping with its speech-protective purpose, section 512(f) is unusually broad, imposing liability for "*any* damages." 17 U.S.C. § 512(f) (emphasis added). The plain meaning of "'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). This terminology on its own demands that "damages" in section 512 be given a generous scope. "Congress' choice of the language '*any* damage' . . . undercuts a narrow construction." *United States v. James,* 478 U.S. 597, 605 (1986), *abrogated on other grounds by Central Green Co. v. United States*, 531 U.S. 425, 436 (2001) (emphasis in original). "[T]he adjective 'any' is not ambiguous; it has a well established meaning." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1337 (11th Cir. 1999) (en banc) (citation omitted) (construing "any person or class of

persons").

Thus, to avoid rendering the word "any" mere surplusage, section 512(f) must be understood to include any type of damages recognized under the law, rather than only pecuniary losses. *See Astoria Fed Sav & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (statutes should be construed "so as to avoid rendering superfluous . . ." any statutory language); *see generally* Damages, Restatement of the Law, Second, Torts, Chapter 47, Section 902; Dan B. Dobbs, Law of Remedies, §§ 3.2-3.3 (2d Ed. 1993).

Moreover, the legislative history reinforces the broad reading of "any damages" commanded by the plain meaning of section 512(f). Congress stated that section 512(f)

> is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and internet users.

S. Rep No. 105-190, at 49 (1998) (emphasis added); *see also* H. Rep. No. 105-551, Part (1), at 27 (1998). The wide range of damages invoked by "any damages" is an effective deterrent, as intended by the drafters. By contrast, a narrow interpretation that limits recovery to out-of-pocket costs, or to costs incurred solely in preparing a counter-notification, would do little in many cases to deter copyright owners from making knowingly false infringement allegations to free services like YouTube, and thus would run contrary to Congresses intent.

59

Congress was well aware of possible alternative language, and in fact used such language elsewhere in the same statute. In passing the DMCA, Congress enacted both section 512(f), using the phrase "any damages," and section 1203(c)(1)(A), which uses the narrower "actual damages." 17 U.S.C. § 1203(c)(1)(A). "Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Indeed, Congress's choice here is telling. As noted above, "'any' has an expansive meaning." *Gonzales*, 520 U.S. at 5. "Actual," on the other hand, suggests a limitation. *See Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc*., 335 F. Supp. 2d 466, 468 (S.D.N.Y. 2004) ("concepts of punishment for infringement, deterrence of similar behavior in the future, and recompense for the costs and effort of litigation . . . form no part of 'actual damages' under the statute"); *see also Jarvis v. K2 Inc*., 486 F.3d 526, 535 (9th Cir. 2007) (citing *Stehrenberger*).

Universal nonetheless insists that Congress couldn't have meant what it said when it chose the phrase "any damages" because, Universal insists, a damages claim divorced from pecuniary loss would run contrary to common law. First,

construing "any damages" to mean "only some types of damages" would run

contrary *to the express words of the statute.* Second, common law is not to the

contrary. As a leading commentator on damages has observed, "it is hard to justify

the position that damages must be denied in all cases of non-pecuniary injury.

Some damages awards have never been truly 'compensatory' and there is no

essential reason why they must always be so." Dobbs § 3.1.1.

Thus, the district court correctly held that "[t]he use of 'any damages' [in the

statute] suggests strongly Congressional intent that recovery be available for

damages even if they do not amount to . . . substantial economic damages." 1ER

22. Any other reading "would vitiate the deterrent effect of the statute." 1ER 23.

## B.    "Any damages" includes nominal damages for impairment of free speech rights.

As a result of Universal's false assertion of infringement, YouTube disabled

access to Ms. Lenz's video, impairing Ms. Lenz's freedom of speech. 1SER 101 ¶

10. Ms. Lenz seeks only nominal damages for the harm Universal caused to her

speech rights. Because nominal damages are a legally cognizable form of damages,

they fall within "any damages."

