**Nos. 13-16106 & 13-16107**

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

STEPHANIE LENZ,

*Plaintiff-Appellee-Cross-Appellant,*

*v.*

UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC., AND
UNIVERSAL MUSIC PUBLISHING GROUP.,

*Defendants-Appellants-Cross-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of California

## BRIEF OF AMICI CURIAE AUTOMATTIC INC.; GOOGLE INC.; TWITTER INC.; AND TUMBLR, INC. SUPPORTING PLAINTIFF-APPELLEE-CROSS-APPELLANT LENZ

Joseph C. Gratz
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
415-362-6666

*Attorneys for Amici Curiae
Google Inc.; Twitter Inc.; and
Tumblr, Inc.*

Marvin Ammori
Lavon Ammori
AMMORI GROUP
1527 S St. NW
Washington, DC 20009
202-505-3680

*Attorneys for Amicus Curiae
Automattic Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *Amici Curiae* certifies the following information:

None of Automattic Inc., Google Inc., or Twitter Inc. has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any of them. The parent corporation of Tumblr, Inc. is Yahoo! Inc.; Yahoo! Inc. does not have a parent corporation, and no publicly held corporation owns 10% or more of the stock of Yahoo! Inc.

# TABLE OF CONTENTS

**PAGE NO.**

IDENTITY AND INTEREST OF AMICI CURIAE ...............................1

INTRODUCTION AND SUMMARY OF ARGUMENT........................4

ARGUMENT ........................................................................................6

    I.    Unfounded DMCA Takedown Notices are Common and Impose a Burden on Both Online Service Providers and the Free Exchange of Ideas. ..................................................................6

    II.    A Copyright Owner Who Sends a Takedown Notice Must Form a Good Faith Belief that a Given Use is Not Authorized by Law, Including Fair Use, or Risk Liability Under Section 512(f). ...........14

    III.    "Any Damages" under the DMCA Encompasses Litigation Costs................................................................18

CONCLUSION ..................................................................................22

CERTIFICATE OF COMPLIANCE...................................................23

CERTIFICATE OF SERVICE............................................................24

ii

# TABLE OF AUTHORITIES

PAGE NO.

## Cases

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) ................................................................................. 5

*Capitol Records, LLC v. Vimeo, LLC*, 09 Civ. 10101 (RA), 09 Civ. 10105 (RA), 2013 WL 5272932 (S.D.N.Y. Sept. 18, 2013) ............................. 18

*DeGeorge v. U.S. Dist. Court*, 219 F.3d 930, 939 (9th Cir. 2000) ........... 16

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008) ................................................................................. 7

*Lenz v. Universal Music Corp.,* 5:07-CV-03783-JF, 2010 WL 702466 (N.D. Cal. Feb. 25, 2010) ..................................................... 19

*Lenz v. Universal Music Corp.,* 5:07-CV-03783-JF, 2013 WL 271673 (N.D. Cal. Jan. 24, 2013) .................................................... 15

*Lenz v. Universal Music Corp.,* 572 F. Supp. 2d 1150 (N.D. Cal. 2008) 15

*Online Policy Grp. v. Diebold, Inc.,* 337 F. Supp. 2d 1195 (N.D. Cal. 2004) ................................................................................. 13

*Reno v. Am. Civil Liberties Union,* 521 U.S. 844 (1997).......................... 6

*Rossi v. Motion Picture Association of America*, 391 F.3d 1000 (9th Cir. 2004) ...................................................................... 6, 15, 16, 18

*Ruff v. Sullivan*, 907 F.2d 915 (9th Cir.1990) ....................................... 15

*Sony Comp Ent'mt Am., Inc. v. Bleem, LLC,* 214 F.3d 1022 (9th Cir. 2000) ................................................................................. 8

