Nos. 13-16106, 13-16107

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STEPHANIE LENZ,

*Plaintiff, Appellee, and Cross-Appellant,*

v.

UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC., AND
UNIVERSAL MUSIC PUBLISHING GROUP,

*Defendants, Appellants, and Cross-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
Honorable Jeremy Fogel, United States District Judge
Dist. Case No. 5:07-cv-03783-JF

**BRIEF OF AMICI CURIAE THE ORGANIZATION FOR
TRANSFORMATIVE WORKS, PUBLIC KNOWLEDGE, AND
INTERNATIONAL DOCUMENTARY ASSOCIATION
IN SUPPORT OF APPELLEE AND CROSS-APPELLANT
STEPHANIE LENZ**

Julie A. Ahrens - #230170
Timothy D. Greene - #278765
Stanford Law School
Center for Internet and Society
559 Nathan Abbott Way
Stanford, CA 94305
Telephone:  (650) 723-2511
Facsimile:   (650) 725-4086

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure:

As to each of the amici who have joined this brief, none has a parent corporation and no publicly traded corporation owns 10% or more of their stock.

December 13, 2013                            _____/s/_____

Julie A. Ahrens
Timothy Greene
Stanford Law School
Center for Internet & Society
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 723-2511
jahrens@law.stanford.edu

*Attorneys for Amici Curiae*
*The Organization for*
*Transformative Works, Public*
*Knowledge and International*
*Documentary Association*

i

# TABLE OF CONTENTS

Corporate Disclosure Statement ....................................................... i

I. STATEMENT OF INTEREST ........................................... 1

II. ARGUMENT.................................................................. 4

    A. The DMCA Safe Harbors Are Crafted to Balance and Protect the Interests of Rightsholders, Service Providers, *and* Users ................................................................... 7

        1. The DMCA Assigns to Rightsholders the Responsibility of Identifying Infringing Material and Activity .................................................... 7

        2. Rightsholders Are Given the Powerful Tool of Takedown and Section 512(f) Ensures They Use It Thoughtfully, Responsibly, and In Good Faith ............ 10

    B. Takedown Notices Sent Without Considering Fair Use Cause Real Harm to Users ....................................... 14

        1. Creative Speech is Chilled by the DMCA's Notice-and-Takedown Process and Universal's Rule Will Exacerbate the Problem ............................. 14

    C. Universal Exaggerates the Difficulty of Making Fair Use Determinations Before Sending Takedown Notices................ 21

        1. Fair Use Is Not Inherently Unpredictable: There Are Many Types of Uses Easily Identifiable as Fair Use..................................................... 21

        2. Significant Creative Sectors Routinely Make Fair Use Decisions without Resort to Litigation................... 26

III. CONCLUSION.................................................................. 31

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) ..........23

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994)........................................9

*Cariou v. Prince,* 714 F.3d 694 (2d Cir. 2013)........................................................22

*Elsmere Music, Inc. v. Nat'l Broadcasting Corp.*, 623 F.3d 252 (2d Cir. 1980).....26

*Faulkner Literary Rights, LLC v. Sony Pictures Classics Inc.*,
    2013 WL 3762270 (N.D. Miss. Jul. 18, 2013) ....................................................24

*Fogerty v. Fantasy, Inc.,* 510 U.S. 517 (1994) ........................................................23

*Harper & Row, Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ....................10

*Monge v. Maya Magazines, Inc.,* 688 F.3d 1164 (9th Cir. 2012)............................21

*Payne v. Courier-Journal*, 2005 WL 1287434 (W.D. Ky. 2005)............................23

*Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102 (9th Cir. 2007) ...............................7

*Righthaven LLC v. Realty One Grp., Inc.*, 2010 WL 4115413
    (D. Nev. Oct. 19, 2010)........................................................................................24

*Rossi v. Motion Picture Ass'n of Am.*, 391 F.3d 1000 (9th Cir. 2001) ......... 3, 13, 32

*Scott v. WorldStarHipHop, Inc.*, 2011 WL 5082410 (S.D.N.Y. Oct. 25, 2011) .....24

*Seltzer v. Green Day, Inc.,* 2013 WL 4007803 (9th Cir. Aug. 7, 2013).................22

*Shell v. De Vries*, 2077 U.S. App.LEXIS 28317 (10th Cir. Dec. 6, 2007)..............23

*SOFA Entertainment, Inc. v. Dodger Productions, Inc.,* 709 F.3d 1273
   (9th Cir. 2013)......................................................................22

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
   718 F.3d 1006 (9th Cir. 2013) ............................................................7

*Video-Cinema Films, Inc. v. Cable News Network, Inc.*,
   2003 WL 1701904 (S.D.N.Y. Mar. 31, 2003)....................................23

## STATUTES & LEGISLATIVE HISTORY

17 U.S.C. § 107......................................................................8

17 U.S.C. § 512.................................................................. *passim*

S. Rep. No. 105-190 (1998) ............................................ 11, 15

## OTHER AUTHORITIES

*Campaign Takedown Troubles: How Meritless Copyright Claims Threaten
   Online Political Speech*. CTR. FOR DEMOCRACY & TECH., CAMPAIGN
   TAKEDOWN TROUBLES: HOW MERITLESS COPYRIGHT CLAIMS THREATEN
   ONLINE POLITICAL SPEECH (2010) ......................................................20

Comment of Int'l Documentary Ass'n, et al., *In the Matter of Exemption to
   Prohibition on Circumvention of Copyright Protection Systems for Access
   Control Technologies*, Docket No. RM 2011-07 (Dec. 1, 2011) .......................28

Michael C. Donaldson, *Refuge from the Storm: A Fair Use Safe Harbor for
   Non-Fiction Works*, 59 J. COPYRIGHT SOC'Y U.S.A. 477 (2012) .......................25

Recommendation of the Register of Copyrights in RM 2008-8, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 133 (June 11, 2010) ..........................9

Pamela Samuelson, *Unbundling Fair Uses*, 77 FORDHAM L. REV. 2538 (2008) ....25

Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 HARV. J. L. & TECH. 171 (2010)....................................................................18

U.S. Copyright Office, *Public Hearings: Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* (May 7, 2009) ............................................................................16

# I.    STATEMENT OF INTEREST

This case concerns fundamental questions of free speech on the Internet. It presents the opportunity to determine the extent to which rightsholders may censor and chill lawful expression online without consequence, and whether users have a meaningful remedy for the wrongful removal of their content based on false claims of copyright infringement under the Digital Millennium Copyright Act ("DMCA").

