Nos. 13-16106, 13-16107

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

### STEPHANIE LENZ,
*Plaintiff/Appellee/Cross-Appellant,*

vs.

### UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC., AND UNIVERSAL MUSIC PUBLISHING GROUP,
*Defendants/Appellants/Cross-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of California
Honorable Jeremy Fogel, United States District Judge
Dist. Ct. Case No. 07-cv-03783

_____

### APPELLANTS' THIRD BRIEF ON CROSS-APPEAL
### PUBLIC REDACTED VERSION

_____

MUNGER, TOLLES & OLSON LLP
Kelly M. Klaus
Melinda E. LeMoine
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702


Attorneys for Defendants-Appellants-Cross-Appellees
UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC., AND
UNIVERSAL MUSIC PUBLISHING GROUP

## CORPORATE DISCLOSURE STATEMENT

Universal Music Corp. and Universal Music Publishing, Inc. are directly or indirectly owned by Vivendi S.A., which is publicly traded on NYSE Euronext. Universal Music Publishing Group is the colloquial name used to refer to the music publishing operations of the Universal Music Group of companies, all of which are directly or indirectly owned by Vivendi S.A.

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendants-Appellants-Cross-Appellees are not aware of any related cases other than Plaintiff-Appellee-Cross-Appellant's cross-appeal, Case No. 13-16107.

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ...................................................................6

I.    Section 512(f) Creates Liability for Knowing Misrepresentations That Material Is Infringing, Not for Failing to "Consider Fair Use" ....................6

    A.    The Text and Structure of § 512(f) Fail to Support Lenz's Argument ..................................................................6

    B.    Lenz's Responses to Universal's Arguments Regarding the Interpretation of § 512(f) Fail....................................12

II.    *Rossi* Controls Lenz's Claim and Ends Her Case .........................20

    A.    *Rossi* Forecloses Lenz's Proposed Requirement That a Copyright Owner "Consider Fair Use" or Suffer § 512(f) Liability ..................................................................21

    B.    Lenz's Arguments for Distinguishing or Ignoring *Rossi* Fail............23

        1.    *Rossi*'s Subjective Standard Does Not (and Cannot) Apply Only to "Factual Investigations"...................................23

        2.    *Rossi's* Construction of § 512(f) Was Not "Dicta" .................28

        3.    Lenz's Analogies to Good Faith in Other Legal Contexts Are Irrelevant ........................................................32

        4.    Lenz's Policy Arguments Do Not (and Cannot) Undermine *Rossi* .....................................................32

    C.    Universal Satisfied Any Requirement to "Consider Fair Use" *Ex Ante* That Could Be Required Under § 512 ................................34

        1.    Universal Gave Lenz's Posting All the "Fair Use Consideration" § 512 Could Reasonably Be Construed to Require—and Lenz Failed to Show That Universal Was Bound to Find "Let's Go Crazy #1" to Qualify for the Fair Use Defense................................................34

        2.    Universal Never Admitted That It Did Not "Consider Fair Use**"** ...................................................................41

III.    The District Court Should Have Granted Summary Judgment for Universal on Lenz's Claim Based on "Willful Blindness." ..........................42

iii

# TABLE OF CONTENTS

**Page**

IV.   Lenz's § 512(f) Claim Fails Because She Failed to Produce Any
      Evidence That She Incurred Any Damages as a Result of the Removal
      of Her Posting ................................................................................46

    A.   Lenz Bore the Burden of Proving That She Incurred Actual
           Monetary Loss ................................................................................46

    B.   Lenz Presented No Evidence Showing That She Incurred Any
           Actual Damages ................................................................................48

        **1.**   The Loss of YouTube's Hosting Services and "Chilling"
                of Lenz's First Amendment Rights ...........................................48

        2.   Lost Time and Resources ...........................................................49

        3.   Attorney's Fees and Costs .......................................................49

V.    CONCLUSION ................................................................................51

iv

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ............................................................... 37

*Alcoa, Inc. v. Bonneville Power Admin.*,
  698 F.3d 774 (9th Cir. 2012) ................................................................ 31

*Am. Geophysical Union v. Texaco, Inc.*,
  60 F.3d 913 (2d Cir. 1994) .................................................................. 38

*Barapind v. Enomoto*,
  400 F.3d 744 (9th Cir. 2005) ................................................................ 31

*Best Life Assur. Co. of Cal. v. C.I.R.*,
  281 F.3d 828 (9th Cir. 2002) ................................................................ 30

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ......................................................................... 8, 41

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ................................................................. 39

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................. 43

*Commil USA, LLC v. Cisco Sys., Inc.*,
  720 F.3d 1361 (Fed. Cir. 2013) ............................................................ 45

*Dellar v. Samuel Goldwyn, Inc.*,
  104 F.2d 661 (2d Cir. 1939) ................................................................. 14

*Disney Enterprises, Inc. v. Hotfile Corp.*,
  2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ...................................... 25

*Dudnikov v. MGA Entm't, Inc.*,
  410 F. Supp. 2d 1010 (D. Colo. 2005) ................................................. 25

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ............................................................................. 47

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
  547 F.3d 1095 (9th Cir. 2008) .............................................................. 19

*Folsom v. Marsh*,
  9 F. Cas. 342 (C.C. D. Mass. 1841) ..................................................... 15

*Gaylord v. United States*,
  595 F.3d 1364 (Fed. Cir. 2010) ............................................................ 39

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011) ................................................................. passim

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ......................................................................... 8, 27

*Higgins v. Detroit Educ. Television Found.*,
  4 F. Supp. 2d 701 (E.D. Mich. 1998) ................................................... 39

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Jackson v. Warner Bros., Inc.*,
   993 F. Supp. 585 (E.D. Mich. 1997) ...................................................39

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
   559 U.S. 573 (2010)....................................................................................11

*Liparota v. United States*,
   471 U.S. 419 (1985)..............................................................................11, 12

*Maxtone-Graham v. Burtchaell*,
   803 F.2d 1253 (2d Cir. 1986) ...............................................................15

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) ..........................................................31, 33

*Miranda B. v. Kitzhaber*,
   328 F.3d 1181 (9th Cir. 2003) ...............................................................31

*Monge v. Maya Magazines, Inc.*,
   688 F.3d 1164 (9th Cir. 2012) ......................................................passim

*Online Policy Group v. Diebold, Inc.*,
   337 F. Supp. 2d 1195 (N.D. Cal. 2004)..........................................26, 27

*Ouellette v. Viacom Int'l, Inc.*,
   2012 WL 1435703 (D. Mont. Apr. 25, 2012)....................................25

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .................................................................8

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996) ...........................................................14, 15

*Ringgold v. Black Entm't Television, Inc.*,
   126 F.3d 70 (2d Cir. 1997) .....................................................................39

*Rossi v. Motion Picture Ass'n of Am., Inc.*,
   391 F.3d 1000 (9th Cir. 2004) ......................................................passim

*Rubin v. Boston Magazine Co.*,
   645 F.2d 80 (1st Cir. 1981).....................................................................38

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir. 1987) ......................................................................41

*Sony BMG Music Entm't v. Tenenbaum*,
   660 F.3d 487 (1st Cir. 2011)...................................................................37

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)...................................................................................8

*Television Digest, Inc. v. U.S. Tel. Ass'n*,
   841 F. Supp. 5 (D.D.C. 1993)...............................................................38

*Tuteur v. Crosley-Corcoran*,
   ___ F. Supp. 2d ___, 2013 WL 4832601 (D. Mass. Sept. 10, 2013) ...........18, 25

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*UMG Recordings, Inc. v. MP3.com, Inc.*,
  92 F. Supp. 2d 349 (S.D.N.Y. 2000) ......................................37

*United States v. Johnson*,
  256 F.3d 895 (9th Cir. 2001) .................................................31

*United States v. Nguyen*,
  493 F.3d 613 (5th Cir. 2007) .................................................45

*Woods v. Interstate Realty Co.*,
  337 U.S. 535 (1949) ...............................................................30

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ...............................................41

## FEDERAL STATUTES

17 U.S.C. § 106 ...............................................................................8

17 U.S.C. § 107 ..................................................................8, 36, 28

17 U.S.C. § 107(1) ...........................................................................9

17 U.S.C. § 107(3) .........................................................................40

17 U.S.C. § 115 ...............................................................................9

17 U.S.C. § 115(b)(1) .......................................................................9

17 U.S.C. § 504(a)-(c) ...................................................................47

17 U.S.C. § 512 ......................................................................passim

17 U.S.C. § 512(c) .........................................................................25

17 U.S.C. § 512(c)(3)(A)(v) .......................................10, 11, 12, 25

17 U.S.C. § 512(f) ...................................................................passim

17 U.S.C. § 512(g)(2)-(3) ..........................................................9, 10

17 U.S.C. § 512(g)(2)(C) ...............................................................33

17 U.S.C. § 512(g)(3) .....................................................................19

17 U.S.C. § 1203(c)(1)-(3) ............................................................47

17 U.S.C. § 1203(c)(1)(A) .............................................................47

## FEDERAL RULES

Fed. R. Civ. P. 11 ...........................................................................32

## LEGISLATIVE MATERIALS

H.R. Rep. No. 105-551, pt. 2 (1998) ..............................................10

S. Rep. No. 105-190 (1998) .......................................................5, 14

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

### OTHER AUTHORITIES

Automattic Terms of Service, *available at* http://en.wordpress.com/tos/ ...............13

Blogger Content Policy**,** *available at* http://www.blogger.com/content.g ..............13

David Nimmer, *"Fairest of Them All" and Other Fairy Tales of Fair Use*,
66 Law & Contemp. Probs. 263 (2003).................................................15

Google Inc. Terms of Service, *available at*
http://www.google.com/intl/en/policies/terms/ ...................................13

Google+ Additional Terms of Service, *available at*
http://www.google.com/+/policy/pagesterm.html ...........................13

Pierre N. Leval, *Toward A Fair Use Standard*,
103 Harv. L. Rev. 1105 (1990).........................................................15

Tumblr, Inc. Terms of Service, *available at*
http://www.tumblr.com/policy/en/terms_of_service.........................13

Twitter Inc. Terms of Service, *available at* https://twitter.com/tos........................13

YouTube Terms of Service, *available at*
http://www.youtube.com/static?template=terms ...............................13

iv

## INTRODUCTION AND SUMMARY OF ARGUMENT

Section 512(f) creates liability only for those who "*knowingly* materially *misrepresent[] . . . that material . . . is infringing*." 17 U.S.C. § 512(f) (emphasis added). *Rossi v. Motion Picture Ass'n of Am., Inc*., 391 F.3d 1000 (9th Cir. 2004) holds that § 512(f) means what it says: "there must be a demonstration of some *actual knowledge of misrepresentation* on the part of the copyright owner." *Id*. at 1005 (emphasis added). Under these controlling standards, Lenz's § 512(f) claim fails. There is no evidence in the record—none—that Universal actually knew that it was misrepresenting Lenz's "Let's Go Crazy #1" posting as infringing. Absent evidence that Universal had such actual, subjective knowledge, Lenz's § 512(f) claim is at an end. To avoid this straightforward result, Lenz and her *amici* urge the Court rewrite both the statute and *Rossi*. The Court should decline these invitations.