The district court erred by holding that harm to speech rights caused by

private actors cannot be compensated with nominal damages. 1ER 21-22. Ms.

Lenz is not arguing that Universal "violated" the First Amendment, because the

First Amendment by its terms applies only to state action. Ms. Lenz simply notes

61

that the right to speak unquestionably has value—that is precisely why the

Constitution prohibits Congress from making any law abridging freedom of

speech. *See New York Times Co. v. United States,* 403 U.S. 713 (1971) (any loss of

First Amendment rights can cause irreparable injury); *Risdal v. Halford*, 209 F.3d

1071, 1072 (8th Cir. 2000) (holding that trial court plainly erred by failing to

instruct jury that award of nominal damages was required upon proof of

infringement of plaintiff's First Amendment right to speak); *see generally Yniguez

v. Arizonans for Official English*, 69 F.3d 920, 949 (9th Cir.1995) (en banc),

*vacated on other grounds,* 520 U.S. 43 (1997).

Nothing in section 512(f) requires that Ms. Lenz quantify the harm caused

by taking her speech offline. Indeed, the very purpose of nominal damages is to

vindicate rights where the precise damages are difficult to ascertain. Nor are

nominal damages limited to harm caused by government actors. *See, e.g., Celle v.

Filipino Reporter Enter's Inc.,* 209 F.3d 163, 179 (2d Cir. 2000) (nominal damages

for defamation *per se*).

Moreover, this Court should look to the reality of the DMCA bargain. The

DMCA takes the takedown process out of the courts and gives private actors the

extraordinary power to demand removal of what might well be—and in this case

is—lawful speech. As discussed above, that grant of power threatened to alter the

traditional contours of copyright by impeding fair uses, and protection of online

62

free speech in this context was of paramount importance to the drafters of section 512. *See Batzel,* 333 F.3d at 1031 n. 19 (9th Cir. 2003) (DMCA procedures "carefully balance the First Amendment rights of users with the rights of a potentially injured copyright holder."). Allowing for nominal damages for impairing speech rights helps ensure that legitimate speakers can challenge improper takedowns whether the cause is state or private action.

### C.    "Any damages" includes damages for lost time, even if no wages were lost.

Ms. Lenz is also entitled to damages for the time she lost while struggling to get her video restored to YouTube. 1SER 100-01 ¶ 9. That this time is not tied to any concrete lost wages might raise a question of whether this is a *pecuniary* loss, *see* 1ER 22, but as discussed above, section 512 damages are not limited to pecuniary losses. Ms. Lenz's time can be valued at the Pennsylvania minimum wage at the time, which was $6.25/hour. 34 Pa. § 231.101(2). Ms. Lenz also used her computer while working to restore her video to YouTube. 1SER 100-01 ¶ 9. As the district court noted, necessarily that required electricity, for which Ms. Lenz had to pay. *See* 1ER 22.

### D.    Section 512(f) permits recovery for attorney fees and costs.

Finally, Ms. Lenz incurred attorneys' fees and costs, in two forms.

63

793876

1.    **Ms. Lenz is entitled to damages because counsel assisted her with the DMCA counter-notification process.**

Ms. Lenz retained counsel to advise her in connection with ensuring access to her video was restored. 1SER 94-95, 100 ¶ 7. Counsel agreed to represent Ms. Lenz *pro bono* ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ 8ER 1438. Ms. Lenz agreed, however, that counsel ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 8ER 1439. Among other things, she ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ 8ER 1440. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

Based on counsel's then-rates, Ms. Lenz is entitled to $1,275 in damages for that work. 1SER 95 ¶¶ 5-7; 8ER 1439 § 5; 17 U.S.C. § 512(f) (damages include "costs and attorneys' fees"); 6ER 997-98 ("any fees incurred for work in responding to the takedown notice and prior to the institution of the suit under § 512(f) are recoverable under that provision . . . ."); 8ER1565.