## Statutes

17 U.S.C. § 505 ........................................................................................ 19

17 U.S.C. § 512 ..................................................................................... 3, 7

17 U.S.C. § 512(c) ...................................................................... 14, 17, 18

17 U.S.C. § 512(f) ............................................................................ passim

17 U.S.C. § 512(g) ............................................................................. 13, 14

17 U.S.C. § 512(i) .................................................................................... 17

17 U.S.C. §§ 107–123 .............................................................................. 17

## Other Authorities

Complaint, *Automattic Inc., et al v. Chatwal*, No. 13-cv-5411 (N.D. Cal. filed Nov. 21, 2013) ............................................................................ 2, 9

Complaint, *Automattic Inc., et al v. Steiner*, No. 13-cv-5413 (N.D. Cal. Nov. 21, 2013) .................................................................................... 2, 8

Copyright Removal Requests – Google Transparency Report, http://www.google.com/transparencyreport/removals/copyright/ ........ 10

Cory Doctorow, *The Criticism That Ralph Lauren Doesn't Want You To See!*, BoingBoing (Oct. 6, 2009, 10:32 AM), http://boingboing.net/ 2009/10/06/the-criticism-that-r.html ..................................................... 13

Electronic Frontier Foundation, *Takedown Hall of Shame: Music Publisher Tries to Muzzle Podcast Criticizing Akon*, https://www.eff.org/takedowns/music-publisher-tries-muzzle-podcast-criticizing-akon. ................................................................................... 13

H.R. Rep. No 105-551 .............................................................................. 19

Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 Wake Forest L. Rev. 745 (2011) ...................................................................................... 13

S. Rep. No. 105-190 ...................................................................... 19

Tim Cushing, *'Attribution Troll' Issues DMCA Notice To Remove Critical Posts From Techdirt, Boing Boing and Popehat*, TechDirt (Nov. 14, 2013, 9:55 AM), https://www.techdirt.com/articles/20131114/08190525241/ ...................................................................... 9

U.S. Copyright Office, *Directory of OSP Designated Agents*, http://www.copyright.gov/onlinesp/list/a_agents.html ......................... 7

**Rules**

Fed. R. App. P. 29(a) ...................................................................... 1

Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief by *amici curiae*.

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

Automattic Inc. operates WordPress.com, a web-based publishing platform.  The WordPress.com platform is powered by the open-source WordPress software, which is available for anyone to use or improve for free.  Automattic's mission is to democratize publishing. WordPress.com hosts sites for some of the largest media companies in the world, including the New York Post, CNN, and Time.  It also hosts more than 33 million individual blogs operated by small businesses, individuals, and citizen journalists who publish on a wide range of topics, such as national and local politics, community affairs, legal analysis and education, food, photography, health, and religion, among many others. More than 91 million people visit the WordPress.com network of sites per month, making it the seventh-most-trafficked website on the Internet.  Alongside journalists who use WordPress.com, Automattic

---

[1] Amici hereby certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than Amici contributed money intended to fund preparing or submitting the brief.

1

has recently brought two misrepresentation suits under the DMCA against parties who submitted abusive DMCA notices.[2]

Google Inc. is one of the world's most popular and best-known online service providers. In addition to its eponymous search engine, Google provides a wide range of other products and services—including online video hosting through YouTube.com, blog hosting through Blogger, and a social-networking platform through Google+—that empower people around the world to create, find, organize, and share information.

Tumblr, Inc. was founded in 2007 by its CEO David Karp in New York City, and is now a wholly-owned subsidiary of Yahoo! Inc. Tumblr's mission is to serve creators by providing the best products and services, on all platforms, to enable them to create their best work and distribute it online to the audience that they deserve. Tumblr is home to over 150 million blogs and nearly 70 billion posts that reach an audience of hundreds of millions of people worldwide each month.

Twitter is a global platform for public self-expression and conversation in real time. Twitter has more than 230 million monthly active users, spanning nearly every country, and creating

---

[2] *See* Complaint, *Automattic Inc., et al. v. Steiner*, No. 13-cv-5413 (N.D. Cal. Nov. 21, 2013); Complaint, *Automattic Inc., et al. v. Chatwal*, No. 13-cv-5411 (N.D. Cal. filed Nov. 21, 2013).

approximately 500 million Tweets every day. The platform is unique in its simplicity: Tweets are limited to 140 characters of text. This constraint makes it easy for anyone to quickly create, distribute and discover content.