When it passed the DMCA, Congress decided how to divide among content owners, Internet service providers, and users the responsibilities of ensuring that copyright remained an "engine of free expression" in the digital age. Part of that decision was enacting Section 512(f) to ensure that users are adequately protected from misrepresentations that result in the wrongful removal of their expressive content. By seeking to substantially weaken Section 512(f), Universal Music Corp. ("Universal") asks this Court to spoil the DMCA bargain, in the process disincentivizing the creation and dissemination of a broad variety of expression.

Amici curiae include the Organization for Transformative Works ("OTW"), Public Knowledge, and the International Documentary Association ("IDA") (collectively, "Amici").[1] OTW is a 501(c)(3) nonprofit organization dedicated to pro-

---

[1]    All parties consent to the filing of this brief. *See* Fed. R. App. P. 29(a). No party's counsel authored this brief in whole or in part, and no party or its counsel

tecting and preserving noncommercial fanworks: works created by fans of existing works, including popular television shows, books, and movies. Public Knowledge is a 501(c)(3) nonprofit public interest organization, working to defend citizens' rights in the emerging digital culture. Its primary mission is to promote online innovation, protect the legal rights of all users of copyrighted works, and ensure that emerging copyright and telecommunications policies serve the public interest. Applying its years of expertise in these areas, Public Knowledge frequently files amicus briefs in cases that raise novel issues at the intersection of media, copyright, and telecommunications law. The IDA was founded in 1982 as a nonprofit membership organization dedicated to supporting the efforts of non-fiction film and video makers throughout the United States and the world; promoting the documentary form; and expanding opportunities for the production, distribution, and exhibition of documentaries. For over three decades, IDA has served as a forum and voice for documentarians around the world. IDA currently serves over 14,000 members and community users in more than fifty countries. Many of IDA's mem-

---

contributed money that was intended to fund preparing or submitting this brief, nor did any other person contribute money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(c)(5).

bers rely on Internet platforms, like Vimeo and YouTube, to share and distribute their films.

Amici write here to highlight how Section 512(f) of the DMCA affects individual users, including documentary filmmakers, and the threats posed to users' speech interests if this Court affirms the decision below. The district court erred by failing to apply Section 512 as written and mistakenly imposing a subjective knowledge standard for legal determinations under Section 512 based on a misreading of this Court's ruling in *Rossi v. Motion Picture Ass'n of Am.*, 391 F.3d 1000 (9th Cir. 2001). Under the lower court's interpretation of the statute, rightsholders would have broad authority to obstruct lawful speech and users would have little to no recourse to stop abuses of that power. The decision below contradicts the meaning of the statute and Congress's intentions in passing it.

Amici submit this brief to clarify for the Court the consequences of a decision adopting the position urged by Universal, that rightsholders bear no responsibility to consider fair use before sending DMCA takedown notices. Section 512's plain meaning requires rightsholders to consider fair use, which is not the impossible task Universal exaggerates it to be. A decision affirming the district court and adopting the rule Universal urges would greatly impair important speech interests and upset the balanced online ecosystem Congress intended to cultivate when it passed the DMCA.

3

## II.   ARGUMENT

When it enacted the DMCA, Congress struck a careful balance between the rights of copyright owners, online service providers, and users. Under Section 512, Congress unambiguously assigned to rightsholders the responsibility of identifying specific instances of infringing conduct on the Internet. In exchange for that duty, the DMCA gives rightsholders a very powerful tool: notice-and-takedown. Recognizing that users have important speech interests at stake in the balance, Congress also wanted to ensure this tool would be used responsibly. It therefore required notice-senders to certify under penalty of perjury that they believe in good faith that the use they wish to have taken down is not authorized by law, and provided a cause of action for misrepresentations about this good faith belief under Section 512(f), specifically so that the notice-and-takedown system would not be used to "shoot first and ask questions later."

Universal suggests that Section 512(f) provides a "narrow cause of action for knowing material misrepresentations," and that a failure to consider fair use "cannot convert an unknowing mistake into a knowing misrepresentation." (Appellants' First Br. on Cross-Appeal at 23–26, 28–40 ("Universal Br.")). Under the rule Universal proposes, Section 512(f) liability would seem to arise only where the rightsholder or its human agent fully understands the line between infringement and non-infringing fair use, and, despite the rightsholder's (or its agent's) conclu-

sion that a given work is not infringing, nonetheless issues a DMCA takedown notice. In other words, Universal suggests that it should escape Section 512(f) liability by completely automating its enforcement efforts—a machine cannot consider fair use, after all—or simply refusing to teach its human enforcers anything about fair use, including the fact of the doctrine's existence. Universal's attempt to avoid Section 512(f) liability in this case and its desire to abdicate any duty to consider fair use before sending takedown notices is a request for this Court to approve Universal's "shoot first" behavior, and to permit Universal and other similarly situated rightsholders to ramp up their automated enforcement efforts. That state of affairs is fundamentally unbalanced in favor of rightsholders and against users. It is neither good policy nor what Congress intended—or even a reasonable approximation of Congress's intent—when it passed the DMCA.