*Lenz's interpretation of § 512(f) cannot be squared with the statute's text, the legislative history, precedent or common sense*. Contrary to the statute's plain language, Lenz first argues that § 512(f) should not require that the copyright owner know it is misrepresenting that "the material"—here, "Let's Go Crazy #1"—"is infringing." Lenz argues that § 512(f) instead should be construed to impose liability if the copyright owner knows that it has not "considered fair use." Under Lenz's proposed reading of § 512(f), a copyright owner's failure to consider

1

fair use "complete[s]" the violation—regardless of whether the underlying use could even qualify for the fair use defense. (Lenz Br. at 31.)

Lenz's proposed interpretation of § 512(f) is inconsistent with the language and structure of § 512(f), which is centered on the copyright owner's representation that "material . . . is infringing," not on the copyright owner's representation about the procedure it followed to arrive at that conclusion. Lenz's reading is inconsistent with *Rossi*, where the Court held there was no evidence of a knowing misrepresentation, even though the defendant's representative did not actually look at the underlying material claimed to infringe, much less "consider" whether the fair use defense would excuse the infringement the representative believed to be occurring. And Lenz's interpretation of § 512(f) is inconsistent with Congressional policy and common sense. Indeed, Lenz's interpretation leads directly to an anomalous and absurd result: under her reading of the statute, any copyright owner who failed to consider fair use before sending a takedown notice would be per se liable under § 512(f), even if the underlying use was blatantly infringing and could not possibly qualify for the fair use defense. Lenz cannot and does not explain how an interpretation that leads to that result can possibly be justified.

***Rossi* cannot be rewritten to embrace Lenz's "knew or should have known" standard**. Lenz next argues that the Court should construe *Rossi* to

2

sanction liability if the copyright owner "knew *or should have known* that the postings were fair [use]." (Lenz Br. at 38.) Lenz's reading of *Rossi* ignores the Court's holding that "mistake[s]," even if made "unreasonably," do not create § 512(f) liability. *Rossi*, 391 F.3d at 1005 (emphasis added). Lenz's proposed reading of *Rossi* does not just invite but practically guarantees waves of litigation under § 512(f), in particular on the defense of fair use, the most malleable of standards in all of copyright law. Lenz's proposed standard is wrong, and the statute and *Rossi* foreclose it.

*Even if, contrary to the text of § 512(f) and Rossi, a copyright owner must "consider fair use" on threat of potential § 512(f) liability, the record indisputably shows that Universal gave "Let's Go Crazy #1" all the fair use consideration the law reasonably could require*. Contrary to Lenz's contention, Universal *never* ███████████████████████████████ (Lenz Br. at 29.) Universal actually argued and demonstrated that its review satisfied any fair use requirement that reasonably could be mandated under § 512(f). Universal considered all the facts available to it that would have been relevant to determining whether a claimed incidental use of Prince's song as background music—which is the type of use Lenz claims her use was—would be a fair use. While no *ex ante* consideration of fair use should be required, the evidence in this case makes clear that Universal's review satisfied any such consideration that could be required, and

3

that Lenz failed as a matter of law to show that Universal's result would have been any different even with some additional "consideration of fair use."

**There is no triable question on Lenz's claim that Universal willfully blinded itself to fair use**.  Lenz had the burden to introduce evidence showing that (i) Universal subjectively believed there was a "high probability" that its policy was resulting in the removal of postings that would be protected by fair use, and (ii) that Universal acted deliberately to avoid learning of that fact.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011).  Lenz tacitly concedes that she has no evidence supporting either of these showings, and so instead asks the Court to rewrite yet another controlling legal standard, this one, the Supreme Court's in *Global-Tech*.  Specifically, Lenz invites the Court to hold that it is sufficient for her to present evidence not of Universal's subjective belief, but evidence that "'a reasonable actor in Universal's position would have understood that [her posting's claim to] fair use was "self-evident."'"  (Lenz Br. at 55 (quoting 1ER 20.))  Lenz's standard is inconsistent with *Global-Tech*, and the Court should reject it.  The district court's failure to grant Universal judgment on Lenz's claim of willful blindness was error.

**Universal is entitled to judgment under § 512(f) because Lenz failed to introduce any evidence that she "incurred" "any damages . . . as the result of" YouTube's removal of her posting, as the statute plainly requires**.  Lenz has not

4

and never will "incur[]" "any damages" "as the result of" YouTube's temporary removal of her posting. 17 U.S.C. § 512(f). This Court can and should reverse and direct judgment for Universal on this ground alone.

*   *   *

Lenz paints her case as one of flagrant abuse of the DMCA's notice-and-takedown procedures. It is anything but that. The undisputed evidentiary record instead shows that all parties concerned used the notice-and-takedown procedures exactly as § 512 envisions private parties would utilize them. Universal reviewed numerous unauthorized uses of Prince compositions in YouTube postings, including more than 200 just with respect to the June 4, 2007 notice that included Lenz's posting. In accordance with the songwriter's desire for his music not to be synched with YouTube postings, Universal sought to redress these unauthorized uses through YouTube's "rapid response" mechanism for removing such material. S. Rep. No. 105-190, at 21 (1998) ("Senate Report"). Lenz, in contrast, believed that it was error for her posting to be removed, and she utilized YouTube's put-back procedure to request that her posting be restored. And YouTube restored the posting, where it remains to this day. Lenz and her *amici* call the put-back procedure "insufficient," but they never acknowledge that in this case the procedure worked precisely as intended, and that Lenz had her posting restored expeditiously and without incurring any damages. On the undisputed facts, there

5

was no § 512(f) violation.  This Court should reverse the district court's order and remand with directions to enter judgment for Universal.

## ARGUMENT

### I.    Section 512(f) Creates Liability for Knowing Misrepresentations That Material Is Infringing, Not for Failing to "Consider Fair Use"

Lenz devotes the first 15 pages of her Argument section to an analysis of § 512(f) that does not account at all for *Rossi*.  (Lenz Br. at 16-30.)  The goal of all this is to show that § 512(f) somehow unambiguously creates liability for any copyright owner who sends a takedown notice without engaging in an undefined exercise of "considering fair use."  This Court is not writing on a blank slate, however.  *Rossi's* controlling construction of § 512(f) as requiring actual, subjective knowledge of a material misrepresentation ends Lenz's case.  But even if *Rossi* was not the law of the Circuit, Lenz's plain language interpretation of § 512(f) would fail.

#### A.    The Text and Structure of § 512(f) Fail to Support Lenz's Argument

Lenz argues that § 512(f) creates liability for a copyright owner who knows that it has not "considered fair use" before sending a takedown notice.  Section 512(f) says no such thing.  And, in all events, Lenz failed to introduce any evidence that Universal knew it was required to consider fair use.

First, § 512(f) on its face states that the knowing misrepresentation that counts for liability is that the "material or activity is infringing."  17 U.S.C.

6

§ 512(f). The statute does not say, as Lenz's argument requires, that the copyright owner knows that it has not conducted the investigation (considering fair use) that Lenz insists is the necessary procedural prerequisite to arrive at the conclusion that material is infringing. Even taking Lenz's reading of the statute as correct (which it is not), "considering fair use" would simply be a step in the process of reaching an ultimate conclusion whether material is infringing. Yet, under Lenz's proposed interpretation of § 512(f), the violation is "complete" based only on the supposedly implicit representation that fair use has been considered, when in fact it has not. (Lenz Br. at 31.) The plain language of § 512(f) makes it clear that it is the ultimate result of the copyright owner's review (whether "material or activity is infringing")—not a representation about the elements considered to arrive at that conclusion—that matters.

Second, Lenz's view that a § 512(f) violation is "complete" if the copyright owner does no more than fail to consider fair use leads to absurd results. (Lenz Br. at 31.) Under Lenz's interpretation, the copyright owner would be liable for damages in such a case regardless of whether the underlying use is indisputably infringing and could not possibly qualify for the fair use defense. Congress could not conceivably have intended that result.

Third, Lenz's reading does not account for the unique role that fair use plays in copyright infringement analysis. Fair use is an *affirmative defense* to conduct

7

that otherwise infringes one or more of the exclusive rights of copyright under

§ 106.  *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561

(1985) (Congress "structured [§ 107] as an affirmative defense"); *Campbell v.*

*Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (same).  Because fair use is an

"affirmative defense," the doctrine does not come into play unless "unauthorized

copying has occurred."  *Monge v. Maya Magazines, Inc.,* 688 F.3d 1164, 1170 (9th

Cir. 2012).  Lenz seizes on the fact that the Copyright Act and the Supreme Court

say that "fair use . . . is not an infringement."  17 U.S.C. § 107; *Sony Corp. of Am.*

*v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984).  But fair use is not

infringement *only after* the user has proved that its use qualifies for the defense

under the § 107 analysis.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146,

1158 (9th Cir. 2007) (party claiming fair use bears burden of proving it).