Universal argues that those fees were not "incurred," because Ms. Lenz's counsel represents her *pro bono,* and even if counsel were awarded fees, that would not result in an "any money out of her own pocket . . . ." Br. 49-50. But, as discussed above, section 512(f) does not limit damages to out-of-pocket losses.

Moreover, court after court, including this Court, has held that the fees and

costs of *pro bono* attorneys are recoverable on the same basis as for any other attorney. *See Morrison v. C.I.R.,* 565 F.3d 658, 662 (9th Cir. 2009) (plaintiff "can 'incur' attorneys' fees if he assumes either: (1) a noncontingent obligation to repay the fees advanced on his behalf at some later time; or (2) a contingent obligation to repay the fees in the event of their eventual recovery."). Indeed, that equal footing is essential to the continued viability of *pro bono* legal representation. *Cuellar v. Joyce* 603 F.3d 1142, 1143 (9th Cir. 2010) (fee award to *pro bono* counsel can help ensure law enforced; "[f]ee awards serve in part to deter frivolous litigation, and denying fees in this case would encourage abducting parents to engage in improper delaying tactics whenever the petitioning parent is represented by pro bono counsel."); *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 681 (N.D. Cal. 1974) (in awarding attorney fees, the court must not decrease reasonable fees merely "because the attorneys conducted the litigation more as an act pro bono publico than as an effort at securing a large monetary return."); *American Ass'n of Retired Persons v. EEOC*, 873 F.2d 402, 406 (D.C. Cir. 1989) (reasonable fees and expenses for *pro bono* counsel are recoverable even though "if we denied fees, they would not pay any fees to counsel").

### 2.  Ms. Lenz is entitled to damages because counsel has assisted and is assisting her with this litigation.

Second, Ms. Lenz incurred fees and costs bringing this action to hold Universal accountable for its misconduct. Indeed, even were this Court to deny all

65

other forms of damages, Ms. Lenz's attorneys' fees and costs in connection with this litigation are not nominal, are unrelated to her lack of employment, and include actual, out-of-pocket costs. *See* 1SER 150:1-7, 153:21-155:13; *see also* 1SER 106:22–25, 100 ¶¶ 6–7, 9.

The district court nonetheless cabined those damages, concluding that litigation fees and costs are not recoverable as damages under section 512(f). 6ER 997-98.[47] This was error. The statute expressly includes "costs and attorneys' fees" in its definition of recoverable damages. 17 U.S.C. § 512(f)(2). That language is unambiguous and notably absent from it is any suggestion that such fees and costs do not include those incurred in enforcing one's rights under that very subsection.

Universal nonetheless argues that Congress cannot have intended section 512(f) to include litigation fees, because section 512(f) limits recovery to damages incurred *as a result of* an improper takedown. But Ms. Lenz's litigation fees and

---

[47] Ms. Lenz raised this issue below during briefing of a prior motion. *See* 6ER 997-98. In her motion for summary judgment, Ms. Lenz reserved the right to raise the issue again on appeal. 8ER 1565 n.23. The Court may address "those issues *material* to the order from which appeal has been taken." *In re Cinematronics, Inc.*, 916 F.2d at 1449. Because Universal challenges all of the other forms of damages Ms. Lenz seeks, the issue of whether litigation fees and costs are recoverable is material to the order denying the cross-motions for summary judgment. Thus, just as review of a prior order where reconsideration of the prior ruling provides grounds for reversal of the certified order, *id.,* so too is review of the prior order proper here, where reconsideration of the prior order provides grounds for affirming the denial of Universal's motion for summary judgment on the issue of damages.

costs are undoubtedly as a result (i.e. caused by) Universal's misrepresentation; absent that misrepresentation, there would have been no litigation. *See Suarez v. Barrett (In re Suarez),* 400 B.R. 732, 741 (B.A.P. 9th Cir. 2009) (Jury, J., concurring) (attorneys' fees and costs incurred by creditor were "'as a result of,' 'with respect to' and 'by reason of' debtor's violation of the injunction and court order," because "[b]ut for debtor's willful and malicious behavior, no attorneys fees and costs would have been incurred nor awarded by statute").