*Amici* are all online service providers (OSPs) within the meaning of the Digital Millennium Copyright Act ("DMCA") and rely on the DMCA's safe harbor framework. This framework is codified in Section 512 of the Copyright Act and is designed to balance the interests of copyright holders, OSPs, and Internet users. A central feature of Section 512 is its "notice-and-takedown" system, which establishes a procedure for a copyright holder or its agent to notify an OSP of allegedly infringing activity on the OSP's service. Upon receipt of a compliant copyright infringement notification, if the OSP expeditiously removes or disables access to the allegedly infringing material, it enjoys a safe harbor from monetary damages and most forms of injunctive relief. Abusive and unfounded takedown notices interfere with an OSP's business, can silence valuable free expression, and can constitute harassment of an OSP's users. Therefore, *amici* have a significant business interest in a legal framework that deters unfounded takedown notices that cause removal of non-infringing content and suppress their users' lawful speech.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Unfounded and abusive takedown notices inflict real harms on OSPs, Internet users, and copyright holders. Every time an unfounded takedown notice results in the removal of legitimate, non-infringing content posted by a user, it constitutes unjustified censorship of the user's right to share speech with others and interferes with the OSP's business of hosting and disseminating that user's speech. If, in an effort to protect users from abusive notices, an OSP diverts resources to screen the notices it receives, those are resources diverted from more productive uses. And to the extent preventative screening measures create delays for valid notices sent by other copyright holders, the abusive notices harm the copyright holders whose notices are delayed in the queue behind them. These are not speculative harms; *amici* collectively have extensive experience with abusive and unfounded takedown notices and the burdens that such notices impose on both the resources of OSPs and the free expression of their users.

In *amici*'s experience, most DMCA notices—including those sent by UMG and its supporting *amici*—are valid, well-founded, and sent in good faith. But the DMCA process is not available only to well-established rights-holders, and even those rights-holders are not above reproach in all cases. Some DMCA notices are obviously and facially indefensible, sent not to protect valid copyright interests, but instead to

4

silence lawful speech. This includes, but is not limited to, situations where the speech targeted plainly constitutes a fair use.[3]

Congress enacted Section 512(f) to deter abuses of the notice-and-takedown system that it created in the DMCA. That provision entitles both users and OSPs to bring claims against those who send abusive notices.[4] A reading of that provision that hinges liability solely on the subjective knowledge of the copyright holder will not achieve that goal. Such an interpretation would lead to the illogical result that the more objectively unreasonable a copyright holder is, the more legal leeway it has to send unfounded notices. This result would jeopardize not just the kinds of commentary, criticism, and parodies that fall well within the bounds of fair use, but also expressive conduct that is non-infringing for other reasons. This cannot have been, and was not, what Congress had in mind when enacting Section 512(f).

 *Amici* therefore respectfully urge the Court to hold that a copyright holder who sends a takedown notice must form a good-faith

---

[3] UMG and its *amici* are certainly correct when they say that fair use cases can present difficult questions. But that is not true of all fair use scenarios, as Appellee points out. *See* Lenz Br. 26-27; *see also, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692 (7th Cir. 2012) (dismissing copyright infringement claim before discovery, finding an "obvious case of fair use").

[4] *Amicus* Automattic has two such actions pending against those who sent abusive takedown notices to its WordPress service. *See* cases cited *supra* note 2.

belief (*i.e.*, both objective and subjective) that a given use is not otherwise authorized by law (including not a fair use) or face liability under Section 512(f). That result is dictated by the plain words of the statute and is consistent with the holding of *Rossi v. Motion Picture Association of America, Inc.*, 391 F.3d 1000 (9th Cir. 2004). In order to accomplish Congress's goal of deterring abuses of the notice-and-takedown system, the Court should further confirm that prevailing plaintiffs are entitled under Section 512(f) to recover attorneys' fees and costs incurred in the course of prosecuting their claims.