Robust protections for users as provided by Section 512(f) are necessary to ensure the proper balance of rights and responsibilities under the DMCA's notice-and-takedown regime. The Framers adjudged, and Congress has agreed, that a grant of limited exclusivity to the authors of creative works is important. However, as the Framers also realized, free speech matters too. The Supreme Court has clarified time and again that copyright is not absolute. Rather, it is the result of a judgment that more valuable expression—both quantitatively and qualitatively—will be created and disseminated if creators have limited exclusive rights in the fruits of

5

their labors. To that end, the DMCA must balance rightsholders' interests in limited exclusion against users' interests in utilizing copyrighted works in the creation of new expression.

If fair use need not be considered, Section 512(f)'s enforcement mechanism will effectively be gutted and valuable expression will be at risk. Moreover, without the prospect of Section 512(f) liability, rightsholders will have a significantly reduced incentive to avoid making sloppy, indiscriminate, or abusive decisions to send takedown notices. A decision in favor of Universal in this case would upset the system of checks and balances Congress created in Section 512 and harm important speech interests.

This case is fundamentally about creating the right incentives for all parties interested in copyright's Internet presence—rightsholders, service providers, *and* users. This last group is the most poorly situated to respond adequately and accurately to a false takedown notice. And this is especially true where the notice ignores the existence of a well-recognized and crucial First Amendment safeguard like fair use. Systematic overclaiming by rightsholders, combined with systematic lack of legal knowledge and resources by users, means a substantial amount of valuable expression will be suppressed under Universal's rule and the lower court's decision. Further, Universal's claims that it is impossible—or at least pro-

hibitively difficult—to consider fair use outside the litigation context are substantially exaggerated. Not every fair use case is hard.

### A. The DMCA Safe Harbors Are Crafted to Balance and Protect the Interests of Rightsholders, Service Providers, *and* Users.

#### 1. The DMCA Assigns to Rightsholders the Responsibility of Identifying Infringing Material and Activity.

Under Section 512, Congress unambiguously assigned to rightsholders the responsibility of identifying specific instances of infringing conduct on the Internet. *See, e.g.*, *UMG Recordings, Inc. v. Shelter Capital Partners LLC,* 718 F.3d 1006, 1022 (9th Cir. 2013) ("Congress made a considered policy determination that the 'DMCA notification procedures [would] place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright.'") (quoting *Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102, 1113 (9th Cir. 2007)). The law requires that any takedown notice contain a "statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). Further, the copyright owner must state under penalty of perjury that the information in the notification is accurate. 17 U.S.C. § 512(c)(3)(A)(vi).

Rightsholders justly shoulder this burden because they are in the best position to determine whether a given work infringes—they have information related to

ownership status and licensing, and know whether a specific use of their content was authorized or not. They also know the length and nature of the original copyrighted work, and can distinguish material they created from material added to the new work by the user (over which the rightsholder has no claim). Moreover, rightsholders are well situated to know whether a new use competes directly with rightsholders' (or their licensees') material or a market they intend to develop. In this way, rightsholders possess nearly all information relevant to determining whether a targeted use is fair. And as the Copyright Act makes clear, a fair use does not infringe. *See* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of copyright."). And because copyright's exclusivity is limited, a use that is *not unauthorized* by copyright law is, logically, authorized by that law.

Under the DMCA, service providers are given certain protections from liability so that innovation and new speech platforms may flourish. So long as service providers meet the statute's requirements, including responding quickly to rightsholders' takedown notices, they are protected by "safe harbors" from liability for their users' infringing conduct. *See* 17 U.S.C. § 512(c) (describing prerequisites for claiming safe harbor protection).

The implementation of a notice-and-takedown regime not only serves the interests of service providers and content owners, it also profoundly affects individual users, including documentary filmmakers and their free speech rights. Users, af-

8

ter all, are rightsholders in their own right, authoring new and important creative works. *See, e.g., Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578–83 (1994). They discuss and critique, share and promote creative works as authors, fans, and audience members. Video remixers like Jonathan McIntosh build on preexisting works to create new works that adapt, critique, and otherwise utilize those works to project a new message or purpose. *See, e.g.*, rebelliouspixels, *Buffy vs. Edward: Twilight Remixed – [original version]*, YOUTUBE (Jun. 19, 2009), *available at* http://www.youtube.com/watch?v=RZwM3GvaTRM. [2] Many documentary filmmakers share their films on Internet platforms including Vimeo, YouTube and several others. Users' interests, therefore, are vital to any consideration of the proper balance of rights and responsibilities for Internet activity.

The DMCA's carefully balanced division of rights, responsibilities, and protections promotes copyright's goals. Safe harbors for service providers allow for more participants, more speech, and broader dissemination of that speech. The proliferation of platforms that host user-generated content—including Facebook,

---

[2] McIntosh's *Buffy vs. Edward* video was screened for the U.S. Copyright Office during the Office's 2012 hearings on DMCA exemptions. It was cited as a paradigm example of transformative noncommercial remix in the Office's official recommendations. *See* Recommendation of the Register of Copyrights in RM 2008-8, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 133 (June 11, 2010) (citing McIntosh's video).

Twitter, Instagram, YouTube, and Tumblr—is a testament to this division's value, and its fundamental promotion of a robust marketplace of ideas. This explosion in forums for creating and sharing is precisely what copyright law is intended to promote: copyright is meant "to be the engine of free expression[]" that supplies "the economic incentive to create and disseminate ideas." *Harper & Row, Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985). New technologies allow for quicker and easier creation, while online speech platforms allow users to quickly and easily disseminate their new works, enriching the marketplace of ideas in the process.

### 2. Rightsholders Are Given the Powerful Tool of Takedown and Section 512(f) Ensures They Use It Thoughtfully, Responsibly, and In Good Faith.