Logically, then, the failure to "consider fair use" in advance of sending a notice

cannot compel liability for the misrepresentation of infringement under § 512(f).  If

the consideration of fair use is relevant, then there *already has been* a use that

otherwise would infringe in the absence of that defense.  Accordingly, the

representation that "material . . . is infringing" is true.

Lenz argues that the fact that fair use is an affirmative defense "merely is the

procedural means by which the question is raised in litigation," and is irrelevant to

the proper construction of § 512(f).  (Lenz Br. at 25-26.)  But fair use is an

8

affirmative defense, among other reasons, because the secondary user, rather than the copyright owner, will have the knowledge about the purpose of the use, which goes to the first of the four statutory fair use factors.  17 U.S.C. § 107(1).  By contrast, a copyright holder sending a takedown notice *lacks* the information to fairly assess whether their own exclusive rights should bend to fair use in any particular case.[1]  It follows as a matter of statutory text and structure that the burden of raising and justifying fair use properly rests with the user who believes that its material or activity qualifies for that defense.

Fourth, just as § 512 provides the incentive for service providers to adopt notice-and-takedown procedures, the statute also provides incentives for service providers to adopt mechanisms where users can raise their claim of fair use, namely, through statutory put-back procedures.  *See* 17 U.S.C. § 512(g)(2)-(3).  If the user believes that its use is a fair use, she or he can raise that in a put-back notice.  The copyright owner then can evaluate the prospects for that defense in litigation.  And, if the copyright owner does not file suit expeditiously, then the

---

[1] The nature of the fair use defense is in marked contrast to the copyright owner's knowledge that a secondary user has a statutorily granted compulsory license to make and distribute phonorecords or digital phonorecord deliveries in accordance with the provisions of 17 U.S.C. § 115.  To obtain the compulsory license under § 115, the secondary user must "serve notice of intention to" obtain that compulsory license on the copyright owner.  17 U.S.C. § 115(b)(1).  Hence, the copyright owner will have actual knowledge that there is a compulsory license, which is quite unlike the question whether a use qualifies for the fair use defense.

material will be reposted. *Id*. § 512(g)(2)(B)-(C). Congress intended for this expedient procedure to protect "third parties' interests in ensuring that material not be taken down." H.R. Rep. 105-551, pt. 2, at 59 (1998). It is wholly consistent with the structure and purpose of the DMCA to expect that fair use would be raised and evaluated in accordance with the put-back procedures —where the user has the requisite information and incentives to assert that the defense applies.

Fifth, even if the Court were to agree with Lenz that 17 U.S.C. § 512(c)(3)(A)(v) requires an *ex ante* consideration of fair use, Lenz still failed to present evidence that Universal made a knowing misrepresentation. Lenz introduced no evidence that Universal knew that such an *ex ante* consideration was required prior to sending a takedown notice. Contrary to Lenz's argument, this is not a case where the knowledge of what Lenz says the law requires may be imputed to Universal. Section 512(f) requires a "knowing" misrepresentation. Under Lenz's theory, the knowing misrepresentation was that Universal knew it was required to form a "good faith belief" that Lenz's posting was "not authorized by the copyright owner, its agent, *or the law*" 17 U.S.C. § 512(c)(3)(A)(v) (emphasis added). That, in turn, required Lenz to show that Universal knew that "the law" in § 512(c)(3)(A)(v) incorporated the fair use defense. Lenz introduced no evidence to support such a showing.

10

Lenz relies on *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573 (2010), for the proposition that Universal should be charged with knowing that "the law" in § 512(c)(3)(A)(v) included the fair use defense. (Lenz Br. at 42-43.) *Jerman*, however, confirms that Lenz, to prevail under her interpretation of § 512, was required to show that Universal subjectively knew this fact. In *Jerman*, the Supreme Court interpreted a "bona fide error" defense for "violation[s]" of the Federal Debt Collection Practices Act ("FDCPA") that are "not intentional." *Id.* at 576-77. The Court held that this particular defense did not encompass legal errors. In so doing, however, the Court distinguished other statutes that, by their terms, require proof of knowledge of the law as an element of the civil or criminal wrong. As an example, the Court contrasted the statute in *Jerman* with another that required knowledge that conduct was "prohibited by the FDCPA." *Id.* at 583-84. *Jerman* also analogized to the statute under consideration in *Liparota v. United States,* 471 U.S. 419, 425 n.9 (1985), in which the Court held that a statute that proscribed "knowingly" using food stamps in a manner "not authorized by" statute or regulations required the government to show that the user *know* his or her particular use was not authorized by law. *Liparota*, 471 U.S. at 421 n.1 (quoting statute); *Jerman*, 559 U.S. at 586 n.7 (analogizing to *Liparota*). If, as Lenz insists, § 512(f) incorporates the elements of § 512(c)(3)(A)(v) into the former's knowledge requirement, then the § 512(f) incorporates a "legal element in

11

the definition of the offense," *Liparota*, 471 U.S. at 425 n.9, namely, the element of knowing what "the law" in § 512(c)(3)(A)(v) means. Lenz introduced no evidence to meet her burden on this issue. Accordingly, even if § 512(f) could impose liability for a copyright owner's failure to consider fair use, Lenz introduced no evidence showing that Universal knew it was required to undertake that consideration, and therefore she still would have no claim.

**B.     Lenz's Responses to Universal's Arguments Regarding the Interpretation of § 512(f) Fail**

Universal, in its opening brief, made a number of arguments based on text, structure, legislative history and copyright policy that demonstrated the error of Lenz's proposed interpretation of § 512(f). (*See* Universal Br. at 20-41.) Universal's responses to a number of Lenz's counter-arguments are set forth in the preceding section. Lenz advances several other arguments in response to Universal's arguments. (*See* Lenz Br. at 24-28.) None has merit.

First, Lenz insists that the statutory put-back procedures are irrelevant to the question of which party—the copyright owner or the user—has the initial obligation to raise fair use. This is so, Lenz argues, because requiring users to raise their fair use defense threatens to violate the First Amendment. (Lenz Br. at 24-25.) Lenz and her *amici's* heavy reliance on the First Amendment is misplaced, because no one involved in the notice-and-takedown process—not the service provider, not the copyright owner and not the user—is a state actor to whom the

12

First Amendment applies—a point that Lenz ultimately (and grudgingly)

concedes.[2]  (*Id.* at 61.)  Section 512 "balance[s] the need for rapid response to

potential infringement with the end-users [sic] legitimate interests in not having

---

[2] The free speech arguments by Lenz's service provider *amici* are particularly ironic.  The *amici* obviously believe that the First Amendment does not apply to private conduct related to the removal of material from their sites. The *amici's* all have terms of service that reserve to themselves the unfettered right to remove any material from their services at any time and for any reason.  *See, e.g.,* Automattic Terms of Service, *available at* http://en.wordpress.com/tos/ ("Automattic has the right (though not the obligation) to, in Automattic's sole discretion (i) refuse or remove any content that, in Automattic's reasonable opinion, violates any Automattic policy or is in any way harmful or objectionable, or (ii) terminate or deny access to and use of the Website to any individual or entity for any reason, in Automattic's sole discretion."); Google Inc. Terms of Service, *available at* http://www.google.com/intl/en/policies/terms/ ("[W]e may remove or refuse to display content that we reasonably believe violates our policies  . . . ."); Google+ Additional Terms of Service, *available at* http://www.google.com/+/policy/pagesterm.html ("Google reserves the right to restrict the content on your Google+ Page at its discretion.");  YouTube Terms of Service, *available at* http://www.youtube.com/static?template=terms ("YouTube reserves the right to decide whether Content violates these Terms of Service for reasons other than copyright infringement, such as, but not limited to, pornography, obscenity, or excessive length.  YouTube may at any time, without prior notice and in its sole discretion, remove such Content and/or terminate a user's account for submitting such material in violation of these Terms of Service."); Blogger Content Policy**,** *available at* http://www.blogger.com/content.g (providing extensive content guidelines and remedies reserved to Blogger); Twitter Inc. Terms of Service, *available at* https://twitter.com/tos ("We reserve the right at all times (but will not have an obligation) to remove or refuse to distribute any Content on the Services, to suspend or terminate users, and to reclaim usernames without liability to you."); Tumblr, Inc. Terms of Service, *available at* http://www.tumblr.com/policy/en/terms_of_service ("Tumblr retains the right to create limits on and related to use of the Services in its sole discretion at any time with or without notice. . . .Tumblr may also terminate or suspend Accounts . . . at any time, in its sole discretion.").

13

material removed without recourse." Senate Report at 21. Congress obviously understood that some material that in other contexts would be protected against government removal or punishment would be removed in cases where the underlying user thought the material should remain. That is where the put-back procedure comes in. It provides a mechanism for the user to air their differences, and for material to be restored if the copyright owner does not elect to file an infringement action. The presence of this mechanism, and the limited nature of § 512(f), shows that Congress intended the put-back procedure to be the mechanism for raising fair use.