This reading is consistent with other cases construing the phrase "as a result of," including in the Copyright Act. *See* William Patry, 6 PATRY ON COPYRIGHT § 22:101 (2013) (causation under Copyright Act section 504(b) damages is "expressed as a 'cause-in-fact' or 'but for' relationship," citing "as a result of" in statutory text); *Williams v. United States.,* 503 U.S. 193, 203 (1992) (construing 18 U.S.C. § 3742 and concluding that, when a district court intends to depart from the guideline range, the sentence is nevertheless "imposed 'as a result of' a misapplication of the Guidelines if the sentence would have been different but for the district court's error"); *Maryland Cas. Co. v. Regis Ins. Co.,* No. CIV.A. 96-CV-1790, 1997 WL 164268, at *4–*5 (E.D. Pa. April 9, 1997) (construing "as the result of" clause in an insurance policy merely to require "but for" causation, because no higher level of causation was stated explicitly).

Universal argues that this interpretation allows a "bootstrap" because the

67

mere filing of a section 512(f) lawsuit will necessarily result in damages. Br. 49. But in section 512, damages are expressed only as the *remedy* for a violation of the statute. *See* 17 U.S.C. § 512(f). Nothing in the structure of the statute suggests that damages are a prerequisite to a finding of liability, and thus there is no "bootstrapping" problem.

The entire purpose of section 512(f) is to enable users to hold copyright owners accountable for unlawful takedowns. Giving the plain language of section 512(f) its full scope allows the statute to serve its intended purpose.

## CONCLUSION

For the foregoing reasons, Ms. Lenz respectfully requests that this Court *affirm* the denial of Universal's motion for summary judgment, *reverse* the denial of Ms. Lenz's motion for summary judgment, and remand for further proceedings regarding determination of Ms. Lenz's damages.

Respectfully submitted,

Dated: December 6, 2013          KEKER & VAN NEST LLP


By: */s/ Michael S. Kwun*
      MICHAEL S. KWUN

*Attorneys for Plaintiff, Appellee, and Cross-Appellant STEPHANIE LENZ*

793862

## STATEMENT OF RELATED CASES

These cross-appeals, Case Nos. 13-16106 and 13-16107, are related cases.

Plaintiff-Appellee-Cross-Appellant Stephanie Lenz is not aware of any other

related cases.


Dated: December 6, 2013            KEKER & VAN NEST LLP



                                   By: */s/ Michael S. Kwun*
                                       MICHAEL S. KWUN

                                   *Attorneys for Plaintiff, Appellee, and Cross-*
                                   *Appellant STEPHANIE LENZ*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2013, I electronically filed the foregoing APPELLEE AND CROSS-APPELLANT'S ANSWERING AND OPENING BRIEF ON CROSS-APPEAL—PUBLIC REDACTED VERSION, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:        December 6, 2013

KEKER & VAN NEST LLP


By:  */s/ Michael S. Kwun*
        Michael S. Kwun
        *Attorneys for Plaintiff, Appellee*
        *And Cross-Appellant*
        *STEPHANIE LENZ*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby

certify that the attached brief complies with the type-volume limitation in Federal

Rule of Appellate Procedure 28.1(e)(2)(B)(i). It is proportionately spaced using

Microsoft Word 2010 in 14-point Times New Roman type, and contains 16,441

words, not including those sections excluded in Federal Rule of Appellate

Procedure 32(a)(7)(b)(iii).


Dated: December 6, 2013            KEKER & VAN NEST LLP



By: */s/ Michael S. Kwun*_____
     MICHAEL S. KWUN

*Attorneys for Plaintiff, Appellee, and Cross-Appellant STEPHANIE LENZ*

# SERVICE LIST

Kelly M. Klaus
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

793862