## ARGUMENT

### I. Unfounded DMCA Takedown Notices are Common and Impose a Burden on Both Online Service Providers and the Free Exchange of Ideas.

The Supreme Court has recognized that the Internet revolutionized individuals' capacity for expression, transforming any person into "a pamphleteer" or "a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 870 (1997). Online service providers have built the tools—search engines, video hosting services, blogging platforms, social networks—that have made this promise real, transforming the Internet into a participatory and interactive global platform for public discourse, expression, and the exchange of ideas and creativity on a wide range of subjects by any individual with access to the Internet.

In enacting the DMCA, Congress created a safe harbor framework that provides copyright holders with a streamlined process for removing content, provides online service providers with remedial safe harbors, and provides aggrieved persons with a cause of action to deter abuse of the framework. According to U.S. Copyright Office records, more than 66,000 OSPs today rely on the notice-and-takedown framework established in Section 512, including not only each of the *amici*, but also a diverse array of businesses united only by their operation of websites where users might post infringing materials or links to infringing materials. U.S. Copyright Office, *Directory of OSP Designated Agents*, http://www.copyright.gov/onlinesp/list/a_agents.html.

*Amici* have direct experience with the costs inflicted on their businesses, their users, and other copyright holders, by abusive and unfounded DMCA takedown notices.

Many times each week, *amicus* Automattic receives a takedown notice that appears motivated not by an interest in protecting copyright but a desire to improperly silence critics. A common example is where a copyright holder who wants to remove unflattering criticism about its business or products on a WordPress.com blog, sends a takedown notice to Automattic alleging infringing use of its business name or logo. The use of names or logos, however, is obviously a fair use in the context of the criticism. *See, e.g., E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1098 (9th Cir. 2008). Another common example is

where an individual, unhappy with criticism of statements she made on a public social networking site, sends a takedown notice identifying the screen-shot image of the statements as infringement. *See, e.g.*, *Sony Comp Ent'mt Am., Inc. v. Bleem, LLC,* 214 F.3d 1022, 1029 (9th Cir. 2000) (holding that a computer screen-shot image used for different purpose than the original use was fair use). Employers also commonly send takedown notices to unmask employee critics and stifle criticism. Other specific examples include:

- An individual sent a takedown request to remove an interview he had in fact authorized, because the interview included his own embarrassing words revealing homophobia. *See* Complaint, *Automattic Inc., et al. v. Steiner*, No. 13-cv-5413 (N.D. Cal. Nov. 21, 2013).

- A medical transcription training service using forged customer testimonials on their website submitted a takedown for screenshots of the fake testimonials in a blog post exposing the scam.

- An animal rights activist, after trying and failing to get a critical blog taken down that used screenshots of conversations with her, submitted a DMCA for all the images on the site, which would have rendered the criticism and commentary meaningless.

8

- A major game development company submitted a takedown request for 81 images on a rival company's blog, where the images were used in the context of highlighting what the latter company saw as the former's questionable business practices.

- A company in India copied a WordPress.com blog then submitted a DMCA takedown notice for the blog with the claim that it was violating their copyright. *See* Complaint, *Automattic Inc., et al. v. Chatwal*, No. 13-cv-5411 (N.D. Cal. Nov. 21, 2013).

*Amicus* Google Inc. similarly receives abusive and unfounded DMCA takedown notices on at least a weekly basis. Here are just a few examples:

- A poet sent repeated takedown notices targeting criticism and commentary relating to the poet's online copyright enforcement efforts.[5]

- A well-known publisher of children's books sent a DMCA takedown notice targeting the use of excerpts by a critic discussing the use of gun imagery in children's literature.

---

[5] *See* Tim Cushing, *'Attribution Troll' Issues DMCA Notice To Remove Critical Posts From Techdirt, Boing Boing and Popehat*, TechDirt (Nov. 14, 2013, 9:55 AM), https://www.techdirt.com/articles/20131114/08190525241/.