In exchange for the duty of identifying infringing material and activity, the DMCA gives rightsholders a very powerful tool: notice-and-takedown. The DMCA notice-and-takedown process provides content owners with the extra-judicial ability to enjoin activity they deem infringing. The process is unsupervised by a neutral judge, arbitrator, or other decisionmaker. Congress believed this powerful tool necessary given the Internet's potential for wide-scale infringement and the need to expeditiously halt harmful conduct.

But at the same time, Congress recognized that the need for expediency cannot absolve rightsholders of their obligation to use notice-and-takedown responsibly. Congress understood that it must balance "the need for rapid response to po-

tential infringement" with Internet users' "legitimate interests in not having material removed without recourse." S. Rep. No. 105-190, at 21 (1998). Through Section 512(f), and in concert with Section 512(c)(3)(A)(v)'s requirement that a rightsholder confirm its good faith belief that use of certain material is unauthorized by the owner, its agent, or the law, Congress meant to ensure the notice-and-takedown system would be used thoughtfully and responsibly—not to "shoot first and ask questions later." For this reason, Section 512(f) provides:

> [a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing.

17 U.S.C. § 512(f).

As the Senate's Committee Report noted, Section 512(f) "is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to . . . Internet users."  S. Rep. No. 105-190 at 49. *See also id.* at 50 (noting that Section 512(f) was "added as an amendment to this title in order to address the concerns of several members of the Committee that other provisions of this title established strong incentives for service providers to take down material, but insufficient protections for third parties whose material would be taken down.").

11

In their briefs, Universal, the MPAA, and the RIAA argue that the burden of identifying infringement is too onerous and time-consuming to consider fair use before sending takedown notices. (Universal Br. at 31–35 (arguing that fair use cannot be resolved "quickly and expeditiously[]" because "[i]t is time consuming, 'open-ended,' and indeterminate."); Br. of Motion Picture Ass'n of Am., Inc. as *Amicus Curiae* in Support of Appellants and Reversal at 7–11 ("MPAA Br."); Br. of *Amicus Curiae* The Recording Indus. Ass'n of Am. in Support of Appellants at 12–17 ("RIAA Br.")). Users' rights cannot be considered, they claim, lest content owners be hamstrung and bogged down, unable to police the constant scourge of online copyright infringement. (*See, e.g.,* Universal Br. at 35.) Universal thus urges that its undisputed failure to even consider fair use before sending takedown notices cannot be a basis for Section 512(f) liability. (*Id.* at 28–41.)

Universal's argument completely excises users' interests from the DMCA bargain. As described above, fair use is an absolute defense to infringement—a fair use *does not infringe*. *See* 17 U.S.C. § 107. By definition, then, fair uses are authorized by law. If rightsholders can ignore fair use altogether, they have no obligation to form "a good faith belief that use of the material in the manner complained of is not authorized … by law." 17 U.S.C. § 512(c)(3)(A)(v). Universal emphasizes the takedown regime's speed and efficiency, but ignores the plain fact that Congress included Section 512(f) precisely to deter rightsholders from sending

12

bogus takedown notices that do not adequately consider users' rights, including their right of free expression.

Universal urges this Court to affirm the district court's misreading of *Rossi*, and to mandate a Section 512(f) standard under which the failure to consider fair use cannot sustain liability. But a rightsholder who fails to form any belief about fair use before sending a takedown notice cannot honestly attest that it has formed a good faith belief that the targeted content is not authorized by law. Universal's position is contrary to Congress's use of the phrase "good faith" in Section 512(c)(3)(A)(v) and wholly inconsistent with Congress's intent in adopting the DMCA. As Lenz deftly articulates in her brief, nothing in this Court's ruling in *Rossi* dictates otherwise. (*See* Appellee and Cross-Appellant's Answering and Opening Brief on Cross-Appeal at 30-41 ("Lenz Br.").)

Section 512(f) is meant to have both a deterrent *and* retributive effect. The prospect of liability is meant to discourage rightsholders from sending spurious takedown notices and to encourage rightsholders to act thoughtfully and responsibly when using the notice-and-takedown procedures. Actual liability under Section 512(f) is intended to ensure the deterrent has teeth in order to affect rightsholders' actions, and to compensate users whose expression was improperly silenced. These effects are sought in service of promoting and protecting the creation and dissemination of expression. Ignoring users' rights to make it easier for rightsholders to

send thousands of automated, thoughtless takedown requests upends the careful balance Congress created in the DMCA, with harmful consequences for online expression.

## B. Takedown Notices Sent Without Considering Fair Use Cause Real Harm to Users.

Universal and its supporting *amici* claim that they cannot and should not be required to consider fair use before sending takedown notices for essentially two reasons: (1) any harms due to mistaken takedowns are minimal and adequately remedied by use of the counter-notice system; and (2) fair use is too vague and difficult to identify and consider given the volume of material they have to expeditiously review for infringement. Neither argument is accurate or persuasive.

### 1. Creative Speech is Chilled by the DMCA's Notice-and-Takedown Process and Universal's Rule Will Exacerbate the Problem.

As a nonprofit organization established to preserve fair use values with respect to fans of cultural works, OTW sees firsthand the problems caused by the DMCA's notice-and-takedown system, and why the counter-notice procedure alone is insufficient to protect the speech of creators of new and non-mainstream expression. OTW's experience teaches that Congress was correct when, in addition to providing counter-notice procedures, it realized Section 512(f) was necessary because the notice-and-takedown and put back procedures "established strong in-

14

centives for service providers to take down material, but insufficient protections for third parties whose material would be taken down." S. Rep. No. 105-190, at 50 (1998).