Second, Lenz rejects the practical impossibility of performing a work-by-work, *ex ante* fair use analysis before sending any DMCA notice concerning any and every piece of infringing material online. Lenz belittled Universal's argument as a plea that "fair use is hard." (Lenz Br. at 26). The point, with which Lenz does not engage, is that to require, as Lenz would, the application of the fair use defense as a prerequisite to sending every notice for every piece of content believed to be infringing would be a practical impossibility. This Court has described fair use as "the most troublesome" and unpredictable doctrine in the whole law of copyright. *Monge*, 688 F.3d at 1170 (quoting *Dellar v. Samuel Goldwyn, Inc*., 104 F.2d 661, 662 (2d Cir. 1939)). The varied results reached by different courts when studying the same purportedly fair use underscore that difficulty. *See, e.g, Princeton Univ.*

14

*Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1390 (6th Cir. 1996) ("The statutory factors are not models of clarity, and the fair use issue has long been a particularly troublesome one."). Lenz responds that fair use is "not always hard," citing two, isolated examples of a court finding fair use at the pleading stage— along with a few cases that awarded fees after determining that a copyright holder's position was unreasonable. (Lenz Br. at 26-27.) Lenz's handful of examples fail to overcome the repeated pronouncements by the Supreme Court, this Court, other courts, and the leading commentators that speak to the complexity of applying fair use in practice.[3]

---

[3] *See, e.g., Princeton Univ. Press*, 99 F.3d at 1392 ("Fair use is one of the most unsettled areas of the law. The doctrine has been said to be 'so flexible as virtually to defy definition.'") (citation omitted); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1255 (2d Cir. 1986) ("Since Judge Hand's time, the common law doctrine has been inscribed into the Copyright Act, but the fair use inquiry continues to require a difficult case-by-case balancing of complex factors."); *Folsom v. Marsh,* 9 F. Cas. 342, 345 (C.C. D. Mass. 1841) (Story, J.) ("But, then, what constitutes a fair and bona fide abridgment, in the sense of the law, is one of the most difficult points, under particular circumstances, which can well arise for judicial discussion."); David Nimmer, "*Fairest of Them All" and Other Fairy Tales of Fair Use*, 66 Law & Contemp. Probs. 263, 287 (2003). ("Although that formulation scarcely resolves concrete cases, it provides the beginning of wisdom by acknowledging that rigid application of set formulae may itself prove inexact. In the end, reliance on the four statutory factors to reach fair use decisions often seems naught but a fairy tale."); Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105, 1106-07 (1990) ("Judges do not share a consensus on the meaning of fair use. Earlier decisions provide little basis for predicting later ones. Reversals and divided courts are commonplace. The opinions reflect widely differing notions of the meaning of fair use. Decisions are not governed by consistent principles, but seem rather to result from intuitive reactions to individual (footnote continued)

Under Lenz's interpretation, the fair use analysis would be complicated by the central, practical flaw in her proposed rule: the copyright owner will almost never have access to the full scope of information necessary to perform a fair use analysis adequately. Such an analysis would require copyright holders to consider information uniquely within the knowledge of the user who incorporated the original work. For example, the "purpose and character of the use" will be known exclusively to the poster, as it was in this matter. Lenz offers no means to obtain such information except by viewing the posting itself, thus requiring the copyright owner to guess at the user's purpose in attempting to formulate an adequate analysis of the fair use factors. And by suggesting that viewing the posting should be sufficient, Lenz assumes the answer to whether a use is fair is always clear from the posting itself.

While Lenz attempts to offer other examples of the Copyright Act requiring similar "*ex ante* judgments," every example Lenz gives is one in which the actor has all the information necessary to make the decision she describes. (Lenz Br. at 27.) A user of another copyrighted work has all the information necessary to make a judgment as to whether their own use is fair. A service provider has all the

---

fact patterns. Justification is sought in notions of fairness, often more responsive to the concerns of private property than to the objectives of copyright.").

information it would need to decide whether it is on notice of ongoing infringement. And a researcher has all the information necessary to determine whether she is circumventing a technological protection measure. In none of these instances is information relevant to the judgment entirely within the knowledge of an outside party. But if copyright owners are required to analyze others' incorporation of their works and make the determination as to whether that use is fair, the users who are not a part of that judgment process will almost always have relevant information about the intent underlying the use that the copyright owner lacks.

Third, Lenz makes the remarkable suggestion that there is no evidence supporting Universal's point about the magnitude of infringing uses on the Internet. The scope of that infringement demonstrates that adopting Lenz's view—and making every takedown notice subject to a § 512(f) suit if not preceded by a consideration of fair use—would dramatically undermine if not end the notice-and-takedown process. In fact, the record below did contain evidence of the magnitude of infringements on the Internet. (5ER 829 ¶ 9, 905 ¶ 322, 911 ¶ 362, 929-37, 941-45, 949.) After more than a decade of experience with cases involving the proliferation of infringing uses online, this Court can take judicial notice of that fact. And, if there were any doubt about the scope of infringement on the Internet, Lenz's *amici* themselves dispel it. In their brief, online service providers describe

17

the "tens of millions of DMCA notices" received by just one service provider (Google) every *month*.  Automattic *Amicus* Br. at 10.  The *amici* also concede that most notices sent are "valid, well-founded, and sent in good faith."  *Id*. at 4.  The standard that Lenz and her *amici* propose would require copyright holders to conduct a full fair use analysis in advance of every one of those tens of millions of notices.  This would obviously dismantle the expedient framework that Congress envisioned.  As one court considering this issue concluded:

> Congress did not require that a notice-giver verify that he or she had explored an alleged infringer's possible affirmative defenses prior to acting, only that she affirms a good faith belief that the copyrighted material is being used without her or her agent's permission. . . . To have required more would have put the takedown procedure at odds with Congress's express intent of creating an "expeditious," "rapid response" to "potential" infringement on the Internet.

*Tuteur v. Crosley-Corcoran*, ___ F. Supp. 2d ___, 2013 WL 4832601, at *9 (D. Mass. Sept. 10, 2013) (quoting Senate Report at 21).

Lenz and her *amici* argue against this reasoning by citing a relative (compared to the number of undisputed infringements on the Internet) handful of what they call takedown "abuses."  (*See, e.g.,* Lenz Br. at 43-45.)  Setting aside the fact that the actual facts of these claimed abuses are outside the record, many of them, as described in the briefs, involve notices that have nothing to do with

claimed copyright infringement,[4] or that appear on their face to involve claims where (if the brief facts described are believed to be true) the sender likely knew they were not a copyright owner.[5]  These extreme—and relatively isolated—examples are not this case.  The handful of claimed abuses that Lenz and her *amici* cite are not representative of the millions of takedown notices concerning unauthorized uses of copyright owners' protected works.  And the proposed liability regime that Lenz and her *amici* advocate is not the one that Congress enacted.

Finally, Lenz incorrectly claims that Universal's position is that taking down her postings and others that users may believe to be fair uses constitutes "legitimate collateral damage" in the war on copyright infringers.  (Lenz Br. at 28.) Universal is not saying any such thing and has never taken such a position.  If a user has a good faith belief that its use of a copyrighted work is fair and that the copyright owner's notice was sent in error, then the user may avail themselves of the put-back procedures in 17 U.S.C. § 512(g)(3)—a provision enacted precisely for that purpose.  As Congress explicitly intended, that procedure is fast, expedient

---

[4] *See* Automattic *Amicus* Br. at 7, citing *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1098 (9th Cir. 2008), concerning a request to take down material claimed to infringe *trademark*, which has nothing to do with § 512.

[5] *See, e.g.*, Automattic *Amicus* Br. at 11-12 (describing takedown requests sent to Tumblr and Twitter having nothing to do with copyright infringement and/or photographs taken by third parties).

and efficient—and if employed will result in the restoration of the material without damages or serious inconvenience.  The facts of Lenz's own case—with zero damage and a re-posting of her material that has been viewed over a million times (and counting)—confirm the adequacy of the put-back procedures.

In sum, Lenz's arguments cannot alter the record and the controlling law. Lenz presented no evidence that Universal believed that it was misrepresenting that her use infringed.  Lenz presented no evidence that Universal knew it had to "consider fair use," but elected to dispense with that requirement and send the notice with regard to her posting in any event.  Lenz presented no evidence that Universal subjectively believed her use to be fair, but sent the notice anyway. Lenz's claim for a violation of § 512(f) fails.

## II.    *Rossi* Controls Lenz's Claim and Ends Her Case

As noted, Lenz's textual and policy arguments, while erroneous on their own terms, presuppose that the Court is writing on a blank slate.  That is not the case, however, because *Rossi* is the law of the Circuit.  *Rossi* holds that a § 512(f) plaintiff must prove that the defendant knew it was materially misrepresenting that the plaintiff's use was infringing.  Section A, *infra*.  Lenz's proffered construction is inconsistent with *Rossi*, so Lenz asks the Court to ignore *Rossi* as dicta or to distinguish it on grounds the decision will not bear.  Lenz's arguments fail. Section B, *infra*.

20

## A.    *Rossi* Forecloses Lenz's Proposed Requirement That a Copyright Owner "Consider Fair Use" or Suffer § 512(f) Liability

*Rossi* construed § 512(f) as an "expressly limited cause of action" that requires proof of *subjective knowledge* of a misrepresentation, explicitly refusing to interpret § 512(f) to punish users who fail to conduct a "reasonable" investigation to determine whether a use is actually infringing. *Rossi*, 391 F.3d at 1004-05. *Rossi* held that § 512(f) does not punish mistakes—even unreasonable ones. *Id.* Because *Rossi* precludes liability for users who fail to conduct an investigation (even unreasonably) into whether material is actually infringing, it cannot stand alongside Lenz's proposed requirement that a user conduct a particular kind of investigation (into potential fair use) before sending a notice.

In *Rossi*, the copyright holders' representative sent a takedown notice based on a website without conducting any review for fair use of the postings in question. The representative did not download any movies, click on any links, or take any other steps to view the material and make a determination whether the fair use defense might excuse some of that conduct. *Rossi*, 391 F.3d at 1002 & n.2. The Court held that the representative complied with the DMCA because it *subjectively believed*, based on the elements of the plaintiff's website that the representative did review, that it contained infringing material. This Court made it clear that § 512(f) imposes liability on copyright holders only for subjectively improper actions. *Id.* at 1004-05. The Court rejected the plaintiff's argument that the statute requires

21

copyright owners to conduct a "reasonable" investigation to determine material actually infringes. *Id*.

> Juxtaposing the "good faith" proviso of the DMCA with the "knowing misrepresentation" provision of that same statute reveals an apparent statutory structure that predicated the imposition of liability upon copyright owners only for knowing misrepresentations regarding allegedly infringing websites. Measuring compliance with a lesser "objective reasonableness" standard would be inconsistent with Congress's apparent intent that the statute protect potential violators from *subjectively* improper actions by copyright owners.