9

- A major investment bank sent a takedown notice targeting documents showing that the bank had been analyzing the effect of political unrest on oil markets.

- A physician claiming a copyright in his signature sent a takedown notice aimed at a document related to the suspension of his license to practice medicine.

- Major broadcast news networks sent takedown notices targeting McCain-Palin campaign videos that included brief excerpts from news footage just weeks before the 2008 presidential election.

- A major soft drink company sent a takedown notice targeting a YouTube news channel for including excerpts from a commercial in its critical coverage of that commercial.

These are only a sample of takedown notices where obvious fair uses are implicated.  Google receives hundreds of notices that suffer from similar defects, often repeatedly from the same vexatious submitters, and devotes substantial human and machine resources in an attempt to identify these abusive notices among the tens of millions of DMCA notices that Google processes each month.[6]

---

[6] *See* Copyright Removal Requests – Google Transparency Report, http://www.google.com/transparencyreport/removals/copyright/.

*Amicus* Tumblr has received in the past, and regularly receives, DMCA takedown notifications that are baseless and intended to silence lawful speech. For example:

- An internet celebrity submitted a DMCA notice to remove a police incident report regarding an altercation at the celebrity's residence.

- A physician demanded removal of newspaper excerpts posted to a blog critical of the physician, by submitting a DMCA notice in which he falsely claimed to be a representative of the newspaper.

- A model involved in a contract dispute with a photographer submitted a series of DMCA notices seeking removal of images of the model, for which the photographer was the rights holder.

- A famous actor submitted a DMCA notice seeking removal of a photograph of his residence obtained in public via Google Earth, falsely claiming to be the rights holder for the Google Earth photograph.

- A prominent state governor submitted a DMCA notice seeking removal of photographs of the governor posted on a political parody site, and taken in public by third-party rights-holders.

- The spouse of a famous official submitted a DMCA notice asserting a copyright claim over a Tumblr URL that merely referenced the official's name.

*Amicus* Twitter similarly receives notices that suffer from similar defects, including repeated reports from the same vexatious submitters. For example:

- An office equipment manufacturer submitted a DMCA notice seeking removal of a video showing teenagers engaged in good-humored misuse of the company's product.

- An international corporation submitted DMCA notices seeking removal of images of company documents posted by a whistleblower.

- A frequent submitter of DMCA notices submitted a DMCA notice seeking removal of a screenshot of an online discussion criticizing him for submitting overreaching DMCA notices.

For all *amici*, processing these abusive takedowns diverts resources from the OSPs' more productive activities and can result in delays in processing for legitimate, good-faith takedown notices.

The problem of abusive DMCA takedown notices does not affect only *amici*. Over the past years, the news media have covered numerous similar situations involving different OSPs. These examples include a manufacturer of electronic voting machines sending takedown

12

notices, just prior to an election, to suppress criticism of the machines' integrity and security;[7] a religious organization's attempt to silence its critics by sending out takedown notices;[8] a well-known fashion company's attempt to silence a blogger criticizing the company for digitally altering an image in its advertisement to portray a model as unnaturally skinny;[9] and several examples posted on EFF's "Takedown Hall of Shame."[10]  But the examples that garner the attention of the media amount to only the tip of a much larger iceberg that OSPs must deal with on a daily basis.

    As these examples illustrate, the DMCA's counter-notice-and-put-back procedures, while important and valuable, have not been enough to remedy the harms to users, nor to deter abuse. The lack of a sanctions regime under Section 512(g) can embolden vexatious

---

[7] *Online Policy Grp. v. Diebold, Inc.,* 337 F. Supp. 2d 1195, 1198 (N.D. Cal. 2004).

[8] *See* Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 Wake Forest L. Rev. 745, 747 (2011).

[9] Cory Doctorow, *The Criticism That Ralph Lauren Doesn't Want You To See!*, BoingBoing (Oct. 6, 2009, 10:32 AM), http://boingboing.net/2009/10/06/the-criticism-that-r.html.