The right to bring a Section 512(f) claim is *separate from and in addition to* the counter-notice procedure. Section 512(f) is intended to discourage spurious takedowns and provide some legal recourse to those individuals or entities on the receiving end of such misrepresentations. Despite Universal's protests to the contrary, overclaiming of DMCA rights is not benign. Rather, the DMCA has been repeatedly used to censor legitimate speech and without any real deterrent provided by Section 512(f) the problem will only grow more malignant.

Users' experiences with the takedown and counter-notice system bring to light several overlapping issues with the DMCA, all of which are made more problematic because, when fair use need not be considered, more takedown notices will be sent *ipso facto*.

First, the DMCA notice-and-takedown system has a patina of governmental intervention. Users' general lack of knowledge about their fair use rights leads them to be more likely to understand overbroad assertions as incontrovertibly true. Users, by and large, are not lawyers. Formal legalistic cease-and-desist letters routinely engender grave fear and uncertainty in the creators Amici counsel. Many in-

dividuals—rightly or wrongly—fear the prospect of governmental intervention even when their actions are clearly protected under prevailing legal principles.

OTW routinely receives requests for help from fanwork creators who believe they may have a fair use defense, but are too intimidated by the DMCA notice to counter-notify. They are worried they will have to reveal their real names and addresses, that their Internet accounts will be suspended, or that if they counter-notify they will get sued despite their strong fair use defenses. Rather than invite the possibility of a lawsuit they lack the resources to defend, they back down. Similarly, many documentary filmmakers report their user accounts have been suspended because of multiple automated takedowns, even though their films only contain lawful uses.

Moreover, as Professor Francesca Coppa noted in her statement to the U.S. Copyright Office during the 2010 DMCA Rulemaking Proceedings, regarding why users are afraid to send counter-notices despite having strong fair use arguments, these fears disproportionately affect women and minorities, who already feel marginalized. *See* U.S. Copyright Office, *Public Hearings: Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, at 0119.4–0120.4 (May 7, 2009) (statement of Francesca Coppa), *available at* http://www.copyright.gov/1201/hearings/2009/transcripts/1201-5-7-09.txt ("To the extent to which [women and minorities] represent marginalized positions,

the extent to which they are making [remix videos] partly because they do not see their views reflected in popular culture, and feel that their position is already marginalized. It's really kind of difficult to say, no, really your speech is valuable, really what you have to say is an acceptable thing to say, stand up and defend yourself against the corporation."). Without a strong disincentive to rightsholder overclaiming provided by Section 512(f), the problem will only grow worse. These distributional concerns are both harmful and real.

Second, the DMCA notice-and-takedown system requires individuals to essentially invite a suit from the copyright holder. *See* 17 U.S.C. § 512(g)(3) (outlining the content of a DMCA counter-notice, which includes "[t]he subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of" specified federal district courts and requires a counter-notifier to make a statement "under penalty of perjury" that she "has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled."). Responding with this information can be problematic for more than just the monetary considerations discussed below. Wendy Seltzer describes one such example:

> The New York State College Republicans, amid a contested battle for control of the College Republicans organization, sent a takedown notice against the weblog "Musings of a New York College Republican," alleging that it copied several photographs and "engaged in 're-mote loading'" of several press releases. The anonymous blogger had been critical of infighting in the College Republicans organization.

17

> The senders of the demand requested identification of the anonymous blogger and threatened legal action if they did not receive it.[3]

This type of censorious behavior is hard to square with the Framers' sufferance—indeed, promotion of—anonymous pamphlet writing during the early years of the United States.

Third, and relatedly, most individual creators who receive takedown notices cannot afford legal counsel to tell them how to file a proper counter-notice, nor whether the risk of suit is worth it. Litigation fees are expensive even without the prospect of monumental statutory damages and attorney fee-shifting. For example, one fan received several DMCA takedown notices related to her Tumblr blog *This Charming Charlie*, which interposed lyrics from songs by The Smiths with Peanuts cartoon strips. She initially planned to simply take down the blog after Tumblr removed the content. Only after receiving a massive flood of public support, including from Morrissey, the former lead singer of The Smiths and author of the lyrics in question,[4] and the assistance of *pro bono* counsel was she willing and able to

---

[3]     Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 HARV. J. L. & TECH. 171, 212 (2010).

[4]     *See* Aaron Souppouris, *Morrissey Saves 'This Charming Charlie' Tumblr from Universal's Bullying*, THE VERGE (Oct. 9, 2013 3:38 AM), *available at*

counter-notify. Most creators threatened with takedown notices are not lucky enough to have such a public outpouring of support.

Another fan received a takedown notice from RIAA for a remix video that included music by the band Nine Inch Nails.[5] The fan decided to remove the work rather than file a counter-notice because the prospect of fighting was too daunting. The fan wrote that she simply did not "have the resources to deal with the possibility, however unlikely, that the copyright holder of the music might sue [her] over it[.]" These chilling effects are real.

Fourth, the put-back process can be prohibitively slow in situations where free speech matters most, such as elections. Campaign advertisements are time-sensitive—by the time the notice-and-takedown process has completed, the ad's value is lost. The Center for Democracy & Technology catalogued many examples of such behavior in its 2010 report, *Campaign Takedown Troubles: How Meritless Copyright Claims Threaten Online Political Speech*. CTR. FOR DEMOCRACY &

---

http://www.theverge.com/2013/10/9/4819260/this-charming-charlie-dmca-takedown-no-lawsuit-morrissey.

[5]     This despite the fact that Trent Reznor of Nine Inch Nails is an outspoken proponent of transformative remix. As early as 2005, Reznor released to fans de-composed versions of his songs to allow those fans to "create remixes, experiment, embellish or destroy what's there." *See, e.g.,* Xeni Jardin, *NIN's Trent Reznor Releases Song as GarageBand File*, BOINGBOING (Apr. 15, 2005 6:10 PM), *available at* http://boingboing.net/2005/04/15/nins-trent-reznor-re.html.