*Id.* at 1005.

Under Lenz's proposed interpretation of § 512(f), *Rossi* would have been decided differently. Nothing in the facts or analysis in that opinion suggests that the copyright owner's representative "considered fair use." The representative did not actually look at the underlying use located at the links, much less conduct any sort of analysis of how the material found at those links would or would not qualify for the fair use defense. According to Lenz, that omission should have made the § 512(f) violation "complete." (Lenz Br. at 31-32.) *Rossi*, however, held that the statute had not been violated.

Lenz's proposed interpretation cannot stand in light of *Rossi's* clear rejection of an objective standard for § 512(f) liability. Lenz never explains what actual steps would be necessary to satisfy any requirement that a sender "consider fair use." Doing so would make the conflict between her standard and *Rossi* explicit,

22

namely, an objective standard against which § 512(f) liability must be measured. Lenz's standard presumes that the copyright holder will conduct the fair use analysis *in a particular way*, aimed at reaching the "right" answer. That necessarily imports an objective standard of liability into what Congress and this Court have both explicitly deemed a subjective question.

What is more, this Court's rejection of an objective standard in *Rossi* is the only one consistent with the goals of the DMCA. Lenz's proposed requirement of a pre-notice fair use analysis would destroy the DMCA's framework by rendering notice-and-takedown unworkable. If this Court were to require copyright owners to perform a fair use analysis in advance of sending every single notice, the "rapid response" Congress provided would be eliminated. Senate Report at 21; *see also Rossi*, 391 F.3d at 1003. The balance struck between end users and copyright owners would collapse.

**B.    Lenz's Arguments for Distinguishing or Ignoring *Rossi* Fail**

Tacitly conceding that *Rossi* dooms her claim, Lenz devotes the bulk of her argument about the case to a plea that the Court disregard the case. None has merit.

**1.    *Rossi*'s Subjective Standard Does Not (and Cannot) Apply Only to "Factual Investigations"**

Lenz first attempts to avoid *Rossi* with a hair-splitting characterization of that case as setting the standard under § 512(f) for "factual investigations" rather

23

than "legal determinations." (Lenz Br. at 33.) While Lenz concedes that *Rossi*'s subjective standard applies to "facts," Lenz insists that "legal determinations" must be governed by an objective standard. *Id*.

Nothing in § 512(f) or *Rossi* distinguishes between "factual investigations" or legal conclusions, much less supports the notion of a different standard for one versus the other for purposes of determining liability. Section 512(f) only refers to *misrepresentations*, and specifically only those that "knowingly materially" misrepresent what Lenz calls the "legal determination," namely, "that material or activity is infringing." 17 U.S.C. § 512(f). *Rossi* could not be clearer in defining the mental state required for a claim based on an error in making *that* single determination: the § 512(f) claimant must show that the copyright owner *knew* it was making a mistake; it is *not* enough "*if the copyright owner acted unreasonably in making the mistake.*" *Rossi*, 391 F.3d at 1005 (emphasis added). Nothing in *Rossi* or § 512(f) permits Lenz's proposed dissection of the "factual" from the "legal" determinations behind a takedown notice.

Nor does Lenz's proposed distinction make any sense in light of Congress's objectives, as *Rossi* articulated them. Under Lenz's reinterpretation of *Rossi*, § 512(f) excuses unreasonable mistakes in the adequacy of conducting factual investigations—which are matters completely within the copyright owner's control—but would allow second-guessing of the reasonableness of ultimate legal

24

conclusions—which a copyright owner cannot predict with guaranteed accuracy on an *ex ante* basis. That proposed dichotomy cannot fairly be described as "an expressly limited cause of action," which is how *Rossi* characterized § 512(f). *Id.* at 1004. It is an invitation to litigation that second guesses, after the fact, the reasonableness of copyright owners' conclusions that "material . . . is infringing."

None of the cases that have followed *Rossi*—and there are many—have seriously entertained, much less adopted, Lenz's proposed double-standard for factual versus legal determinations. To the contrary, all of the cases that adopted *Rossi*'s standard have done so without distinguishing between the level of knowledge applicable to a factual versus legal question.[6]

---

[6] *See, e.g.*, *Tuteur*, 2013 WL 4832601, at *6 (explaining that *Rossi* held that the "'interpretive case law and the statutory structure [of the DMCA] support the conclusion that the 'good faith belief' requirement in § 512(c)(3)(A)(v) encompasses a *subjective, rather than objective, standard*'" and that the Ninth Circuit "rejected the imposition of an 'objective standard of review for gauging the reasonableness' of a copyright owner's 'conduct in notifying' parties of an 'allegedly infringing website'"); *Disney Enterprises, Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *46 (S.D. Fla. Sept. 20, 2013) (explaining that *Rossi* held that Section 512(f) "encompasses a subjective, rather than objective [reasonableness] standard" and that "mistakes, even 'unreasonable' mistakes, do not necessarily call for liability, *so long as they are honestly believed*") (emphasis added); *Ouellette v. Viacom Int'l, Inc.*, 2012 WL 1435703, at *3 (D. Mont. Apr. 25, 2012) ("The Ninth Circuit has interpreted § 512(f) as setting a high bar for plaintiffs. Whether a copyright owner issued its takedown notice in 'good faith' is analyzed under a subjective standard."); *Dudnikov v. MGA Entm't, Inc.*, 410 F. Supp. 2d 1010, 1012 (D. Colo. 2005) ("In *Rossi*, the Ninth Circuit held that the good faith standard under § 512(c) is a subjective rather than objective standard based on the fact that a cause of action for improper infringement notifications under § 512(f) is expressly (footnote continued)

The legislative history of the DMCA that Lenz recites does not support a limitation of *Rossi*. In fact, that history does not distinguish between factual versus legal determinations *at all*. Lenz quotes various portions of the history, including the Senate Report's statement that § 512(f) was "'intended to *deter* knowingly false allegations to service providers.'" (Lenz Br. at 36 (quoting Senate Report at 49).) The Report recites "knowingly" but does not define it. This Court in *Rossi* does, and its construction is controlling. The history that Lenz recites affords no basis to read into the single statutory term "knowingly" two different meanings, one if "knowingly" refers to factual investigations and another if "knowingly" applies to legal determinations.

Lenz's main support for her factual investigation-legal conclusion dichotomy is the pre-*Rossi* decision in *Online Policy Group v. Diebold, Inc.,* 337 F. Supp. 2d 1195 (N.D. Cal. 2004). In *Diebold*, which preceded *Rossi*, the district court, without any reference to the structure or history of § 512, said that "knowingly" includes both the subjective standard of actual knowledge, and, in the alternative, an objective standard of what the sender "should have known" or "would have had no substantial doubt" about had it been "acting in good faith." *Id.* at 1204.

_____

limited to those situations where the copyright owner's notification is a 'knowing' and 'material' misrepresentation.").

*Diebold* obviously is inconsistent with *Rossi*, and the standard that the district court articulated in *Diebold* does not survive *Rossi*.  As for Lenz's argument about a double standard between factual investigations and legal determinations, the opinion in *Diebold* announces no such distinction.  Moreover, the district court in this case was the same court that decided *Diebold*, yet the court in this case did not embrace Lenz's purported distinction of *Rossi*.  The court instead held that *Diebold* was "distinguishable based on its facts."  (6ER 1046; *see also* 6ER 1006 n.5.)  In *Diebold,* the defendant's notice listed "hundreds of emails," but "the defendant failed to identify any specific emails containing copyrighted content"; moreover, the defendant "appeared to *acknowledge* that at least some of the emails were subject to the fair use doctrine."  (6ER 1046 (emphasis added).)  Here, *Diebold* is unavailing, because there is no evidence that Universal subjectively knew it was making a misrepresentation of infringement when it sent its notice to YouTube.

Lenz's double standard makes no more sense in the very context she claims it should apply—in a case that involves the consideration of fair use.  As has been long established, whether fair use excuses infringement is a "mixed question of law and fact." *Harper & Row*, 471 U.S. at 560.  Lenz's double standard would view the different elements in that "mixed question" under two separate standards.  The factual elements in the fair use question would be governed by an actual,

subjective knowledge standard, while the legal elements would be viewed under an objective lens. That would lead to terrific confusion over what part of the analysis has a legal versus a factual character.[7]

In sum, Lenz's proposed recharacterization of *Rossi* to apply only to factual investigations finds no support in the statute's text, structure or history; in *Rossi* or cases following it; or in common sense.

### 2. *Rossi*'s Construction of § 512(f) Was Not "Dicta"

Lenz next argues that *Rossi*'s construction of § 512(f) was "dicta," reasoning that because the statements on Rossi's website "virtually compel[led]" the belief that the site linked to infringing content, *Rossi*, 391 F.3d at 1005, it would have been objectively reasonable for the copyright owners' representative to believe that

---

[7] Within even the application of a single factor in the "fair use" analysis, there are both legal and factual determinations that could prompt confusion. For example, consider the single element of the "amount and substantiality of the portion" of the work incorporated into the infringing material. 17 U.S.C. § 107. Lenz's definition of "knowingly" would apply a subjective, actual knowledge standard to the factual elements underlying that factor—such as the actual length in seconds of the material adopted. And it would apply a different, objective standard to the legal elements—such as the ultimate conclusion of whether the length incorporated weighs in favor of or against a fair use determination. Still other factors relevant to this element—whether the amount incorporated is the "heart" of the work, whether the length is irrelevant because the work is a parody—are not clearly legal or clearly factual, rendering the question of which standard applies to what aspect of the question unclear. Lenz's suggested dissection of the term "knowingly" complicates—without any basis—the straightforward construction that *Rossi* (and cases following it) have already given to Congress's clear, singular requirement of subjective, actual knowledge that a copyright owner is misrepresenting that material is infringing.

28

there was infringement afoot.[8]  (Lenz Br. at 32, 35.)  Lenz argues that this Court's

opinion regarding the degree of knowledge required for § 512(f) liability therefore

was unnecessary and may be ignored in this case.