[10] Electronic Frontier Foundation, *Takedown Hall of Shame: Music Publisher Tries to Muzzle Podcast Criticizing Akon*, https://www.eff.org/takedowns/music-publisher-tries-muzzle-podcast-criticizing-akon.

copyright owners to send repeated takedown notices for the same material, resulting in a "yo-yo" of notices and counter-notices (each notice triggering a new 10-day statutorily-mandated waiting period during which the material remains inaccessible). Moreover, in the experience of *amici,* the vast majority of users who have content improperly taken down do not counter-notify, perhaps intimidated by the statutory requirements or the threat of litigation. To counter-notify, the user must consent to the jurisdiction of the local federal court and risk the possibility of litigation, which can be costly and time-consuming, regardless of the eventual outcome. Moreover, a counter-notice also requires a user to provide her real name, address, and telephone number, which can be problematic for anonymous bloggers and commenters engaged in critical political speech or whistleblowing. 17 U.S.C. § 512(g)(3). Not only can false takedown notices censor lawful speech, they can also lead to self-censorship in the future, discouraging critics who have already received such notices.

## II. A Copyright Owner Who Sends a Takedown Notice Must Form a Good Faith Belief that a Given Use is Not Authorized by Law, Including Fair Use, or Risk Liability Under Section 512(f).

Those issuing a DMCA takedown notice must attest to having a "good faith belief that use of material in the manner complained of is not authorized by…the law." 17 U.S.C. § 512(c)(3)(A)(v). Fair uses are "authorized by the law." Therefore, a plain reading of Section 512(c)

requires that a copyright owner have formed a good faith belief that the activity it is targeting for takedown is not a fair use, as the district court twice properly held. *Lenz v. Universal Music Corp.,* 5:07-CV-03783-JF, 2013 WL 271673 (N.D. Cal. Jan. 24, 2013); *Lenz v. Universal Music Corp.,* 572 F. Supp. 2d 1150, 1154 (N.D. Cal. 2008). Sending a DMCA notice that falsely attests to such a good faith belief should thus expose the copyright owner to potential liability under Section 512(f).

The district court erred, however, in concluding that *Rossi* made liability under Section 512(f) turn entirely on the subjective state of mind of the defendant. In coming to this conclusion and rejecting its own prior contrary rulings, the court below relied wrongly on dicta in *Rossi.*

The aspect of the *Rossi* ruling that troubled the district court (and that has also troubled other district courts) was its statement that "[a] copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake." *Rossi*, 391 F.3d at 1005. This reading violates both the letter and spirit of Section 512(f), creating a perverse incentive that favors unreasonable copyright holders over those whose subjective beliefs comport with reasonable understandings of the law.

Fortunately, this aspect of the *Rossi* ruling was dicta, and this Court need not distinguish dicta, it can openly reconsider and disregard it. *Ruff v. Sullivan*, 907 F.2d 915, 918 (9th Cir.1990) ("This panel is not

bound by dicta from prior cases[.]"). The interpretation of Section 512(f) that would excuse unreasonable mistakes was dicta because, in *Rossi*, the copyright holder's belief was clearly objectively reasonable. Indeed, the *Rossi* panel found that the belief was "virtually compel[led]" based on the "unequivocal" language and "explicit nature of the statements" on the relevant website. *Id.* at 104-06. Therefore, opining that copyright holders need not meet an objective standard was not "essential to its disposition," and "thus dicta." *DeGeorge v. U.S. Dist. Court*, 219 F.3d 930, 939 (9th Cir. 2000).