TECH., CAMPAIGN TAKEDOWN TROUBLES: HOW MERITLESS COPYRIGHT CLAIMS THREATEN ONLINE POLITICAL SPEECH *16 (2010), *available at* http://www.cdt.org/files/pdfs/copyright_takedowns.pdf ("In a political campaign, 10 business days can be a lifetime, and the removal of important and timely non-infringing campaign videos for such a period can reduce their effectiveness and potentially impact an election. In other words, the damage is often done by the time a video can be put back online."). *See generally id.* (cataloguing situations in which DMCA notice-and-takedown procedures were used to stifle online political speech).

Counter-notice and put-back cannot be the sole remedy for users because it is insufficient to fully—or even mostly—remedy the problems described above. And that is why Congress adopted Section 512(f). If Universal's position on Section 512(f) is adopted, we can expect much more of the type of censorious behavior described above. Copyright law, including the DMCA, provides recourse only against those uses that infringe the rightsholder's limited exclusive rights. With creative works no less than political advertisements, the law should not empower senders to use the copyright system to censor speech they do not like.

**C.    Universal Exaggerates the Difficulty of Making Fair Use Determinations Before Sending Takedown Notices.**

Universal and its *amici* supporters contend that fair use is too fact-intensive to evaluate before sending a takedown notice. They claim fair use is too grey and unpredictable to recognize without judicial intervention. (Universal Br. at 28–37; MPAA Br. at 17–19; RIAA Br. at 18–22.) These arguments are demonstrably false.

**1.    Fair Use Is Not Inherently Unpredictable: There Are Many Types of Uses Easily Identifiable as Fair Use.**

It is simply not the case that fair use is inherently unpredictable. Even if fair use is "the most troublesome doctrine in the whole law of copyright[,]" *Monge v. Maya Magazines, Inc.,* 688 F.3d 1164, 1170 (9th Cir. 2012) (citation omitted), judges across the country, including in this Circuit, have recognized how many routine fair use scenarios are susceptible to pre-litigation analysis and decision. Indeed, as described above, rightsholders will usually have within their control more than enough information to undertake a reasoned pre-litigation (and pre-DMCA

21

notice) fair use analysis.[6] Despite Universal's protestations to the contrary, not every fair use case is a hard one.

For example, this Court in *SOFA Entertainment, Inc. v. Dodger Productions, Inc.*, affirmed a lower court's award of attorneys' fees to the defendant precisely because the defendant's fair use defense was so obvious. 709 F.3d 1273 (9th Cir. 2013). In *SOFA*, the plaintiff sued the defendant, the producer of the musical *Jersey Boys*, for copyright infringement based on the musical's use of a seven-second clip from *The Ed Sullivan Show* as a "biographical anchor" showing how The Four Seasons found success as an American band during the 1960s' 'British Invasion.' *Id.* at 1278. The Court found in favor of the defendant, noting that its use of the clip was "undoubtably" fair. *Id.* This Court affirmed the award of attorneys' fees

---

[6]  The only information the rightsholder does not have immediately available is related to the user's purpose. However, recent cases have emphasized that a user's statements about what she intended in creating a second work are not the measure of whether the first fair use factor tips in her favor. Rather, the test is objective: what matters is how the work appears to a "reasonable observer" viewing the work in context. *See Cariou v. Prince,* 714 F.3d 694, 707 (2d Cir. 2013) ("What is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work. . . . Rather than confining our inquiry to [the artist's] explanations of his artwork, we instead examine how the artworks may reasonably be perceived . . ..") (internal quotations omitted); *Seltzer v. Green Day, Inc.,* 2013 WL 4007803 (9th Cir. Aug. 7, 2013) (applying *Cariou*). Thus, even if it does not have the artist's statement as to why she used a particular work, the rightsholder can still make a reasoned prediction of how a factfinder would analyze a particular use without need for such information.

because the plaintiff "should have known from the outset that [its] chances of success in this case were slim to none." *Id.* at 1280. "Moreover," the Court wrote, it "agree[d] with the district court that lawsuits of this nature . . . have a chilling effect on creativity insofar as they discourage the fair use of existing works in the creation of new ones." *Id.* (citing *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 527 (1994) ("[D]efendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement.")). *See also Video-Cinema Films, Inc. v. Cable News Network, Inc.*, 2003 WL 1701904 (S.D.N.Y. Mar. 31, 2003) (awarding attorneys' fees where plaintiff's copyright infringement claim based on defendant's use of a short clip from plaintiff's motion picture in television obituaries of actor Robert Mitchum was "objectively unreasonable," noting how an award of attorneys' fees can "deter future copyright owners from using the threat of litigation to chill other fair uses.").

Further, many courts across the country have found it possible to grant a Rule 12(b)(6) motion to dismiss where it is clear on a cursory "side-by-side" comparison of the new, accused work and the underlying, preexisting work that the new work is a fair use. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012); *Shell v. De Vries*, 2077 U.S. App.LEXIS 28317 (10th Cir. Dec. 6, 2007); *Payne v. Courier-Journal*, 2005 WL 1287434 (W.D. Ky. 2005),

*aff'd* 2006 WL 2075345 (6th Cir. 2006). *See also Faulkner Literary Rights, LLC v. Sony Pictures Classics Inc.*, 2013 WL 3762270 (N.D. Miss. Jul. 18, 2013) (granting motion to dismiss plaintiff's copyright infringement claim because defendant's use of a single line of William Faulkner's *Requiem for a Nun* in the Woody Allen film *Midnight in Paris* was an obvious fair use); *Scott v. WorldStarHipHop, Inc.*, 2011 WL 5082410 (S.D.N.Y. Oct. 25, 2011) (granting defendant's motion to dismiss on fair use grounds); *Righthaven LLC v. Realty One Grp., Inc.*, 2010 WL 4115413 (D. Nev. Oct. 19, 2010) (same).