Lenz's argument misreads *Rossi*.  In *Rossi*, the plaintiff asked the Court to

"adopt a rule that in order to have 'a good faith belief' of infringement, the

copyright owner is *required to conduct a reasonable investigation* into the

allegedly offending website."  *Rossi*, 391 F.3d at 1003 (emphasis added).  As

discussed, the copyright owners' representative did not investigate the actual

content asserted to be infringing.  *Id*.  This Court therefore confronted the question

whether plaintiff's "objective standard of review for gauging the reasonableness of

the MPAA's conduct" could be squared with § 512(f).  *Id*. at 1004.  The Court

rejected that objective standard because (1) "courts interpreting other federal

statutes have traditionally interpreted 'good faith' to encompass a subjective

standard"; and (2) Congress in § 512(f) provided an "expressly limited cause of

action" that limited liability only for misrepresentations of infringement with

---

[8] Lenz's own construction of *Rossi* for the purposes of this "dicta" argument runs contrary to her own claims about what should be required of copyright holders.  In Lenz's view, it would *not* have been "objectively reasonable" for a copyright holder to determine that a takedown notice should be sent because a website's advertisements "virtually compelled" that result.  (Lenz Br. at 32-33.)  Not only would a user have to conduct an investigation into whether the site actually included infringing content, the user would have to "consider fair use," whatever that requirement demands.

subjective, actual knowledge that the use was not infringing.[9] *Id.* After

determining the very question presented—the level of knowledge required prior to

sending a takedown notice—the Court then concluded that plaintiff had failed to

meet the subjective standard of actual knowledge because the website "virtually

compels" the belief that it contained infringing material.

Lenz's dictum theory depends on a belief that the Court *could have*

concluded that the MPAA's conduct was objectively reasonable *without* reaching

the question of the degree of knowledge required.  But that is not what the plaintiff

argued, and it is not what the Court did—the Court construed whether the proposed

objective standard was consistent with § 512, and determined that it was not.

Then, the court considered whether the representative's failure to investigate the

actual content at the links in question showed subjective knowledge; the Court held

that it did not.  The Court never once held or stated (as Lenz argues) that the

MPAA's conduct was "objectively reasonable," because it rejected that as the

applicable standard and rendered the question moot.  Lenz's characterization of the

interpretation of Section 512(f) as "dictum" is simply wrong.

---

[9] The fact that the Court's § 512(f) construction is one of several reasons the Court
reached its decision does not render it "dicta."  "[W]here a decision rests on two or
more grounds, none can be relegated to the category of obiter dictum."  *Woods v.
Interstate Realty Co.,* 337 U.S. 535, 537 (1949); *Best Life Assur. Co. of Cal. v.
C.I.R.*, 281 F.3d 828, 834 (9th Cir. 2002).

Lenz cites no authority for her characterization of this portion of the *Rossi* case as "dictum." This Court has repeatedly addressed—including three times en banc—the precise question of when a prior three-judge panel's statement of law may be disregarded as "dictum."[10] Ultimately, this Court adopted a standard that Lenz never recites:

> [W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.

*Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) (quoting Judge Kozinski's opinion in *Johnson*); *see also Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 796 (9th Cir. 2012) (characterizing this standard as "the law of the circuit."). Applying this standard, *Rossi*'s construction of § 512(f) is not dicta depending on (as Lenz contends) whether it was "necessary in some strict logical sense." Because the panel "confront[ed the] issue" of knowledge under § 512(f), an issue "germane to the eventual resolution of the case," and the panel "resolve[d] it after reasoned consideration in a published opinion," *Rossi* is "the law of the circuit." *Miranda B.*, 328 F.3d at 1186; *Johnson*, 256 F.3d at 914-16.

---

[10] *See, e.g., United States v. Johnson*, 256 F.3d 895, 914-16 (9th Cir. 2001) (en banc) (Kozinski, J., concurring); *id*. at 919-21 (Tashima, J., concurring); *Miller v. Gammie*, 335 F.3d 889, 900-902 (9th Cir. 2003) (en banc) (Kozinski, J., concurring); *id.* at 902-904 (Tashima, J., concurring); *Barapind v. Enomoto*, 400 F.3d 744, 751 (9th Cir. 2005)(en banc).

### 3.    Lenz's Analogies to Good Faith in Other Legal Contexts Are Irrelevant

Lenz next tries to reason by analogy to other statutes and rules that "good faith" in § 512 encompasses the objective standard she proposes. (Lenz Br. at 39-41.)  Lenz's attempt to import objective standards from other, inapposite contexts is beside the point, given that this Court already has construed the "good faith" requirement in the precise legal context of § 512(f).  On that question, *Rossi* held that "courts interpreting other federal statutes have traditionally interpreted 'good faith' to encompass a subjective standard."  *Rossi*, 391 F.3d at 1004.  Lenz's extrapolations from other legal contexts—whether from bankruptcy law or Fed. R. Civ. P. 11—therefore are irrelevant.  Whether a bankruptcy court or a court construing obligations under Rule 11 would consider whether the exercise of "good faith" was reasonable in those context is immaterial, because this Court already confirmed that the very text under consideration here demands a subjective and not an objective standard.

### 4.    Lenz's Policy Arguments Do Not (and Cannot) Undermine *Rossi*

Lenz next argues that, unless this Court establishes an objective standard, § 512(f) is ineffectual against takedown abuses.  (Lenz Br. at 42-47.)  This is not an argument; it is an inappropriate request to ignore *Rossi* and to redraft the DMCA.  Absent any "clearly irreconcilable" authority undermining this Court's

32

decision in *Rossi*—and there is none—there is no basis to revisit the decision. *Miller*, 335 F.3d at 900.

Lenz also is wrong that *Rossi* fails to provide protection against actual abuses. If a copyright owner *actually knew* it was making a material misrepresentation that material was infringing, there would be liability under § 512(f) as construed in *Rossi*. That is not Lenz's case, however.

Lenz's policy arguments dismiss the critical safeguards for speech that Congress included in the DMCA. If a speaker has a good faith belief that a takedown was sent in error or is inappropriate, the put-back procedures provide for the expedient return of an Internet user's material. If the user believes his or her material is non-infringing based on some affirmative defense (like statute of limitations or fair use), then the speaker can submit a put-back notice that will result in the restoration of the material, unless the copyright owner files an infringement action. 17 U.S.C. § 512(g)(2)(C).

The purported DMCA "abuses" that Lenz (and her *amici*) raise do not prove the crisis she contends exists. *Amici* RIAA and MPAA have provided the Court with information that their members collectively send millions of takedown notices every year to combat widespread infringement. (RIAA Br. at 15; MPAA Br. at 3, 19-20; Automattic Br. at 10.) Despite this vast number of takedown notices, Lenz and her *amici* come up with only a handful of alleged "abuses." None of these

33

instances offer any reason to believe that the DMCA has chilled speech, as Lenz and her *amici* argue. This Court's construction of § 512(f) as requiring subjective knowledge—rather than objectively defined good faith—is entirely consistent (and indeed compelled by) the text and purpose of the DMCA, despite Lenz's alarmist claims to the contrary.

### C. Universal Satisfied Any Requirement to "Consider Fair Use" *Ex Ante* That Could Be Required Under § 512

Even if § 512(f) creates liability for failing to "consider fair use" *ex ante* (and it does not), Lenz is wrong that she showed Universal did not consider fair use. (Lenz Br. at 29-30.) If the Court reaches this issue, the question of standard—what does it mean to "consider fair use"—is critically important. As set forth in Section 1, *infra*, Universal submits that it gave all the consideration to fair use for Lenz's posting that the law could even arguably be held to require. Section 2, *infra*, shows that Lenz is wrong that Universal "admitted" it did not consider fair use. (Lenz Br. at 29.)

#### 1. Universal Gave Lenz's Posting All the "Fair Use Consideration" § 512 Could Reasonably Be Construed to Require—and Lenz Failed to Show That Universal Was Bound to Find "Let's Go Crazy #1" to Qualify for the Fair Use Defense

The undisputed evidence shows that Universal, before sending the notice, considered all of the information available to it that would be relevant under a formal, legal analysis of fair use. ███████████████████████████

34

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  (7ER 1146:18-1147:10; 1148:4-1154:16;

1161:15-1162:6, 1164:2-17, 1166:18-1167:19; 1174:25-1175:11, 1176:4–1178:20,

1179:10–1181:22.)  With all those considerations in mind, Universal determined

that Plaintiff's posting was unauthorized and should be included in the email to

YouTube.  No more can or should be required to establish a "consideration of fair

use" that could be consistent with Congress's objectives in § 512.

The district court held that a jury could find this review insufficient to

"consider fair use" because Universal did not conduct "some analysis of the legal

import of the facts."  1ER 18.  Lenz, unsurprisingly, does not attempt to defend this

standard.  It would require individualized analysis of the application of law to

particular facts.  Requiring such review for every single piece of the many millions

of uses that are the subject of a takedown notice would be a practical impossibility

and would undermine the entire notice-and-takedown regime that Congress

incentivized in § 512.

In addition to refraining from embracing the district court's unworkable

standard, Lenz does not offer any definition of her own of what it means to

"consider fair use."  Lenz's omission is telling, and is further evidence that failing

35

to consider fair use does not create § 512 liability.  If the Court disagrees, however, then no more should be required than that the copyright owner (or its agent) followed a policy that took into account those facts that then were available to the copyright owner and that would be relevant to a fair use defense, were one to be raised.

As applied to Lenz's "Let's Go Crazy #1" posting, it is clear that Universal gave the posting all such consideration based on the facts then available to Universal as of the date it sent the notice.  The undisputed facts show that, regardless of the label placed around it, Universal's review considered precisely those facts that would be relevant to a fair use defense of a posting like Lenz's— and that there is no evidence that the conclusion of Universal's review (that Lenz's posting was unauthorized and should be removed) could or would have been any different with further legal analysis.