Consider the difference between the subjective and objective test in particular examples. *Amicus* Automattic receives notices from businesses asserting the use of unauthorized copyrighted logos in posts criticizing or parodying the copyright holder. It is not objectively reasonable for the business to believe that such uses are not fair use. Yet, under the decision below, the business could maintain that it held a subjective good faith belief, forcing the critic to engage in discovery to find a "smoking gun" email demonstrating subjective knowledge that the use was most likely fair use. The lower court's mistaken interpretation would affect all copyright doctrines, not just those turning on fair use. For example, *amicus* Automattic recently brought a 512(f) suit against an individual who filed a takedown notice claiming that an interview infringed his copyright. The individual had granted the interview and authorized its publication, but had second thoughts

16

and wanted the interview removed from WordPress.com once the interview was posted, complete with accurate, but embarrassing, statements. If "good faith" encompassed a purely subjective standard, then it may be possible for a copyright-holder to escape liability even while conceding to having an objectively unreasonable view of the facts or law. In other words, the more misinformed or unreasonable the copyright owner, the broader the immunity he would have from liability under Section 512(f). This reading of 512(f) would effectively encourage copyright owners to remain ignorant about the limitations on their exclusive rights under the Copyright Act, *see* 17 U.S.C. §§ 107–123, because the less they know, the more leeway they would have to send takedown notices. This cannot be what Congress had in mind.

Requiring copyright holders to form an *objectively reasonable* good faith belief prior to sending a DMCA takedown notice would not impose an undue burden on copyright holders, contrary to the fears of UMG and its supporting *amici*. As pointed out by Lenz, nothing about 512(c)'s "good faith" standard should impose liability on a copyright owner that "guesses wrong" regarding a difficult fair use case. Lenz Br. 46. An objective standard would only require that the "good faith belief" regarding a potential fair use be a reasonable one. Just as the courts have held under Section 512(i) that OSPs have considerable leeway in "reasonably implementing" a policy of terminating subscribers who repeatedly infringe copyrights, *see Capitol Records,*

17

*LLC v. Vimeo, LLC*, 09 Civ. 10101 (RA), 09 Civ. 10105 (RA), 2013 WL 5272932, at *10-13 (S.D.N.Y. Sept. 18, 2013), so too would copyright holders retain leeway in reaching reasonable conclusions about fair use in particular cases.

While UMG and its supporting *amici* suggest that analyzing fair use is an almost impossible burden, they are in fact seeking merely to shift that burden to others, such as OSPs. Rather, the statute correctly presumes that the copyright holder, not the OSP, is the least cost avoider in determining if a work is "authorized by law," including meeting the four fair-use factors. 17 U.S.C. § 512(c)(3)(A)(v). The copyright holder often has the necessary facts to weigh the purpose and character of the use, the nature of the copyrighted work, the amount and substantiality of the portion taken, and effect of the use upon the potential market.

In summary, while the outcome in *Rossi* was correct, its nonbinding dicta, concerning unreasonable mistakes by copyright holders, was ill-considered. This Court should take this opportunity to clarify the law and hold that that good faith requirement in Section 512(c)(3)(A)(v) encompasses not just a subjective standard but also an objective one.

**III.  "Any Damages" under the DMCA Encompasses Litigation Costs.**

The lower court erroneously held that attorneys' fees and costs associated with bringing a claim would not be available to a prevailing plaintiff under the mandatory fee shifting provision in Section 512(f), but would instead be governed by the permissive fee shifting provision in Section 505 of the Copyright Act.  *Lenz v. Universal Corp.,* 5:07-CV-03783-JF, 2010 WL 702466, at *11 (N.D. Cal. Feb. 25, 2010).  This Court should reverse because such an interpretation is contrary to both the express language in the provision and Congress's intent.

Legislative intent demonstrates that Congress added section 512(f) to deter knowing misrepresentations.  S. Rep. No. 105-190, at 49; H.R. Rep. No 105-551, at 59 ("This subsection is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and Internet users.").  Congress's purpose in creating a private right of action for users to recover "any damages" was not simply to compensate those harmed, but also to deter those who would make misrepresentations in the future.  The statute thus provides that a prevailing plaintiff *shall* be entitled to "any damages, including costs and attorneys' fees." 17 U.S.C. § 512(f).