Again, and as these courts have made quite clear, copyright is meant to *balance* rightsholders' interests in limited exclusion against users' interests in relying on copyrighted works to create new works in order to promote the creation and dissemination of expressive works. Copyright cannot possibly do its job if nearly every factual scenario involving the incorporation of a part of one work—however small—into another requires judicial intervention to determine whether it is or is not fair. Although Universal and its *amici* supporters may deny it, courts have recognized this simple fact and acted accordingly.

Indeed, many scholars have shown how courts deal with relatively routine factual scenarios involving fair use defenses. For example, Professor Pamela Samuelson has illustrated how consistent courts have been with respect to commonly reoccurring types of uses. *See generally* Pamela Samuelson, *Unbundling Fair Us-*

24

*es*, 77 FORDHAM L. REV. 2538 (2008). These include well-recognized fact patterns like productive uses in critical commentary (e.g., book reviews), iterative copying for "orthogonal speech-related purposes" (e.g., quoting a magazine article or radio broadcast to critique it), uses for news reporting purposes, as well as uses in social or cultural commentary, uses to support an argument or prove a point, uses to set historical context, use in reference works, uses in litigation or other government purposes, uses in advertising, personal uses, and uses made to promote new technologies or access to information (e.g., search engines and video technology). *See generally id.* (collecting cases).

Copyright attorney Michael Donaldson has also shown how courts generally—and consistently—support fair use defenses in the context of documentary films and other non-fiction works like biographies. *See generally* Michael C. Donaldson, *Refuge from the Storm: A Fair Use Safe Harbor for Non-Fiction Works*, 59 J. COPYRIGHT SOC'Y U.S.A. 477 (2012).

If courts can easily recognize some obvious fair uses, why should it be any different for rightsholders like Universal or its *amici* supporters?

### 2. Significant Creative Sectors Routinely Make Fair Use Decisions without Resort to Litigation.

If fair use were as uncertain and difficult to identify as Universal and its *amici* supporters suggest, we would not have huge creative sectors regularly relying on fair use—the financial risks would be too high. But in fact a vast number of creators—both individual and industrial—routinely identify and rely on fair use in the creation of new works. And as fair use case law has developed and solidified (as described above), lawyers who advise creators are increasingly comfortable counseling clients about what is and is not fair use. While there are certainly grey areas in the fair use case law, not every use falls into them.

Universal and MPAA and RIAA members themselves routinely make fair use decisions during their production processes. Industrial rightsholders like Universal are sophisticated businesses, well-staffed with copyright lawyers, and they make these decisions all the time. Universal's affiliate NBCUniversal, Inc. produces a variety of shows, such as *Late Night with Jimmy Fallon*, *The Tonight Show with Jay Leno*, and *Saturday Night Live*, which for years have included parodies that rely on fair use principles. *See, e.g., Elsmere Music, Inc. v. Nat'l Broadcasting Corp.*, 623 F.3d 252 (2d Cir. 1980) (affirming a grant of summary judgment in favor of NBC, which aired a Saturday Night Live parody of the plaintiff's advertis-

26

ing jingle). Moreover, MPAA members often create documentaries and docudramas that rely on fair use. All this is done without judicial intervention.

There are many lawyers, and quite a few public interest organizations, that regularly provide creators with fair use advice. In addition to OTW's advocacy work in support of fans' right to engage with cultural artifacts, it also regularly consults with fans about their fair use rights. Similarly, the undersigned attorneys run the Documentary Film Program at Stanford Law School's Center for Internet & Society, where they have provided fair use advice to dozens of documentary filmmakers who have successfully, and without controversy, relied on fair use to incorporate unlicensed copyrighted content in their films. *See* Copyright and Fair Use, *available at* http://cyberlaw.stanford.edu/focus-areas/copyright-and-fair-use.[7] Many lawyers in private practice also regularly provide fair use advice to clients.

---

[7]    Several other law schools across the country run similar programs where students and supervising attorneys routinely advise creators on fair use. For example, New Media Rights at California Western School of Law provides similar services for Internet users and creators. *See* New Media Rights Legal Services, *available at* http://www.newmediarights.org/services_new_media_rights_offers. Other schools, including the University of Southern California, University of California-Berkeley, New York University and University of Colorado offer similar assistance to creators.

Relatedly, in the last decade, more and more creative user communities have been able to rely on fair use with the help of guidelines that identify common classes of situations to which fair use is likely to apply. The Center for Media & Social Impact at American University Law School, along with other individuals and groups, has spearheaded the creation of codes of best practices in fair use, which have been instrumental in expanding creators' knowledge about and ability to depend on fair use principles. *See* Best Practices, *available at* http://www.cmsimpact.org/fair-use/best-practices. Creators (including documentarians, poets, online video creators, educators, and journalists) routinely use these guides during their production processes to assess whether uses are likely fair or not.

In addition, insurance companies are increasingly offering errors and omissions insurance to filmmakers and other creators who make fair use of unlicensed copyrighted material in their works. *See* Comment of Int'l Documentary Ass'n, et al., *In the Matter of Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, Docket No. RM 2011-07, at *6 (Dec. 1, 2011) (describing errors and omissions insurance). Insurance companies' ability to assess risk and decide to insure against it testifies to the fact that fair use is not so inherently grey that it cannot be identified and evaluated outside of litigation.