***The Purpose and Character of the Use***.  Lenz concedes that the first element of the fair use analysis considers whether the use is commercial or non-commercial.  *See* 17 U.S.C. § 107(1).  Tacitly conceding that Universal actually considered this factor, Lenz takes issue with how it did so:  that Universal should not consider whether the *context* is commercial, but whether *Lenz's motives* were commercial or non-commercial.  (Lenz Br. at 48.)  Universal had no way of knowing Lenz's motives upon viewing the posting—that is information wholly

36

within Lenz's knowledge. Lenz's attempt to isolate her posting from its context by calling it a "home video" is inaccurate. Posting the video on YouTube allowed for the reproduction and synchronization of the composition in a posting displayed on an indisputably commercial service that made that posting available to *millions*. 4ER 526 (webcapture of Lenz's YouTube posting). Courts routinely consider the *context* in which a claimed personal use is made to determine if it is of a commercial nature. For example, this Court *rejected* the argument that music "uploaders" on peer-to-peer services—people who place copyrighted content in "share" folders available for others to copy—are engaged in non-commercial uses simply because they do not profit from the use. *See A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1015 n.4 & 1019 (9th Cir. 2001) (rejecting argument that so-called "space-shifting" use of Napster was fair use because once music is in folder "the song becomes 'available to millions of other individuals,' not just the original CD owner") (citing *UMG Recordings, Inc. v. MP3.com, Inc.,* 92 F. Supp. 2d 349, 351-52 (S.D.N.Y. 2000)); *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 497 n.10 (1st Cir. 2011) (citing *Napster* for proposition that "what constitutes a commercial use [for the '"fair use" exception'] has also been interpreted broadly"). Lenz's dismissal of YouTube's commercial nature cannot be reconciled with

37

*Napster* or with other cases holding that the context in which a use is made is relevant to whether the use is commercial.[11]

Lenz also claims that her use is "transformative," in that it used the composition "in the genre of family home videos," and added "additional creative elements." (Lenz Br. at 49.) Universal was not required to conclude that Lenz's use was "transformative," based solely on its viewing of the video. This purportedly transformative purpose is not obvious from the posting standing alone.

While several examples of "transformative" works have been recognized over the years, "the genre of family home video" is not one of them. "Transformative" works include those that offer commentary or criticism, or parody—purposes different from the original. Lenz's use of the composition — as a background track to persuade her children to dance (as she claimed in her Second Amended Complaint) — serves entirely the same purpose as the original

---

[11] *See, e.g.*, *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) (although copying of journal articles by in-house researchers was not "commercial exploitation," the court "need not ignore the for-profit nature" or "indirect economic advantage" that Texaco obtained because of the use); *Rubin v. Boston Magazine Co.*, 645 F.2d 80, 84 (1st Cir. 1981) ("[Plaintiffs] irrefutably showed that the copyrighted material was used as a quiz to entertain readers of a magazine of general circulation. Plainly, the district judge correctly concluded that the defendants' use of the plaintiff's copyright was 'of a commercial nature.'"); *Television Digest, Inc. v. U.S. Tel. Ass'n*, 841 F. Supp. 5, 9-10 (D.D.C. 1993) ("USTA may not have directly profited in the sense of monetary gain; however there is no dispute that USTA saved money by photocopying . . . .").

composition, weighing against a finding that it is "transformative." If the new work simply incorporates the original into a new media with the same purpose and minimal additions (as Lenz's does), that is not "transformative" as a matter of law. *See Cariou v. Prince*, 714 F.3d 694, 711 (2d Cir. 2013). For example, in *Gaylord v. United States*, the Federal Circuit denied the claim that a U.S. postage stamp depicting a sculptor's copyrighted work was "transformative," because both the stamp and the sculpture had the same purpose, and the new work included minimal additions. 595 F.3d 1364, 1372-73 (Fed. Cir. 2010). To be "transformative" a work should convey, "a new expression, meaning, or message," none of which can be gleaned from Lenz's posting as a matter of law. *Id*. To the contrary, Lenz's use, like the published photographs with commentary in *Monge*, was (at best) "minimally transformative." 688 F.3d at 1176.

Instead, Lenz's use appears to be exactly what she characterized it to be in the district court—an "incidental" use of the work in the "background" of the domestic scene she was capturing on video. *See* 8ER 1560 (describing use as "incidental background music"). Although Lenz belittles Universal's consideration of whether the song was the focus of the video, that is the pivotal fair use question in reviewing such incidental uses. *See Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997); *Higgins v. Detroit Educ. Television Found.*, 4 F. Supp. 2d 701, 707 (E.D. Mich. 1998); *Jackson v. Warner*

*Bros., Inc.*, 993 F. Supp. 585, 589 (E.D. Mich. 1997). Lenz never responds to these cases, or the fact that Universal's consideration of her posting reviewed those facts known to Universal that would be relevant in weighing such an incidental use.

  ***The Nature of the Copyrighted Work.*** Lenz dismisses the fact that "Let's Go Crazy" is precisely the type of creative work the Copyright Act is designed to protect. Lenz instead tries to dismiss this factor on the ground that Prince already received sufficient compensation. This is not a reasonable construction of the second factor.

  ***The Amount and Substantiality of the Work.*** Lenz claims that this factor must weigh in her favor, because "the entire video is less than thirty seconds long." (Lenz Br. at 50.) But the proper consideration is "the portion used in relation to the copyrighted work as a whole," which in this case is less than five minutes long. 17 U.S.C. § 107(3). The inquiry is not merely quantitative, it is qualitative: a use that incorporates the "heart" of the work weighs against a fair use finding. *Monge*, 688 F.3d at 1178. ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ (8ER 1389:4-1395:16.)

The title of the posting itself incorporated the name of the work. Universal was not bound to weigh this factor in favor of fair use.

*Effect Upon the Potential Market.*  Lenz incorrectly focuses on her isolated use.  The U.S. Supreme Court has confirmed that it is not the single use that is at issue but "whether unrestricted and widespread" similar uses would adversely impact the market.  *Campbell*, 510 U.S. at 590.  And despite Lenz's claims to the contrary, fair use case law makes clear that ███████████████████████ ██████████ is a relevant consideration regarding the analysis under the fourth fair use factor, since the copyright owner has the "right to change his mind" regarding whether to license uses of his works.  *Monge*, 688 F.3d at 1181 (quoting *Worldwide Church of God v. Philadelphia Church of God, Inc*., 227 F.3d 1110, 1119 (9th Cir. 2000)); *Salinger v. Random House, Inc.,* 811 F.2d 90, 99 (2d Cir. 1987).

In sum, Lenz is simply wrong that Universal "*would* have concluded" that Lenz's use was excused by the fair use defense had Universal marched through the four fair use factors.  (Lenz Br. at 48.)

## 2. Universal Never Admitted That It Did Not "Consider Fair Use"

Lenz incorrectly asserts that Universal made admissions in the district court that it did not consider fair use.  (Lenz Br. at 29.)  That is wrong, and Lenz ignores the fact that she has not offered—and in her appellate brief still does not offer—any definition of what it means to "consider fair use" for purposes of purportedly complying with § 512.

41

Lenz tries to weave a Universal "policy" of refraining from considering fair use from a series of deposition snippets cited by SER number at footnotes 32-34 of her brief. The excerpts are from the deposition of Robert Allen, Universal's then-head of business affairs who established the guidelines for reviewing postings of Prince music to YouTube and who supervised Sean Johnson, the employee who actually reviewed the postings (including Lenz's). Contrary to Lenz's characterization, Allen never stated that Universal had a policy of not considering fair use. Allen actually testified at length as to the basis for Universal's conclusion that postings made unauthorized use of Prince compositions, including that the analysis turned on whether the composition was the focus of the posting. Allen's testimony referred to Universal's guidelines and the application of them, all of which were explored at length in discovery, and all of which must be considered to resolve whether Universal "considered fair use," if that is the standard this Court adopts. (*See, e.g.*, 7ER 1165-68, 1174-1181.)

## III. The District Court Should Have Granted Summary Judgment for Universal on Lenz's Claim Based on "Willful Blindness."

Lenz concedes that the Supreme Court's controlling standard for willful blindness requires that she show Universal (1) subjectively believed that there was a high probability that its policy sought takedowns of postings that qualified for the fair use defense, and (2) took deliberate actions to avoid learning of that fact.

42

*Global-Tech*, 131 S. Ct. at 2070. Lenz failed to raise a genuine issue as to either of these standards.

Lenz cannot and so does not dispute the district court's holding that the record is "devoid of evidence that Universal subjectively believed that fair use might apply to Lenz's video," 1ER 19 n.3. Nor does she contest the district court's ruling that Lenz failed to produce any evidence that Universal *subjectively* was aware, as of June 4, 2007, that there was a "high probability" that postings incorporating Prince compositions constituted fair use. 1ER 20. Lenz introduced no evidence as to Universal's subjective knowledge on either ground.

Lenz does not even attempt to defend the district court's conclusion that, notwithstanding Lenz's failure to introduce evidence establishing the first element, Universal could not obtain summary judgment because it failed to prove a negative, namely, "that it *lacked* a subjective belief that there was a high probability that any given video might make fair use of a Prince composition." 1ER 20. That holding, as Universal demonstrated, is wrong under *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), a point that Lenz cannot and does not dispute.

Lenz nevertheless argues that she adduced sufficient evidence to defeat summary judgment on the first prong of *Global-Tech* because a "a reasonable actor would have understood" that her posting constituted a self-evident fair use, or that

"a reasonable actor would have understood" that Universal's review process would identify fair uses as infringing. (Lenz Br. at 55.) Lenz's attempt to create a fact dispute on willful blindness based on Universal's review of *her* posting is bootstrapping that cannot satisfy *Global-Tech*. For this theory to make any logical sense, Universal would have had to immediately and necessarily recognize that her posting qualified for the fair use defense, but then must have had to deliberately ignore that possibility. But, as the district court held, Lenz introduced no evidence that Universal had any inkling that her posting was a fair use. Indeed, her theory (and all of her argument, discussed above) was that Universal deliberately blinded itself to the possibility of fair uses in YouTube postings *before* Sean Johnson reviewed *her* posting. Lenz introduced no evidence that Universal subjectively knew of the possibility before reviewing her posting, and when Universal did review her posting, that could not have magically created, *nunc pro tunc*, a non-existent pre-existing subjective knowledge.