This mandatory fee shifting language stands in contrast to the discretionary language contained in Section 505, the general fee shifting provisions for the Copyright Act.  17 U.S.C. § 505 ("Except as otherwise provided by this title, the court may also award a reasonable

attorney's fee to the prevailing party as part of the costs."). Under Section 505, a court *may*, in its discretion, award attorneys' fees and costs to prevailing plaintiffs and defendants alike. As a remedial statute intended to deter knowing misrepresentations, Section 512(f) explicitly *overrides* the Copyright Act's default fee-shifting standard with a mandatory award only to prevailing plaintiffs. This makes sense, as it operates to protect the interests of those whose injury stems from a knowing misrepresentation. The lower court's interpretation instead yields a perplexing result: a prevailing plaintiff under Section 512(f) would be entitled as a matter of law only to her *pre-litigation* attorneys' fees and costs, and be left in no better position than any other plaintiff (or defendant, for that matter) with respect to her likely much larger attorneys' fees and costs incurred as a result of the litigation itself.

The lower court went astray because it misconceived of "any damages" (including attorneys' fees and costs) as stating an independent element that a plaintiff must prove to make her case under 512(f). The statute provides that:

> Any person who knowingly materially misrepresents under this section…that material or activity is infringing…shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer…or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing….

20

While a plaintiff must show that she has been "injured," the entitlement to "any damages, including costs and attorneys' fees" is a reference to the remedies available to a prevailing plaintiff, not an independent element of the claim. Therefore, the district court's "bootstrapping" concern—that plaintiffs can satisfy the damages element simply by filing a 512(f) case—is misplaced. Congress specified that the alleged infringer must be "injured" by having the speech actually removed or access disabled. Those who can demonstrate injury can bring suit and recover "any damages," including attorneys' fees and costs incurred in bringing the suit.

Congress' decision in Section 512(f) to make an award of attorneys' fees and costs mandatory to prevailing plaintiffs makes good sense. Without an award of litigation costs, many users could not afford to bring a federal lawsuit to keep content online. Where the content taken down is noncommercial, including political or corporate criticism, the monetary damages at stake might be dwarfed by the costs of suit. Therefore, while Section 505's discretionary fee shifting provision might be adequate in some cases, Section 512's mandatory language guarantees recovery of litigation costs and attorney fees and thereby achieves Congress' goal of deterring abusive DMCA takedown notices.[11]

––––––––––––––––

[11] Congress provided that service providers may file 512(f) claims, acknowledging that service providers are damaged by expending valuable resources such as staff time to take down content that has

## CONCLUSION

In support of Plaintiff-Appellee-Cross-Appellant Lenz, *amici* respectfully urge this Court to give full effect to Congress's express intent to deter abuse of takedown procedures in the DMCA.

DATED:  December 13, 2013                 Respectfully submitted,

                                          */s/ Marvin Ammori*
                                          Marvin Ammori
                                          AMMORI GROUP
                                          *Attorneys for Amicus Curiae*
                                          *Automattic Inc.*

                                          */s/ Joseph C. Gratz*
                                          Joseph C. Gratz
                                          DURIE TANGRI LLP
                                          *Attorneys for Amici Curiae*
                                          *Google Inc.; Twitter Inc.; and*
                                          *Tumblr, Inc.*

---

been removed as a result of misrepresentation.  *Amicus* Automattic, alongside two authors publishing on WordPress.com, has initiated suits against two parties who filed DMCA notices without good faith, and did so in pursuit of the congressional goal to deter such abuse.  Automattic would have less incentive to deter such abuse without the possibility of recovering its attorneys' fees in such cases.

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A), because it is written in 14-point Century Schoolbook font, and with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because it contains 4,618 words, excluding the portions excluded under Fed. R. App. P. 32(a)(7)(B)(iii).  This count is based on the word-count feature of Microsoft Word.

DATED:  December 13, 2013            */s/ Joseph C. Gratz*
                                     Joseph C. Gratz
                                     DURIE TANGRI LLP
                                     *Attorneys for Amici Curiae*

23

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on December 13, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that, for any participants in the case who are not registered CM/ECF users, I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days.

DATED:  December 13, 2013          */s/ Joseph C. Gratz*
                                   Joseph C. Gratz
                                   DURIE TANGRI LLP
                                   *Attorneys for Amici Curiae*

24