28

It is simply not the case that fair use is too difficult to identify for Universal or others rightsholders to consider when they are deciding which content to target under notice-and-takedown. Universal clearly has the institutional knowledge to evaluate fair use and make fair use calls as part of its day-to-day business. Indeed, the MPAA admits in its brief that it gives a "wide berth to fair uses," thereby placing in question Universal's and its *amici*'s assertions that it is prohibitively difficult to consider fair use without a specific legal ruling. (MPAA Br. at 22 n. 9 ("[T]he MPAA and its members seek to give fair use a wide berth in issuing takedown notices by focusing on blatantly infringing content.")). As the MPAA appears to understand, rightsholders can easily and efficiently separate the "blatantly infringing content[]" from more legally unclear content using information within their control. Sophisticated software algorithms, like YouTube's Content ID system for example, can be—and are—used to detect wholesale and unaltered copying.

After separating the wheat from the chaff, as it were, we suggest only that a closer look be given to the remaining works for which infringement is not quite so "blatant[.]"[8] Section 512 requires at least this much. (See Lenz Br. at 21–28.) And

---

[8] The Electronic Frontier Foundation has proposed a three-step test for implementing filtering technologies, suggesting that content should not be removed

if Universal's *amici*'s numbers are correct with respect to the accuracy of their sorting mechanisms, then the rightsholder's burden should not be unduly weighty. (*See, e.g.*, MPAA Br. at 22 n. 9 (noting how few counter-notices the MPAA receives); RIAA Br. at 21 (noting the "minuscule" number of counter-notices the RIAA receives)). If the number of counter-notices received is so small, and assuming for the sake of argument this means the number of potential fair uses is equally small, it should not be difficult to apply a "closer look" in borderline cases *before* sending the notice in order to better balance the rightsholder's interest in exclusion against the user's—and society's—interest in the creation and dissemination of valuable, free expression.

Congress gave rightsholders this responsibility under the DMCA for good reason. It is much easier for rightsholders to analyze fair use than it is for users in the counter-notification setting, particularly where those rightsholders are industrial organizations like Universal and its *amici* supporters. These entities already employ numerous copyright lawyers who routinely consider fair use in the course of

---

unless: (1) the video track matches the video track of a copyrighted work submitted by a content owner; (2) the audio track matches the audio track of that same copyrighted work; and (3) nearly the entirety (90% or more) of the challenged content is comprised of a single copyrighted work. *See* Fair Use Principles for User Generated Video Content, ELEC. FRONTIER FOUND., *available at* https://www.eff.org/pages/fair-use-principles-user-generated-video-content.

doing business. On the other hand, many users are too frightened or daunted to send a counter-notice or to even seek legal advice. As a practical matter, only a tiny fraction of those who receive overreaching takedown notices know of, or may think to contact, advocacy groups or clinics dealing with these issues. And while some pro bono legal counsel exist, their availability is limited and they cannot represent or provide guidance to all those who need help even if the users know to look for them.

## III.   CONCLUSION

Rightsholders, service providers, and users all have interests at stake in copyright's Internet presence. As illustrated above, however, users are poorly situated to be able to assert their interests in response to a takedown notice. This is especially true where the notice ignores the existence of a crucial speech protection like fair use. Rightsholders exaggerate their rights under the current system. When combined with users' systematic lack of legal knowledge and resources, Universal's proposed rule would magnify this problem, leading to the suppression of a substantial amount of valuable expression. Further, as shown above, Universal's claims that it cannot reasonably consider fair use outside of litigation are markedly overstated. Fair use may be flexible and sensitive to context, but often the context is clear—not every fair use case is hard.

31

The district court's misinterpretation of the knowledge standard required under Section 512 will allow rightsholders to stifle lawful speech and leave users with little protection against rightsholder overclaiming and abuse. The district court's misapplication of the *Rossi* decision and Universal's proposed rule set an insurmountably high a bar for Section 512(f) liability. This Court should reject Universal's request to substantially weaken Section 512(f) and spoil the DMCA bargain Congress plainly provided for in the statute.

Given the weighty speech interests at stake in this case, First Amendment values compel the conclusion that Section 512(f) places on rightsholders the responsibility to consider fair use prior to initiating the DMCA's notice-and-takedown process. This need not be a high bar. But unless the DMCA's highest use is as a cudgel for bludgeoning artists, cultural critics, and other speakers, the bar must exist.

December 13, 2013

Respectfully Submitted,

_____/s/_____

Julie A. Ahrens
Timothy Greene
Stanford Law School
Center for Internet & Society
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 723-2511
jahrens@law.stanford.edu

*Attorneys for Amici Curiae*
*The Organization for*
*Transformative Works, Public*

32

*Knowledge and International Documentary Association*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and (6), because it is written in 14-pt Times New Roman font, and with the type-volume limitations of Rules 28.1(e)(2)(B) and 29(d), because it contains 7,184 words, excluding the portions excluded under Rule 32(a)(7)(A)(iii). This count is based on the word-count feature of Microsoft Word 2010.

December 13, 2013

                                             /s/
                                        Julie A. Ahrens
                                        Timothy Greene
                                        Stanford Law School
                                        Center for Internet & Society
                                        559 Nathan Abbott Way
                                        Stanford, CA 94305-8610
                                        Telephone: (650) 723-2511
                                        jahrens@law.stanford.edu

                                        *Attorneys for Amici Curiae
                                        The Organization for
                                        Transformative Works, Public
                                        Knowledge and International
                                        Documentary Association*

34

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2013, I electronically filed the foregoing BRIEF OF AMICI CURIAE THE ORGANIZATION FOR TRANS-FORMATIVE WORKS, PUBLIC KNOWLEDGE, AND INTERNATIONAL DOCUMENTARY ASSOCIATION IN SUPPORT OF APPELLEE AND CROSS-APPELLANT STEPHANIE LENZ, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

December 13, 2013

_____/s/_____
Julie A. Ahrens
Timothy Greene
Stanford Law School
Center for Internet & Society
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 723-2511
jahrens@law.stanford.edu

*Attorneys for Amici Curiae*
*The Organization for*
*Transformative Works, Public*
*Knowledge and International*
*Documentary Association*