Lenz's alternative theory—that a jury could infer subjective knowledge by what a "reasonable actor would have understood"—is not the *Global-Tech* standard. It is a "negligence" standard, which is not sufficient under *Global-Tech*. Lenz asserts that evidence of what "a reasonable actor would have understood" is circumstantial evidence of what Universal actually understood, and that a jury would be permitted to infer from this purported circumstantial evidence that

44

Universal had actual, subjective knowledge.  Lenz cites no authority for this proposition, and for good reason:  there is none, and the proposition is flatly inconsistent with *Global-Tech*.  In *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361 (Fed. Cir. 2013), the Federal Circuit rejected an argument precisely like the one Lenz makes here.  In *Commil*, the Court considered whether a jury instruction reciting a negligence standard was consistent with the knowledge standard announced in *Global-Tech*.  *Id.* at 1366.  The plaintiff argued that the instruction's negligence standard simply allowed the jury to divine actual knowledge based on "circumstantial evidence" of what a reasonable actor should have known.  *Id.*  The Federal Circuit rejected that argument as inconsistent with the requisite knowledge standard announced in *Global-Tech*.[12]  *Id.*  This Court should do the same.

In any event, Lenz does not point to what *evidence*—other than the video itself—would supposedly establish her *ipse dixit* claim of the "self-evident" fair use in her posting.  No actual viewer—including Lenz and her own counsel—actually understood what Lenz claims a reasonable actor would have understood.

---

[12] The Fifth Circuit rejected the same theory even before *Global-Tech*, holding that the "first prong permits a deliberate ignorance instruction only when the Government presents facts that support an inference that the particular defendant *subjectively* knew his act to be illegal *and not when the Government presents facts that tend to support an inference that a reasonable person would have known* the act to be illegal."  *United States v. Nguyen,* 493 F.3d 613, 619 (5th Cir. 2007) (second emphasis added) (citation and internal quotation marks omitted).

████████████████████████████████████████████

███████████████████████████████████████ (4ER 502;

*id.* 590:1-16, 592:24-593:2, 605:19-25; 606:23-607:6; 4ER 653; 8ER 1329; *see also*

8ER 1422:2-8.)

Lenz failed not only to satisfy *Global-Tech's* first requirement but its second

as well.  Lenz, like the district court, cites evidence that purportedly shows

Universal's guidelines were not sufficient to recognize fair uses of Prince

compositions.  Lenz, however, did not introduce any evidence showing that

Universal instituted the guidelines that it did "to avoid learning of" possible fair

uses. *Global-Tech*, 131 S. Ct. at 2070.  Lenz's willful blindness argument fails.

## IV.    Lenz's § 512(f) Claim Fails Because She Failed to Produce Any Evidence That She Incurred Any Damages as a Result of the Removal of Her Posting

### A.    Lenz Bore the Burden of Proving That She Incurred Actual Monetary Loss

Section 512(f) does not create liability unless the plaintiff actually

"incurred" damages "as the result of" the service provider's removal of the

plaintiff's posting.  17 U.S.C. § 512(f).  Lenz failed to meet her burden to prove

damages under § 512(f).  Despite shifting theories of damage throughout the

district court proceedings, Lenz failed to proffer *any* evidence that she ever

actually lost—or ever stands to lose—even a penny as the result of YouTube's

temporary removal of her posting.  Lenz insists that the statute's use of the term

46

"any damages," must allow a claim of "nominal damages," which for Lenz means damages that do not have any proof of monetary loss. Lenz's repeated focus on the word "any," however, ignores the statutory requirement that, whatever the damages, they must actually be "*incurred*." *Id.* (emphasis added). It simply is not possible for someone to "incur" damages where there is no monetary loss. Accepting Lenz's theory would override this critical limiting component of damages under § 512(f). It also would make § 512(f) inconsistent with the law of misrepresentation, which requires the plaintiff to show "*actual economic loss.*" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 336-37 (2005) (emphasis added). Nothing in the text, structure or legislative history of § 512 shows that Congress intended to reverse the common law presumption. The word "incurred," in fact, shows just the opposite intent.

Lenz claims that the use of the words "actual damages" in an *entirely different* title of the DMCA—concerning prohibitions on circumvention of content-protection technology—shows that Congress intended for § 512(f) to allow recovery of something other than losses the plaintiff actually incurred. (Lenz Br. at 60 (citing 17 U.S.C. § 1203(c)(1)(A)).) The use of "actual damages" in that unrelated provision shows no such intent. The Copyright Act has long used the term "actual damages" to be contrasted with "statutory damages" as a remedy for copyright infringement. *See* 17 U.S.C. § 504(a)-(c). Section 1203(c)(1)-(3) simply

47

carries forward this distinction between "actual" and "statutory" damages as alternative remedies for civil violations of the anti-circumvention provisions (albeit with a different range of statutory damages for violations of the latter provision). There is no significance to be drawn from the use of "actual damages" in this unrelated provision of the statute, as contrasted with the word "any" in § 512(f).

### B. Lenz Presented No Evidence Showing That She Incurred Any Actual Damages

Lenz's three categories of damages asserted at summary judgment fail to demonstrate that she incurred—or ever has any risk of incurring—actual monetary loss.

### 1. The Loss of YouTube's Hosting Services and "Chilling" of Lenz's First Amendment Rights

Lenz's arguments regarding the loss of YouTube hosting services and the "chilling" effect on her First Amendment rights lack any basis in fact or law.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████        (4ER 512; *accord* 8ER 1426.)  Any loss that she now claims for unidentified "nominal" damages arising out of the loss of those services is simply nonsensical.

48

Lenz's claims for so-called "First Amendment" damages are equally specious. She concedes as much—acknowledging that Universal is not a state actor, so no claim for First Amendment damages may lie. (Lenz Br. at 61.) Second, the claim that Lenz has been "chilled" in exercising simply belies the record – and therefore has no basis in fact. (*See, e.g.,* 4ER 672-78.)

### 2.    Lost Time and Resources

Lenz's attempt to impute the minimum wage value of her claimed lost time fails as a matter of law because she admitted that she did not actually lose *any* wages. (4ER 561:18-20, 611:2-24.) The district court erred when it held that "Lenz must have incurred at least minimal expenses for electricity to power her computer, internet and telephone bills, and the like, that potentially could be recoverable under § 512(f)"—because it did so in the total absence of any evidence that such expenses had been incurred by Lenz. (1ER 22.)

### 3.    Attorney's Fees and Costs

Finally, Lenz's claim that she incurred fees from work done by lawyers in responding to Universal's notice and in bringing this lawsuit fails. Lenz never had, and never will have, an obligation to pay her lawyers any money out of her own pocket for their work on the counter-notification, or anything else. Lenz's citations to cases where attorney's fees are recoverable for pro bono counsel are unavailing and change nothing. To constitute damages under § 512(f), the fees must have

been "incurred." The point is to restore the Lenz in the position she would have been in had the posting not been removed. If Lenz never had to pay her lawyer, and never has to pay her lawyer, then she never actually lost anything—nothing was "incurred . . . as the result of" the posting's removal.

Lenz further argues that the supposed fees and costs of her lawyers in *this litigation* demonstrate damages under § 512(f). This is wrong for two reasons. First, Lenz has not incurred, and never will incur, any such fees or costs. Second, as the district court correctly held, the costs of litigating a § 512(f) claim cannot constitute costs and fees "incurred" "*as the result of*" YouTube's action. A contrary rule would allow any plaintiff to create the damages required to have a claim simply by filing suit.

Lenz's refined argument, on summary judgment, that her claim for "attorney's fees" was isolated to only those fees allegedly "incurred" in pre-litigation efforts to restore her posting to YouTube is equally unavailing because Lenz "incurred" no fees during that time at all. (4ER 616:3-23.)

Ultimately, Lenz introduced no evidence of damages "incurred" under the plain meaning of Section 512(f). This failure of proof is fatal to Lenz's claim and entitled Universal to summary judgment.

50

## V.    CONCLUSION

Universal respectfully submits that the district court's denial of Universal's motion for summary judgment should be reversed, and the case should be remanded with instructions to enter judgment for Universal.

DATED: February 4, 2014            MUNGER, TOLLES & OLSON LLP


            _____/s/Kelly M. Klaus_____
                    Kelly M. Klaus

                    *Attorneys for Universal*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I hereby certify that the attached brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B)(i).  It is proportionately spaced using Microsoft Word 2010 in 14 point Times New Roman type, and contains 12,864 words, not including those sections excluded in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

DATED: February 4, 2013                MUNGER, TOLLES & OLSON LLP


                                       _____/s/ Kelly M. Klaus_____
                                       Kelly M. Klaus

                                       *Attorneys for Universal*

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2014, I caused this public, redacted version of the foregoing Appellants' Third Brief on Cross-Appeal to be electronically filed with the Clerk of the Court for the United States Court of Appeals by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service of this public, redacted version will be accomplished by the appellate CM/ECF system.

DATED:  February 4, 2014                MUNGER, TOLLES & OLSON LLP


_____ */s/ Kelly M. Klaus*_____
Kelly M. Klaus

*Attorneys for Universal*

<u>Lenz v. Universal Music Corp, et al.,</u>
U.S. Court of Appeals, 9th Circuit Case Nos. 13-16106, 13-16107
**<u>Service List</u>**

KEKER & VAN NEST, LLP
Michael S. Kwun
Theresa H. Nguyen
Ashok Ramani
633 Battery Street
San Francisco, CA 94111-1809
Tel: (415) 391-5400
Fax: (415) 397-7188
Email:  aramani@kvn.com; mkwun@kvn.com; rnguyen@kvn.com

***Served via Hand Delivery***